# EXHIBIT B

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:                )        CDC Number J-03392
                           )
JOSE FLORES                )
                           )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JUNE 15, 2006

9:55 A.M.


PANEL PRESENT:

JACK GARNER, Presiding Commissioner
FERNANDO PEREZ, Deputy Commissioner

OTHERS PRESENT:

JOSE FLORES, Inmate
MARCIA HURST, Attorney for Inmate
RICHARD SACHS, Deputy District Attorney (video)
Araceli Zavala, Interpreter
CORRECTIONAL OFFICERS, Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No     See Review of Hearing
_____  Yes    Transcript Memorandum


**Ramona Cota            Peters Shorthand Reporting**

ii

## INDEX

|  | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 11 |
| Pre-Commitment Factors | 21 |
| Post-Commitment Factors | 28 |
| Parole Plans | 24 |
| Closing Statements | 38 |
| Recess | 43 |
| Decision | 44 |
| Adjournment | 51 |
| Transcriber Certification | 52 |

--oOo--

1

1               **P R O C E E D I N G S**

2          **PRESIDING COMMISSIONER GARNER:**    All

3     right, this is a Subsequent Parole Consideration

4     Hearing for Jose Flores, F-L-O-R-E-S, CDC number

5     J like John 03392.   The date today is June 15,

6     2006, it's 9:55 a.m. we are located at the

7     Correctional Training Facility in Soledad.   The

8     inmate was received on January 5, 1994, the life

9     term started on August 16, 1995 from San Diego

10    County.   The offense is kidnap for ransom, case

11    number C like Charles, R like Robert, 140788.

12    Count number two is PC 209(a).   The term was

13    seven years to life plus four years and the

14    minimum eligible parole date is August 16, 2002.

15    Other commitment offenses include use of a

16    firearm, PC 12022.5(a), same county, same case

17    number and same count number.   Stayed offenses

18    include conspiracy for kidnapping and ransom, PC

19    182(a)(1), PC 209(a), same county, same case

20    number.   That's count number one.   Use of a

21    firearm, 12022.5(a), same county, same case

22    number, count number one.   Kidnap 207, same

23    county, same case number, count number three is

24    that.   Possession of a weapon by an ex-felon is

25    12021(a), San Diego County, same case number,

26    and that's count number six.   Okay, this hearing

27    is going to be tape-recorded and for purposes of

2

1  voice identification for the transcriber each of

2  us is going to be required to give our first

3  name, last name, spelling the last name.  And

4  when we get to you, Mr. Flores, if you would

5  give us your CDC number, please.  I'll start and

6  go to my left.  I'm Jack Garner, G-A-R-N-E-R,

7  Commissioner.

8          **DEPUTY COMMISSIONER PEREZ:**  My name is

9  Fernando Perez.  It's P-E-R-E-Z.  Deputy

10  Commissioner, Board of Parole Hearings.

11          **ATTORNEY HURST:**  Marcia Hurst, H-U-R-S-T,

12  counsel for Mr. Flores.

13          **INMATE FLORES:**  My name is Jose Luis

14  Flores, F-L-O-R-E-S.  My CDC number is J-03392.

15          **INTERPRETER ZAVALA:**  Araceli Zavala, Z-A-

16  V-A-L-A, interpreter.

17          **PRESIDING COMMISSIONER GARNER:**

18  Mr. Sachs, could you identify yourself.

19          **DEPUTY DISTRICT ATTORNEY SACHS:**  Richard

20  Sachs, S-A-C-H-S, deputy district attorney.

21          **PRESIDING COMMISSIONER GARNER:**  Okay, and

22  for the record the interpreter was previously

23  sworn at an earlier hearing and we haven't

24  established on the record (inaudible).  All

25  right.  And we do have two correctional peace

26  officers in the room for purposes of security.

27  Mr. Flores and Ms. Hurst, I have the reasonable

1  accommodation form, the BTP 1073 that Mr. Flores

2  signed on August 11, 2005. And it indicates

3  that no disabilities were identified from the

4  file review and that other than an interpreter

5  and legal assistance that he didn't need any

6  other help for the hearing. I do note a grade

7  point level of 7.4 and that Mr. Flores does,

8  does speak English. Again, the services of an

9  interpreter were requested for the legal matters

10  and also an understanding of those. Let me ask

11  you, since August 11 of last year have you

12  developed any other kind of condition that we

13  would need to provide an accommodation for?

14  Hearing, seeing, anything like this?

15       INMATE FLORES:  No sir.

16       PRESIDING COMMISSIONER GARNER:  No other

17  problems?

18       INMATE FLORES:  No.

19       PRESIDING COMMISSIONER GARNER:  Okay.

20  Are you on any prescription medications?

21       INMATE FLORES:  Right now I have one for

22  my cholesterol, it's high, yeah.

23       PRESIDING COMMISSIONER GARNER:  All

24  right. You take that daily?

25       INMATE FLORES:  Yes.

26       PRESIDING COMMISSIONER GARNER:  And

27  you're all current? Do you take it in the

4

1   morning or in the afternoon?

2        INMATE FLORES:  In the evenings.

3        PRESIDING COMMISSIONER GARNER:  The

4   evening, okay.  Did you take it last night?

5        INMATE FLORES:  Yes.

6        PRESIDING COMMISSIONER GARNER:  Okay.  So

7   you're ready to go?

8        INMATE FLORES:  Yes sir.

9        PRESIDING COMMISSIONER GARNER:

10  Ms. Hurst?

11       ATTORNEY HURST:  Yes.

12       PRESIDING COMMISSIONER GARNER:  All

13  right, thank you.  This hearing is being

14  conducted pursuant to Penal Code Section 3041

15  and 3042 and the rules and regulations of the

16  Board of Parole Hearings governing parole

17  consideration hearings for life inmates.  Let me

18  stop now.  If there is some time that I get

19  going a little too fast, you don't understand

20  something, just call a stop and we'll go back

21  and make sure you have a good understanding,

22  okay.

23       INMATE FLORES:  Yes sir.

24       PRESIDING COMMISSIONER GARNER:  The

25  purpose of today's hearing is to consider your

26  suitability for parole.  In doing so we will

27  consider the number and nature of the crimes

5

1   that you were committed for, your prior criminal

2   and social history and your behavior and

3   programming since your commitment.  We have had

4   the opportunity to review your Central File and

5   your prior hearing transcript.  You will be

6   given the opportunity to correct or clarify the

7   record.  We will consider your progress since

8   your commitment and since your last hearing.

9   Your updated counselor's report and

10  psychological report will also be considered and

11  any change in parole plans should be brought to

12  our attention.  We will reach a decision today

13  and inform you whether or not we find you

14  suitable for parole and the reasons for our

15  decision.  If you are found suitable for parole

16  the length of your confinement will be explained

17  to you.  This hearing will be conducted in two

18  phases.  I will discuss with you the crime you

19  were committed for, your prior criminal and

20  social history, your parole plans and any

21  letters of support or opposition that may be in

22  the file.  Commissioner Perez will discuss with

23  you your progress since your commitment, your

24  counselor's report and your psychological

25  evaluation.  Once that is concluded the

26  Commissioners, the district attorney and your

27  attorney will be given the opportunity to ask

6

1    you questions.  The questions from the district

2    attorney will be asked through the Chair and you

3    should direct your answers back to the panel.

4    Before we recess for deliberations the district

5    attorney, your attorney and you will be given an

6    opportunity to make a final statement regarding

7    your parole suitability.  Your statement should

8    be directed to why you feel you are suitable for

9    parole.  We will then recess, clear the room and

10   deliberate.  Once we have completed our

11   deliberations we will resume the hearing and

12   announce our decision.  The California Code of

13   Regulations states that regardless of time

14   served a life inmate shall be found unsuitable

15   for and denied parole if in the judgment of the

16   panel the inmate would pose an unreasonable risk

17   of danger to society if released from prison.

18   Now Mr. Flores, you have certain rights.  The

19   rights include a timely notice to this hearing,

20   the right to review your Central File, and the

21   right to present relevant documents.  I'd ask

22   you at this time, have those rights been met?

23        **INMATE FLORES:**  Certain, yes sir.  Other

24   ones are late.  I didn't have chance to get to

25   the file, I believe.

26        **ATTORNEY HURST:**  That's all right, we can

27   turn those in today.

1          PRESIDING COMMISSIONER GARNER:  Yes,

2    that's the right to present documents.

3          DEPUTY COMMISSIONER PEREZ:  Yes, we'll

4    give you an opportunity to present them.

5          INMATE FLORES:  Thank you.

6          PRESIDING COMMISSIONER GARNER:  So with

7    that right everything has been met?

8          INMATE FLORES:  Yes sir.

9          PRESIDING COMMISSIONER GARNER:  Okay,

10   good.  You also have the right to be heard by an

11   impartial panel.  Today your panel will consist

12   of myself and Commissioner Perez.  Any

13   objections to the panel?

14          INMATE FLORES:  No sir.

15          PRESIDING COMMISSIONER GARNER:  Thank

16   you.  You will receive a copy of our written

17   tentative decision today.  That decision is

18   subject to review by the Decision Review Unit

19   and a copy of the tentative decision and a copy

20   of the transcript will be sent to you.  You may

21   recall from a previous hearing that back in May

22   of 2004 the appeal procedure of any panel

23   decision has changed and you have to go through

24   the courts.  Were you aware of that?

25          INMATE FLORES:  Yes sir.

26          PRESIDING COMMISSIONER GARNER:  Okay, all

27   right.  And you are not required to admit your

1    offense or discuss your offense if you do not

2    wish to do so.   However, this panel does accept

3    as true the findings of the court and you are

4    invited to discuss the facts and circumstances

5    of the offense if you desire.   The Board will

6    review and consider any prior statements you

7    have made regarding the offense in determining

8    your suitability for parole.   And at this time I

9    will ask Commissioner Perez if there is

10   confidential material in your Central File and

11   if we'll be using it?

12          **DEPUTY COMMISSIONER PEREZ:**   Yes,

13   Commissioner, there is confidential material in

14   Mr. Flores' Central File.   However, for purposes

15   of hearing they will not be entered into the

16   record.

17          **PRESIDING COMMISSIONER GARNER:**   Thank

18   you.   Ms. Hurst, the hearing checklist, do you

19   have all the documents?

20          **ATTORNEY HURST:**   Yes, I do have all the

21   documents.

22          **PRESIDING COMMISSIONER GARNER:**   Okay.

23   Officers, could I get that.   Mr. Sachs?

24          **DEPUTY DISTRICT ATTORNEY SACHS:**   Yes, I

25   stipulate I do have those documents,

26   Commissioner.

27          **PRESIDING COMMISSIONER GARNER:**   Thank

9

1   you.  All right, I'll ask now if we do have

2   additional documents that would like to be

3   submitted today?

4        ATTORNEY HURST:  The three.  Did you pass

5   them over yet or not?

6        PRESIDING COMMISSIONER GARNER:  Just give

7   them to the officer, thank you.

8        DEPUTY COMMISSIONER PEREZ:  And we'll

9   give these back to you.  Make sure they get into

10  the file.

11       INMATE FLORES:  Thank you sir.

12       ATTORNEY HURST:  And you already received

13  the document under the declaration of

14  Mr. Flores, which of course Mr. Sachs does not

15  have at this time.

16       INTERPRETER ZAVALA:  I'm sorry, one of

17  them is a letter, which I guess is for parole

18  plans.

19       DEPUTY COMMISSIONER PEREZ:  Yes, this one

20  is in Spanish.

21       INTERPRETER ZAVALA:  It's in Spanish.

22       DEPUTY COMMISSIONER PEREZ:  With a

23  (indiscernible) addition, okay.

24       PRESIDING COMMISSIONER GARNER:  And what

25  we'll do when we get to the section I'll pass

26  these back over to you for the translation,

27  thank you.  All right, any preliminary

10

1   objections, Ms. Hurst?

2        **ATTORNEY HURST:**  No, there are none.

3        **PRESIDING COMMISSIONER GARNER:**  How about

4   Mr. Flores, is he going to be speaking with the

5   panel today?

6        **ATTORNEY HURST:**  Yes he will.

7        **PRESIDING COMMISSIONER GARNER:**  On all

8   matters?

9        **ATTORNEY HURST:**  Well yes on all matters,

10  although he has provided a statement of facts.

11  But he will answer questions as well if you have

12  any.

13       **PRESIDING COMMISSIONER FARMER:**  Okay,

14  okay.  We just today were provided with this

15  report that you did about your involvement in

16  the situation.  I started reading it.  What we

17  can do is during, during our deliberations I'll

18  make sure I'll get all the way through it.  All

19  right, if I could get you to raise your right

20  hand, sir.  Do you solemnly swear or affirm that

21  the testimony you give at this hearing will be

22  the truth, the whole truth and nothing but the

23  truth?

24       **INMATE FLORES:**  Yes sir.

25       **PRESIDING COMMISSIONER GARNER:**  Thank

26  you.  All right, let's get the summary of the

27  commitment offense on the record.  And this is,

11

1    this is very lengthy.  I've read it twice now.

2    It doesn't get any shorter either time.  All

3    right, we are going to be reading from a report

4    that was prepared for the December 2005 Board

5    Report and it was prepared by Correctional

6    Counselor H. Staten, S-T-A-T-E-N, Correctional

7    Counselor I.

8            "On April 13, 1993 at

9            approximately 4:50 p.m. Angelica,

10           A-N-G-E-L-I-C-A, Leticia, L-E-T-I-

11           C-I-A, Gonzales --"

12   And Gonzales is with an S at the end.

13           "-- went to the residence of the

14           victim Maria Isordia, I-S-O-R-D-I-

15           A, and subsequently left the

16           residence.  Moment's after

17           Ms. Gonzales left three armed men

18           entered the residence.  One of the

19           men put a gun to the victim's head

20           and forced her out of the house.

21           The men also placed a substance

22           which caused the victim to feel

23           sleepy and nauseated over her

24           mouth.  They also placed an

25           unknown substance on the mouth of

26           the victim's 88-year-old mother

27           and told her to keep quiet.

12

1     Outside of the residence witnesses

2     observed one of the men and

3     Mrs. Gonzales dragging the victim,

4     who was screaming.  The victim,

5     Maria Isordia, was seen being

6     forced out of the house by

7     Ms. Gonzales and one of the men

8     with a gun pointed to her.  The

9     victim yelled at the subjects to

10    stop but was ignored.  Before the

11    vehicle was driven off the victim

12    was forced to lie in the backseat.

13    At one point when the victim was

14    placed in the front seat she tried

15    to jump while the vehicle was

16    still moving but was stopped by a

17    male who was sitting in the

18    backseat.  For the next eight days

19    the victim was moved to and from

20    several locations in the Los

21    Angeles area and Tijuana, Mexico.

22    The victim told arresting officers

23    that the substance which had been

24    forced, that she had been forced

25    to inhale had affected her nerve

26    and stomach and thus she was not

27    able to eat any food for several

13

1        days.  She was told that she was

2        being taken to Tijuana to sign

3        some papers to sell the house she

4        owned.  She was kept in a very

5        dirty, rundown hotel where one of

6        the kidnappers had discharged a

7        firearm through a window.  On

8        April 13, 1993 after the

9        kidnapping the victim's son,

10       Marcos Isordia, reported that he

11       had received a telephone call from

12       the kidnappers indicating they

13       wanted $150,000 in ransom for his

14       mother.  The kidnappers told him

15       that they had his mother in Mexico

16       and that they wanted the money by

17       the following day.  The caller

18       stated that if Mr. Isordia wanted

19       to see his mother he would have to

20       provide the first $75,000 within

21       24 hours and the second $75,000

22       within 24 hours after that.

23       Approximately ten minutes later

24       Cecilio, C-E-C-I-L-I-O, Decastro,

25       and that's D-E-C-A-S-T-R-O, who is

26       Ms. Gonzales brother, telephoned

27       Mr. Isordia indicating that the

1      kidnappers had telephoned him to
2      say that they had Ms. Gonzales and
3      her four children.  Mr. Decastro
4      told Mr. Isordia that these people
5      were not playing around and to
6      give the money they demanded.
7      Marcos Isordia went on to tell
8      investigating officers that he and
9      his ex-cousin-in-law, Leticia
10     Gonzales, had been involved in a
11     stolen vehicle, quote, rip-off,
12     end quote, of a subject know as,
13     quote, Manuel, end quote.
14     Mr. Isordia stated that he not
15     only kept the money owed to Manuel
16     but that he went to Hawaii,
17     spending Ms. Gonzales' portion as
18     well.  During the next several
19     days Mr. Isordia received several
20     telephone calls from the alleged
21     kidnappers, quote, Manuel, end
22     quote, and quote, Sergio, end
23     quote, and negotiations were
24     attempted.  During the next
25     several days Marcos Isordia
26     negotiated with the kidnappers for
27     the safe return of the victim.

15

1        Isordia told the kidnappers that

2        he could only raise $75,000 in

3        cash and would take the deal only

4        if he could see his mother at the

5        time he gave the money.  The

6        kidnappers refused his request,

7        telling Mr. Isordia, quote, it's

8        your problem, end quote.  On April

9        16, 1993 sheriff's deputies placed

10       an emergency tap on Mr. Decastro's

11       telephone, home telephone.  On

12       April 17, 1993 a successful tap

13       was identified as coming from the

14       manager's office in a Comfort, C-

15       O-M-F-O-R-T, Inn Hotel located in

16       El Monte, California.  Sheriff's

17       deputies discovered that

18       Ms. Gonzales left her four

19       children and a male known as Jose

20       Flores, parens Infante, I-N-F-A-N-

21       T-E, end of parens, had checked

22       into the hotel on May 15, 1993 and

23       had checked out on May 17, 1993.

24       The hotel manager told deputies

25       that he did not appear --"

26  I'll read it verbatim.

27       "-- that he did not appear as if

16

1          Ms. Gonzales or the children had

2          been kidnapped.  The continuing

3          negotiations between Manuel and

4          Mr. Isordia became more intense

5          with Manuel threatening to cut off

6          the victim's ear or kill her if

7          their demands weren't met.  They

8          also threatened the lives of

9          Mr. Isordia's two sisters.  On

10         April 19, 1993 Arturo Vasquez, --"

11 And Vasquez is with a Z on the end.

12         "-- husband of Ms. Gonzales,

13         listened to the tape-recorded

14         conversation between kidnapper

15         Manuel Marquez and Isordia.  After

16         listening to the tape Mr. Vasquez

17         immediately identified the voice

18         of Manuel as belonging to Jose

19         Flores Infante.  Later on Vasquez

20         retracted his statement.  On April

21         19, 1993 the negotiations with

22         Mr. Isordia took a turn.  The

23         individual, Manuel, who did all

24         the negotiating up to this point,

25         was no longer calling.  A

26         different individual who said his

27         name was Manuel called

17

1       Mr. Isordia.  This individual

2       acted very angry and demanded that

3       Mr. Isordia meet him with the

4       money at Winchell's Doughnut Shop

5       in El Monte.  The first attempt to

6       collect the money fell through

7       when Mr. Isordia didn't show up.

8       Dimas, D-I-M-A-S, Decastro and

9       Gonzales left the area and

10      returned to the Decastro house.

11      After the unsuccessful meeting

12      Mr. Isordia received several

13      telephone calls stating that the

14      kidnappers were not playing around

15      and that they were going to kill

16      the victim.  On April 19, 1993

17      Jose Flores entered the United

18      States from Mexico.  The vehicle

19      in which he was riding was turned

20      over to a secondary inspection.  A

21      loaded .25 millimeter

22      semiautomatic handgun with the

23      safety off and hammer cocked was

24      found under the front seat where

25      Mr. Flores was sitting.

26      Mr. Flores was arrested after a

27      computer check revealed that he

18

1        had a prior felony conviction and

2        an outstanding felony warrant.  On

3        April 20, 1993 Manuel told Marcos

4        Isordia to meet him at the

5        Winchell's store between 6 and

6        6:30 p.m.  The caller stated that

7        after the money was turned over

8        the victim would be released.

9        Mr. Isordia agreed to meet the

10       kidnapper.  Surveillance units

11       followed the two vehicles from

12       Mr. Decastro's residence to the

13       Winchell's Doughnut House.

14       Mr. Decastro was observed exiting

15       one of the vehicles and then

16       entering Winchell's.  Mr. Decastro

17       was observed driving and parking

18       the same vehicle approximately 75

19       yards from Winchell's.  A third

20       subject identified as Luis Arce,

21       A-R-C-E, was observed parking a

22       motorcycle next to the Winchell's

23       exit.  Arrest was effected at the

24       same time.  Subsequent to the

25       arrest a fully loaded SKS

26       semiautomatic rifle was found

27       hidden in the back seat of the car

19

1        occupied by Mr. Decastro.  In the

2        county jail Mr. Flores was

3        admonished and declined to make a

4        statement.  On April 21, 1993 in

5        the early morning hours three of

6        the unidentified kidnappers

7        entered the room in which the

8        victim was staying and told her

9        she could leave.  The kidnappers

10       told her to give them five

11       minutes, enough time to leave the

12       area, and then she could leave.

13       They made her promise not to

14       identify them ever.  Ms. Isordia

15       waited five minutes, left the

16       hotel room and ran to a residence

17       where she was allowed to use the

18       telephone.  She then telephoned

19       her family who picked her up and

20       took her home to Imperial Beach.

21       On April 21, 1993 at approximately

22       4:30 a.m. a sheriff's detective

23       received a call from Marcos

24       Isordia who stated that his mother

25       was safe and in good condition.

26       According to the three men, Dimas,

27       Decastro and Arce, who were

1              arrested on April 20, 1993, the

2              kidnapping scheme was conceived

3              because sometime before kidnapping

4              Leticia Gonzales did a quote, drug

5              deal or something, end quote, with

6              Marcos Isordia. Mr. Isordia took

7              off with Ms. Gonzales' half of the

8              money. One of the men stated that

9              Jose Flores came up with the idea

10             to get the money back. By the

11             time the men were arrested there

12             were several involved. When they

13             received a phone call that Flores

14             was in Mexico they continued the

15             negotiation. Ms. Gonzales was

16             arrested at her brother Decastro's

17             house. According to one of the

18             men she was in charge of the

19             operation with Flores."

20 Okay. That rather kind of lengthy, kind of

21 weaving itself around a lot of different ways.

22 Let me ask you, Mr. Flores, what was your

23 involvement in this? I know it's here but let's

24 get it on the record.

25        **INMATE FLORES:** I explain it better, I

26 tried to explain it my best way I could so there

27 won't be no more confusion. The way I explained

1  it last time on the record went back and forth.

2  I finally put everything together the way the

3  Deputy Commissioner asked me last time to do.

4           **PRESIDING COMMISSIONER GARNER:**  So

5  basically your version that you wish this panel

6  to consider of the crime, your version will be

7  what you've provided to us here.  Is that

8  correct?

9           **INMATE FLORES:**  Yes sir.

10          **PRESIDING COMMISSIONER GARNER:**  Okay, all

11  right.  What we'll do then is we will, again as

12  I said earlier, we will review this during our

13  deliberations and incorporate whatever we feel

14  is appropriate.

15          **INMATE FLORES:**  Okay.

16          **PRESIDING COMMISSIONER GARNER:**  And at

17  some point we may want to put it on the record

18  or we may adopt it by exhibit and get it back in

19  the record that way.  Okay.  Let's talk about

20  your prior record.  I show an arrest in

21  Montclair, California in January of '79 for

22  petty theft.  Do you recall that?  It's on your

23  rap sheet.  And that one went to a court in

24  Ontario and you were -- the judgment was

25  withheld.  You got 12 months probation.

26          **INMATE FLORES:**  Excuse me, I think that's

27  the wrong one.  I think (inaudible).

22

1        **ATTORNEY HURST:**  (Inaudible).

2        **PRESIDING COMMISSIONER GARNER:**

3   Unfortunately they just gave me the first page

4   and I'm not even finding a name on it.  This was

5   a, this was a rap sheet that was provided to us.

6        **INMATE FLORES:**  Oh, she make a -- my

7   other counselor, she make a, she find all the

8   Jose Flores and everybody in there.

9        **PRESIDING COMMISSIONER GARNER:**  All

10  right.

11       **INMATE FLORES:**  All the Jose Flores

12  people.  I don't know why she did that.

13       **PRESIDING COMMISSIONER GARNER:**  And they

14  may have had some pages joined.  How about

15  November 30, '89, Mammoth Lakes, for under the

16  influence of a controlled substance?

17       **INMATE FLORES:**  Yes.

18       **PRESIDING COMMISSIONER GARNER:**  That

19  accusation was set aside.  Bishop PD for H&S

20  352, transportation and sale of a controlled

21  substance.  And on that one you got 270 days in

22  county jail and five years probation.

23       **INMATE FLORES:**  Yes sir.

24       **PRESIDING COMMISSIONER GARNER:**  Is that

25  correct.

26       **INMATE FLORES:**  That is correct.

27       **PRESIDING COMMISSIONER GARNER:**  Okay,

1    let's take a look at the probation report to see

2    if there's -- The probation report consists of

3    what we just read so that will give us our

4    summary.   And then of course that led us to the

5    commitment offense itself.   It would be

6    interesting to see whose rap sheet this is

7    because it includes murder.

8            **INMATE FLORES:**  Ooh.

9            **PRESIDING COMMISSIONER GARNER:**   All

10   right, back on track.   Okay, it talks about your

11   plans.   And I know that there may be some

12   letters.   But in December of 2005 when you had

13   met with the correctional counselor, that if you

14   were allowed to remain in the United States that

15   you would either live with your mother in

16   Mammoth Lakes or your sister, who also lives in

17   Mammoth Lakes.   Because of the INS hold there is

18   no likelihood of staying.   We don't know.   But

19   it's good that you have parole plans both places

20   because sometimes INS things fall through the

21   cracks.   But you could go back to Michoacán

22   where you have family still living.   So far as

23   employment, that you would look for work in

24   welding or any kind of skilled machinist work.

25   And if you got deported you would try to open a

26   business.   The business would either be in

27   welding or some kind of supermarket.

24

1          **INMATE FLORES:** Yes sir.

2          **PRESIDING COMMISSIONER GARNER:** All

3     right, let's take a look at any letters of

4     support that are in the file. Let me ask you,

5     did you do an Olson Review of your file? Did

6     you look at you Central File?

7          **INMATE FLORES:** Yes.

8          **PRESIDING COMMISSIONER GARNER:** You did?

9     Okay. You might want to, you might want to --

10    Next time you do it --

11         **INMATE FLORES:** That wasn't, that wasn't

12    in there.

13         **PRESIDING COMMISSIONER GARNER:** Okay.

14         **INMATE FLORES:** No sir.

15         **PRESIDING COMMISSIONER GARNER:** All

16    right. All right, the first one was done

17    through translation services and it's

18    appropriately notarized and it was done in

19    November of 2005. And it's from your mother.

20              "I am writing this letter to

21              support my son. I am aware of his

22              hearing he is going to have. I am

23              very familiar with his case and he

24              was found guilty of a very serious

25              case for which he is serving a

26              sentence that was given to him.

27              He has been incarcerated 13 years.

25

1        During his incarceration he has

2        changed a lot.  Very remorseful,

3        regrets everything he was involved

4        in.  All this has made a very

5        positive change on him.  Everyone

6        in his family are ready to help

7        him on everything he might need

8        when he has his hearing.  If he is

9        allowed to go free he can come

10       live here with us and if he is

11       deported he can count on us for

12       whatever he needs.  We are able to

13       provide moral, financial as well

14       as work advice and whatever else

15       he might need."

16  She wants to give you an opportunity.  They know

17  you're capable and well prepared to live in

18  society and work with the community, not

19  creating any problems and the whole family is

20  waiting for you.  And that's from your mother

21  and she is in, she is in Mammoth Lakes.

22       **INMATE FLORES:**  Yes, my family, part of

23  my family is in Mammoth Lakes.  My mom, my

24  brother.

25       **PRESIDING COMMISSIONER GARNER:**  They're

26  in Mammoth Lakes.

27       **INMATE FLORES:**  Okay.

1       **PRESIDING COMMISSIONER GARNER:**  Officer,

2  please give it to Ms. Zavala.  And we also have

3  a letter in Spanish.

4       **INTERPRETER ZAVALA:**  It is dated May 17,

5  '06 from a Ms. Reyes and the envelope indicates

6  Bernardina Reyes.  It's coming from East Palo

7  Alto, California.  It says:

8           "To the authorities who it

9           concerns.  I, Bernardina Reyes am

10          writing this letter to let you

11          know that the young man, Jose Luis

12          Flores, initial I, has with me a

13          home -- has here a home with me

14          and my moral support and financial

15          once he returns to the community.

16          If he were to stay here in the

17          United States or if he were to be

18          taken to Mexico he also has a home

19          there and overall a job.  He will

20          always have support here or in

21          Mexico.  Sincerely."

22  Signature and it gives a phone number also.

23       **PRESIDING COMMISSIONER GARNER:**  What was

24  the name on that?

25       **INTERPRETER ZAVALA:**  Bernardina Reyes.

26       **PRESIDING COMMISSIONER GARNER:**  Reyes,

27  okay.

27

1       **INMATE FLORES:** She is my cousin, first

2  cousin.

3       **PRESIDING COMMISSIONER GARNER:** Okay,

4  thank you. All right, so the letter from your

5  first cousin in East Palo Alto and the letter

6  from your mother in Mammoth Lakes. Are there

7  any others that we have missed?

8       **INMATE FLORES:** Just the last time --

9  Like I say, my mom, she includes all the family

10  together, my brothers and everybody.

11       **PRESIDING COMMISSIONER GARNER:** And what

12  was the date on that one? Was that read into

13  the last record? Has that letter from your

14  mother, is that --

15       **ATTORNEY HURST:** Is it (overlapping)?

16       **PRESIDING COMMISSIONER GARNER:** Is it the

17  same letter? Excuse me. Was your mother still

18  living in Mammoth Lakes at the time that was

19  written?

20       **INMATE FLORES:** Yes sir.

21       **PRESIDING COMMISSIONER GARNER:** Okay,

22  then we're fine because we have one from her

23  that is more recent, okay. And again, other

24  than that one old one from your mother we have

25  got everything that's current, letters of

26  support?

27       **INMATE FLORES:** Yes sir.

28

1          **PRESIDING COMMISSIONER GARNER:**  Okay,
2     thank you.  We did send out the 3042 notices.
3     Those are the legal notices that went to all the
4     agencies that had a direct involvement in your
5     case.  And there is a representative from the
6     San Diego County District Attorney's Office who
7     will be speaking later in the hearing.  Okay,
8     Mr. Flores, at this time I want to ask you to
9     direct your attention over to Commissioner Perez
10    who is going to talk about your institutional
11    behavior.

12          **DEPUTY COMMISSIONER PEREZ:**  Good morning
13    Mr. Flores.

14          **INMATE FLORES:**  Good morning.

15          **DEPUTY COMMISSIONER PEREZ:**  The documents
16    that were reviewed for post-conviction
17    information was the information that was secured
18    from your Central File as well as the life
19    Prisoner Evaluation Report prepared for the
20    December 2005 calendar by Correctional Counselor
21    Staten.  The post-conviction progress report
22    covering the period of December 17, 2003 to the
23    present was prepared by Correctional Counselor
24    Staten again.  The psychological evaluation
25    prepared for the May 2006 calendar by
26    Dr. Macomber was also considered as well as any
27    subsequent information that you supplied for us

29

1   as well anything verbally you may choose to

2   enter into the record, we certainly will

3   consider that for post-conviction information.

4   At the time of your last parole consideration

5   hearing, Mr. Flores, which was held on December

6   17, 2003, you were housed at CTF, here at CTF.

7   At that time the Board took action to deny

8   parole for two years and recommended that you

9   the parolee remain discipline-free and

10  participate in self-help.  A review of our

11  records show that you have had continuous self-

12  help and therapy with anger management as well

13  as the AA, easily over 25 entries in AA since

14  1999.  You were involved in Project Change on

15  1/29/2003 as well as the Learning to be a Father

16  anger management program.  It also indicates

17  that you voluntarily participated in two hours

18  of video instruction issues regarding inmate

19  employability program information.  And this

20  talked about issues such as family support,

21  relationships, addiction, support groups,

22  realistic goals, preparation for employment and

23  change.  And also indicates that you

24  participated in three hours of inmate

25  employability program again relating to --

26  another program on May 18, 2006 related to anger

27  management.  We have, let's see, also a chrono

1  indicating your experience with the Prison

2  Industry Authority and your marketability in the

3  community.  And we'll give you this back so you

4  can eventually put it back into the file.

5  Mr. Flores, our records show that you have

6  worked in various trades as a patio porter, as

7  an AM sanitation crew for trash collection,

8  textile garment assembly, AM cook as well as

9  other culinary duties, machine operator in

10  furniture upholstery and furniture upholsterer

11  and finisher, again for the Prison Industries.

12  Education includes ABE, peer tutor, preparation

13  for GED.  Did you ever get your GED?

14          INMATE FLORES:  Yes sir.

15          DEPUTY COMMISSIONER PEREZ:  And what was

16  the date of your GED, ballpark?

17          INMATE FLORES:  It was September 1999.

18          DEPUTY COMMISSIONER PEREZ:  September

19  '99, congratulations.  Okay, September 3 of '99,

20  I'm sorry.  Cal-OSHA Haz-Mat, Community

21  Standards Right to Know.  You were involved in

22  the instruction for HIV/AIDS prevention and

23  management.  Vocation, our records show that you

24  got a vocational certificate in plumbing.

25          INMATE FLORES:  Yes.

26          DEPUTY COMMISSIONER PEREZ:  In machine

27  shop.

1        **INMATE FLORES:**  Yes.

2        **DEPUTY COMMISSIONER PEREZ:**  You were

3   involved in scullery, culinary.  You didn't get

4   a vocational certificate in that?

5        **INMATE FLORES:**  No.

6        **DEPUTY COMMISSIONER PEREZ:**  Okay, that

7   was back, it looks like the late '90s.  You

8   received training in general safety, lockout,

9   tag-out, right to know, air, eyes, back, safety

10  and sound and finishing.  You also received a

11  welding certificate.

12       **INMATE FLORES:**  Yes.

13       **DEPUTY COMMISSIONER PEREZ:**  So you've got

14  quite a number of vocations.  Congratulations,

15  that's certainly --

16       **INMATE FLORES:**  (Overlapping) use my time

17  this way.

18       **DEPUTY COMMISSIONER PEREZ:**  That's good,

19  you've got a lot of time.  Chronos indicate the

20  cause, prevention, treatment and management of

21  tuberculosis as well as employee safety

22  operation.  This was in 2003 and this

23  tuberculosis chrono was in 2006.  And as I

24  indicated you have quite a few entries in AA and

25  it has been continuous involvement since 1999.

26  A review of recommendations by your correctional

27  counselors indicate, and again this is

32

1   reaffirmed, that prior to release from prison
2   that you remain discipline-free, you participate
3   in self-help.  An assessment indicates that you
4   do have family that resides in California that
5   will provide a place of residence and support.
6   Indicated that at that time that there was no
7   letter of support or references.  Also indicates
8   again your vocational experience and
9   certification in maintenance plumbing,
10  vocational welding and machine shop.
11  Mr. Flores, a review of your psychiatrist's
12  diagnosis indicates that you had an Axis I of no
13  mental disorders; Axis II, no personality
14  disorders; and you have a current GAF score of
15  90.  The psychiatrist's assessment of danger
16  indicates that in considering potential for
17  dangerous behavior in the institution Mr. Flores
18  has remained entirely discipline-free.  It is
19  commendable -- This is a commendable achievement
20  considering the institution has had ongoing
21  racial altercations, especially among Hispanics.
22  It is evident compared to other inmates that the
23  potential for dangerous behavior is definitely
24  below average.  Mr. Flores poses no more risk of
25  violence in the community than the average
26  citizen in the community and your level of
27  threat to the community is probably lower,

33

1    again, than the average citizen in the

2    community.  The psychiatrist's recommendations

3    indicate that you have a very good attitude.

4    You have grown, changed, matured and advanced in

5    his self-awareness and knowledge over his years

6    of incarceration and the prognosis for

7    successful adjustment in the community is

8    excellent.  Congratulations, you have done very

9    well in your adjustment.  Certainly we don't

10   always see that, those types of recommendations

11   by the psychiatrists.  It indicates you have no,

12   to reaffirm you have no CDC 115s and only two

13   entries of CDC 128s, the last one being on

14   7/30/2005, failure to comply during count, and

15   products on 7/12/1999.  Have I missed anything,

16   Mr. Flores?  Anything else you want to enter

17   into the record?

18        **INMATE FLORES:**  No sir, I think

19   everything is in there.

20        **DEPUTY COMMISSIONER PEREZ:**  Okay.

21        **INMATE FLORES:**  Except I take all the

22   courses, the treatments of diseases.

23        **DEPUTY COMMISSIONER PEREZ:**  Well you're

24   making --

25        **INMATE FLORES:**  I complete the whole

26   courses.

27        **DEPUTY COMMISSIONER PEREZ:**  Well you've

34

1    made good use of your time while you are in

2    custody.  And what I'm going to do is I'm going

3    to give this back to you so you could ensure

4    that this gets into here.

5        INMATE FLORES:  Okay.

6        DEPUTY COMMISSIONER PEREZ:  Okay.  And

7    this has been entered into the record.  Counsel,

8    is there anything else we missed?

9        ATTORNEY HURST:  No, I don't think so,

10   you've covered it well.

11       DEPUTY COMMISSIONER PEREZ:  All right,

12   thank you.  Mr. Flores, thank you.

13   Commissioner.

14       PRESIDING COMMISSIONER GARNER:  Thank

15   you.  I've finished reviewing this declaration

16   that you provided today.  What I'd like to do is

17   ask you a few questions.  In the Board Report

18   there is a reference made to a Comfort Inn

19   hotel.  Is that actually the Motel 6 that is

20   referenced in your declaration or was that a

21   different hotel?

22       INMATE FLORES:  I didn't understand the

23   question, could you ask it again?  Sorry.

24       PRESIDING COMMISSIONER GARNER:  Okay.  In

25   the Board Report that I read, that real lengthy

26   thing that I read.

27       INMATE FLORES:  Yes.

1          **PRESIDING COMMISSIONER GARNER:** It

2   mentioned that, that a telephone tap was made on

3   one of the telephone calls and it came from the

4   manager's office at a Comfort Inn hotel. And

5   that a male known as Jose Flores had checked in

6   to the hotel on May 15 and checked out on May

7   17. And there is some indication there that

8   Ms. Gonzales or the children didn't look like

9   they had been kidnapped. Now in your

10  declaration there is a motel in El Monte called

11  the Motel 6 that you checked into.

12          **INMATE FLORES:** Yes sir.

13          **PRESIDING COMMISSIONER GARNER:** So what I

14  am trying to see, were you in two different

15  hotels or just one?

16          **INMATE FLORES:** Okay. The first hotel is

17  when she first called me. She first called me

18  is when I first came to El Monte, at her

19  request. The second one the same, is the same

20  thing, they connected. The one on the 15, I

21  didn't stay there. I don't know if they show

22  the records but I went in there to rent videos,

23  yes, and that's when they release me. And the

24  14 in there, the Motel 6, the 14 of April,

25  that's where they ask me. The only way they

26  will release the children to her is if I

27  cooperate with them. And the 15 is when we have

36

1  the kids.

2        PRESIDING COMMISSIONER GARNER:   Okay.

3  And on the 14th was when you gave Manuel the

4  $1,000.

5        INMATE FLORES:  Yes.

6        PRESIDING COMMISSIONER GARNER:   And it

7  was at that time you were told of the kidnap of

8  Mrs. Isordia.

9        INMATE FLORES:  Yes sir.

10       PRESIDING COMMISSIONER GARNER:   And that

11 all you would have to do is make some telephone

12 calls.

13       INMATE FLORES:   Yes.

14       PRESIDING COMMISSIONER GARNER:   And you

15 went with Manuel to where he was holding

16 Mrs. Isordia.

17       INMATE FLORES:  Yes sir.

18       PRESIDING COMMISSIONER GARNER:   Where was

19 that?

20       INMATE FLORES:   Tijuana.

21       PRESIDING COMMISSIONER GARNER:   It was in

22 Tijuana.  At the hotel?  Was it at a hotel in

23 Tijuana?

24       INMATE FLORES:   I don't know.  When I

25 went over there she was in a hotel, yes.

26       PRESIDING COMMISSIONER GARNER:   Okay.

27 And you made some telephone calls from there and

1  on the way back is when you got arrested, is

2  that correct. You said, I was arrested on my

3  way to pick up the money.

4        **INMATE FLORES:** Yes sir.

5        **PRESIDING COMMISSIONER GARNER:** And that

6  you didn't have any prior knowledge of the

7  kidnap of Mrs. Isordia and that your involvement

8  was limited to being taken to where she was

9  being held, making phone calls and apparently

10 according to her testimony, trying to comfort

11 her and letting her use the phone.

12       **INMATE FLORES:** Yes.

13       **PRESIDING COMMISSIONER GARNER:** Okay. I

14 have also been provided -- Before we move on I

15 want to put into the record some parole plans

16 that I want to make sure there's not (inaudible)

17 here. It's dated August 12, 2003 and signed by

18 Jose Flores. It's speaking to his skills and

19 maintaining family ties and doing self-help

20 studies. Okay, I think that's all it said. Any

21 follow-up questions?

22       **DEPUTY COMMISSIONER PEREZ:** No, thank

23 you.

24       **PRESIDING COMMISSIONER GARNER:**

25 Mr. Sachs, any questions?

26       **DEPUTY DISTRICT ATTORNEY SACHS:** I have

27 no questions of the inmate, Commissioner, thank

1    you.

2    **PRESIDING COMMISSIONER GARNER:**  Thank

3    you.  All right, Ms. Hurst, any questions?

4    **ATTORNEY HURST:**  No, I have no questions.

5    **PRESIDING COMMISSIONER GARNER:**  Okay,

6    Mr. Sachs, could I get you to close, please.

7    **DEPUTY DISTRICT ATTORNEY SACHS:**  Yes,

8    thank you very much, I appreciate it.  On behalf

9    of the People we would respectfully oppose

10   parole based on the totality of the

11   circumstances of the offense.  We feel that the

12   denial of parole is proper.  There have been

13   factors both surrounding the commitment offense

14   in which the victim was screaming while being

15   dragged out of the home, she was struck.

16   There's factors in relation to the surveillance

17   that occurred and the wiretaps which revealed

18   additional information.  The fact that he was

19   armed with a weapon at the time he was trying to

20   cross the Mexican border.  We feel that the

21   violence, the threat of bodily harm, the other

22   actual cruelty and callousness, sophistication

23   and professionalism and there has not been any

24   responsibility for the offense in any real terms

25   or meaningful terms or any history of it.  In

26   addition we feel that the programming is

27   inadequate to warrant release at this time so on

39

1   that basis we would oppose parole.  Thank you.

2            **PRESIDING COMMISSIONER GARNER:**  Thank

3   you.  Ms. Hurst.

4            **ATTORNEY HURST:**  Yes, thank you.  First

5   of all I think we need to remember that this was

6   a kidnap, it's not a murder case, although it is

7   more aggravated than many kidnapping cases.

8   Secondly, Mr. Flores has acknowledged that he

9   participated but there is no evidence that he

10  was involved in the planning stages of this

11  offense.  And I read through the letter from San

12  Diego County pretty carefully this morning and

13  it is really unclear as to exactly what

14  Mr. Flores' role was.  He has acknowledged in

15  past hearings and he certainly has acknowledged

16  in his statement that he made some phone calls.

17  He acknowledged in his last hearing that he was

18  armed in the presence of the victim on one

19  occasion.  Another thing I think that is

20  important for us to consider is that to my

21  knowledge Mr. Flores is the only individual who

22  is doing time for this crime at the present

23  time.  Ms. Gonzales I think suffered a

24  conviction and that was reversed on appeal.

25  There were other individuals who were arrested

26  and detained after Mr. Flores was already in

27  custody and to my knowledge they were not

1   convicted of any part of this crime.  So to the

2   extent, speaking to the issue of his accepting

3   responsibility, he not only accepts

4   responsibility, he is the only one paying any

5   price, except of course for the victim and the

6   victim's family.  He has very minimal criminal

7   history.  He has one conviction, I believe, that

8   he suffered prior to the life crime.  Since he

9   has been in prison I believe his programming has

10  been absolutely exemplary.  He has had no 115s

11  at all.  And although we do see lifers who come

12  in with that kind of a record it certainly is

13  not the norm.  It is exemplary conduct.  He has

14  upgraded educationally, obtaining his GED.  He

15  has also been a peer tutor.  He has been

16  involved in the inmate employability program.

17  He has upgraded vocationally in many different

18  fields, in vocational welding, plumbing, machine

19  shop, upholstery, so he has tremendously good

20  job skills.  He has also been involved in a

21  great deal of self-help, remaining in the AA

22  program for a long period of time.  Project

23  Change, which I think is one of the best

24  programs that they have had here and it involves

25  about 44 weeks and it's a multi-faceted program.

26  Also been involved in anger management, both

27  within the context of Project Change as well as

1    the IEP program.  So he's done a lot of things.

2    You will find laudatories in the back of his

3    file here and I think you mentioned some of

4    those.  The psychiatric report is extremely

5    positive in nature and I think under conclusions

6    that the doctor states that he would do better

7    than 98 percent of parolees if he were released.

8    He also mentions his family support, his many

9    vocational skills, maturation.  And in

10    conclusion he says the prognosis for a

11    successful adjustment in the community is

12    excellent.  No significant risk factors are

13    noted by Dr. Macomber in this report.  He does

14    have viable parole plans.  He will probably be

15    deported but he has alternative parole plans in

16    California if he is not deported.  I think it is

17    time consider him very seriously for parole.  I

18    don't believe he presents an unreasonable risk.

19    And if he is not found suitable today then I

20    would ask the panel to give him a one-year

21    denial rather than a two, thank you.

22             **PRESIDING COMMISSIONER GARNER:**  All

23    right.  Mr. Flores, this is your opportunity if

24    you would like to address the panel as to why

25    you think you're suitable.  If you're more

26    comfortable doing it in Spanish through the

27    interpreter that can be, that's your choice.

42

1          **INMATE FLORES:** Thank you, I will do so.

2          **INMATE FLORES (THROUGH THE INTERPRETER):**

3    The reason why I think I should be found

4    suitable is because I know I am a different

5    person, I have changed a lot. I have matured a

6    lot during this whole time and I am very aware

7    of my actions and choices. And I think I would

8    be, once I integrate into society it would be to

9    give support to many people who have gone

10   through drugs and alcohol as I tell them my

11   story and the things I have gone through. I

12   could then prevent many things, many bad things

13   that would happen to others. And as you have

14   seen I haven't wasted my time. I have tried to

15   take all the tools that have been provided to me

16   during the time that I have been incarcerated.

17   And as you have seen my family is waiting for

18   me. I have all the support from them. Another

19   thing also, I won't be a load, a load for the

20   state being that I will be deported. And I also

21   ask that you take into account all the time that

22   I have spent here. I have been doing it

23   positively. Just that, take that into

24   consideration when you make your decision.

25          **INMATE FLORES:** Thank you. If possible,

26   please give me a release date.

27          **PRESIDING COMMISSIONER GARNER:** All

43

1    right, thank you, sir.  It's 10:45 a.m. and we

2    will recess for deliberations.

3         **DEPUTY COMMISSIONER PEREZ:**  And we are

4    going to go off record.

5                        **R E C E S S**

6                        --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

44

1          **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3          **DEPUTY COMMISSIONER PEREZ:**  Okay,

4  Commissioner, we are back on record.

5          **PRESIDING COMMISSIONER GARNER:**  All

6  right, it is 11:01 a.m. in the matter of Jose

7  Flores, J John 03392.  Mr. Flores, the panel has

8  reviewed all the information received from the

9  public and relied on the following circumstances

10  in concluding that you are not yet suitable for

11  parole and would pose an unreasonable risk of

12  danger to society or a threat to public safety

13  if you were released from prison.  We are going

14  to deny you for a year and we've got some work

15  that you need to do, okay.  So listen up.  We

16  are going to note first we considered many

17  factors but we started with the commitment

18  offense.  And the panel noted that this offense

19  was carried out in an especially cruel manner in

20  that the victim was forced from her home, Maria

21  Isordia.  She was kidnapped.  She was held for

22  ransom in a hotel in Tijuana and then

23  transported in and around the Los Angeles County

24  area, eventually winding up in Tijuana.  The

25  offense was carried out in a very dispassionate

26  and calculated manner in that the victim was

27  **JOSE FLORES  J-03392  DECISION PAGE 1    06/15/06**

1   removed from her home, threatened, taken to

2   Mexico and held there for ransom for a number of

3   days.  The motive for the crime, the best we

4   could determine, the panel came up with it was

5   some economic gain that they had hoped to gain

6   from the kidnapping.  And these conclusions were

7   drawn from the statement of facts.  And

8   Ms. Hurst, without objection I am going to enter

9   the statement of facts contained in the prior

10  reading as Exhibit 2 and I would also like to

11  incorporate and enter into the record as Exhibit

12  3 the declaration that Mr. Flores provided for

13  us today.

14          **ATTORNEY HURST:**  No objection.

15          **PRESIDING COMMISSIONER GARNER:**  Okay.  So

16  far as the previous record the panel did note

17  that you did have the Bishop Police Department,

18  December 30, 1989, and that was the transporting

19  of a controlled substance, the H&S 11352 as your

20  prior record.  So far as your institutional

21  behavior you have done very well.  You have only

22  received two 128(a) counseling chronos and the

23  last was July 30 of 2005.  And this was for

24  failure to comply during a count, nothing

25  associated with any kind of violence.  The panel

26  noted the psychological report that was prepared

27  **JOSE FLORES   J-03392   DECISION PAGE 2    06/15/06**

1    by Dr. Macomber in May of 2006 and the report is

2    generally favorable, it's a good report for you.

3    The area that we're going to ask you to do so9me

4    work on is your parole plans.  You do have plans

5    for your mother in Mammoth Lakes and also a

6    relative in East Palo Alto but we didn't find

7    any record or any supporting documents of any

8    plans or availability of services and support in

9    Mexico.  We're going to need to get those, sir.

10   Did you have them?

11           INMATE FLORES:  Yes, they supposed to be

12   in the file.  It's from my mother's sister, the

13   house over there.

14           DEPUTY COMMISSIONER PEREZ:  Well not only

15   that, no.  The issue was the support, the

16   support in the immediate community.  I know

17   Mexico has AA, has NA, has support groups that

18   are in each community.  So that's something that

19   we just wanted you to include in that.

20           INMATE FLORES:  That's right there too in

21   the file.  It's AA, NA, letters from them, from

22   them over there.

23           PRESIDING COMMISSIONER GARNER:  Okay,

24   I'll have him take a look.  I'll tell you for

25   the record that it was not in mine.  Because

26   when I went through and I asked you if that's

27   **JOSE FLORES   J-03392   DECISION PAGE 3    06/15/06**

47

1    all we had, that's because those were the only

2    ones that were available to me.  Let me, while

3    he's looking for that -- and if there is a need

4    to modify it we'll do it.  But you were here and

5    you did hear the district attorney from San

6    Diego indicate opposition to the granting of

7    parole.  While he's looking for that I'll

8    indicate that during this period of time of

9    course we want you to remain disciplinary-free,

10   we want you to continue doing the self-help

11   program.  And I have already made the indication

12   here but we'll wait and see that we want you to

13   do some work on the plans.  Do we want to go off

14   the record for just a second?

15        **DEPUTY COMMISSIONER PEREZ:**  Yes, let's go

16   off record.

17                  (Off the record.)

18        **DEPUTY COMMISSIONER PEREZ:**  Okay, we're

19   back on record.  And for the record, thank you

20   for bringing it to our attention.  For the

21   record there is support groups specifically in

22   Michoacán, Nueva Italia.  Got a Little Italy

23   there huh?  And also in the other, Apasigán

24   (phonetic) in Michoacán indicating support

25   services in the community that you will be, you

26   will be paroling to.  Anyway, that is noted for

27   **JOSE FLORES   J-03392   DECISION PAGE 4   06/15/06**

1    the record and that will be certainly in your

2    favor.

3         **PRESIDING COMMISSIONER GARNER:**    Okay, and

4    those are for support?

5         **DEPUTY COMMISSIONER PEREZ:**    For support,

6    yes.

7         **PRESIDING COMMISSIONER GARNER:**    Okay.

8         **DEPUTY COMMISSIONER PEREZ:**    And thank

9    you.

10         **PRESIDING COMMISSIONER GARNER:**    So what

11    we would want you to do, support is one thing

12    but what we need to do is have with respect to

13    housing and any other kind of support, financial

14    support.   Those would be incorporated into the

15    next hearing.   It will be real important for you

16    to get to work on those quickly because we know

17    how long it takes to get things done and to get

18    them done here too.   So it's two places it's

19    real hard to get things done, in Mexico and also

20    very difficult to get things done in prison too.

21    So any additional comments, Commissioner?

22         **DEPUTY COMMISSIONER PEREZ:**    A year, a

23    year is not a lot of time so do what you can to,

24    to get your ducks in order to get those parole

25    plans firmed up.

26         **INMATE FLORES:**    Can --

27    **JOSE FLORES  J-03392    DECISION PAGE 5    06/15/06**

49

1      **PRESIDING COMMISSIONER GARNER:**  Go ahead.

2      **INMATE FLORES:**  Can I just understand.

3  You want me to bring that I have housing over

4  there and family over there?

5      **PRESIDING COMMISSIONER GARNER:**  Yes.

6      **INMATE FLORES:**  They are in the file too,

7  supposed to be.  The counselor got those letters

8  and supposed to put it in the file.  He don't

9  give me copy.  That's my mother's sister's house

10  over there.  They write a letter.  They waiting

11  for me also.

12      **PRESIDING COMMISSIONER GARNER:**  I can

13  only offer my apologies.

14      **INMATE FLORES:**  Yes.

15      **PRESIDING COMMISSIONER GARNER:**  We don't,

16  we did not have that record before us and that's

17  what we need.  We would be doing you a

18  disservice if we did anything different because

19  the review authority is going to look a the same

20  thing we did and they are going to see that

21  there is no indication of any kind of housing

22  offer for you in Mexico.  So all I can do is

23  offer my apologies.  Do a real good Olson file

24  review before your next hearing and make sure

25  everything that you get between now and then is

26  in there.  And I would keep a copy of it and

27  **JOSE FLORES  J-03392  DECISION PAGE 6    06/15/06**

50

1    bring it to the hearing.  That way if they mess

2    up and don't get into our packets you can give

3    those to us at the hearing and we can consider

4    it at that time.  Okay?

5         **ATTORNEY HURST:**  If you had seen copies

6    of those documents today might the panel have

7    made a different decision at this time?

8         **PRESIDING COMMISSIONER GARNER:**  I think

9    it would have been persuasive.  I wouldn't want

10   to give you a firm yes or no.  But obviously by

11   granting a year it is our impression that

12   Mr. Flores is making progress and is getting

13   himself very close to getting out of here.

14        **ATTORNEY HURST:**  Okay.  Because it was, I

15   felt that the residential offer was in the file.

16        **DEPUTY COMMISSIONER PEREZ:**  Well that

17   wasn't our only consideration.  But certainly --

18   And I want to reaffirm what Mr. Gardner

19   indicated.  You are certainly at the cusp of

20   compliance and so you're almost there.

21        **PRESIDING COMMISSIONER GARNER:**  All

22   right, it is now 11:08 a.m. and that does

23   conclude this hearing.

24        **DEPUTY COMMISSIONER PEREZ:**  Good luck to

25   you.

26        **INMATE FLORES:**  Thank you.

27   **JOSE FLORES  J-03392  DECISION PAGE 7    06/15/06**

51

1          **DEPUTY COMMISSIONER PEREZ:**  And we're

2   going to go off record.

3                    --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED ONE YEAR**

24   **THIS DECISION WILL BE FINAL ON:** Oct. 13, 2006.

25   **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **JOSE FLORES   J-03392   DECISION PAGE 8    06/15/06**

52

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, RAMONA COTA, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do
hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total one in number and cover a total of pages
numbered 1 - 51, and which recording was duly
recorded at CORRECTIONAL TRAINING FACILITY,
SOLEDAD, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING of JOSE
FLORES, CDC NO. J-03392, on JUNE 15, 2006, and
that the foregoing pages constitute a true,
complete, and accurate transcription of the
aforementioned tape to the best of my ability.

I hereby certify that I am a
disinterested party in the above-mentioned
matter and have no interest in the outcome of
the hearing.

Dated September 19, 2006, at Sacramento
County, California.

RAMONA COTA
TRANSCRIBER
**PETERS SHORTHAND REPORTING**