# EXHIBIT C

SAN DIEGO COUNTY PROBATION DEPARTMENT

ADULT SERVICES

PROBATION OFFICER'S REPORT

| THE PEOPLE OF THE STATE OF CALIFORNIA v. RN: FLORES, JOSE LUIS CN: FLORES, JOSE LUIS AKA: INFANTE, JOSE LUIS | COURT NO. CR 140788 | DEPT. & JUDGE SDSC 4 LINK, F |
|---|---|---|
| | DA FILE NO. 26247 | ATTORNEY APPT X THIELEN, R    RET____ |
| | HEARING DATE/TIME 12-16-93 8:30 A.M. | PROB CASE NO. A 743811 |
| | PROBATION OFFICER B.GERLACH:prb | PO TEL. NO. (619)531-6084 |

| ADDRESS 2596 Annapolis East Palo Alto, California | TEL. NO. None | BIRTHPLACE/CITIZENSHIP Michoacan, MX MX |
|---|---|---|

| BIRTH DATE 1-31-70 | AGE 23 | RACE H | SEX M | HT 5-7 | WT 160 | EYES BRO | HAIR BRO |
|---|---|---|---|---|---|---|---|

| SOC. SEC. NO. 616 26 9967 | DRIVER'S LIC. NO. CA A1863249 | INS. NO. | OTHER ID DATA |
|---|---|---|---|

| DATE OFFENSE COMMITTED 4-13-93 | DATE CONVICTED 11-19-93 | HOW GJ | CUSTODY STATUS CUSTODY |
|---|---|---|---|

| INVESTIGATING ARRESTING AGENCY SDSO | DATE INFORMATION FILED 10-27-93 | SDSO SYSTEM NO. 93111 131735 |
|---|---|---|

| CII NO. 09270664 | FBI NO. | ARREST REPORT NO. | SDSO BOOKING NO. 93127992B |
|---|---|---|---|

**CONVICTED OF:**

Count One: PC 182(a)(1): Conspiracy to Commit a Crime. In support of this count there are alleged 12 Overt Acts; also attached to this count are Allegations 12022(a)(1), that the defendant was armed with a firearm, to wit: a handgun and 12022.5(a) PC that the defendant Personally Used a Firearm, to Wit: a Handgun.

Count Two: PC 209(a), Kidnapping for Ransom plus allegations that the defendant was armed with a firearm, within the meaning of PC 12022(a)(1).

Count Three: PC 207(a), Kidnapping, plus allegations that the defendant was armed with a firearm, to wit, a handgun, within the meaning of PC 12022(a)(1) and 12022.5(a) PC that the defendant used a firearm, to wit: a handgun.

Count Six: PC 12021(a) Possession of a Firearm by a Convicted Felon.

The defendant previously admitted a prior felony conviction.

**RECOMMENDATION:** STATE PRISON

FLORES, JOSE LUIS                              2                              12-16-93
CR 140788

### CODEFENDANT(S):

Angelica Leticia Gonzales, Rodolfo Dimas, Luis Gabriel Arce, Cecilio de Castro all scheduled for probation hearing and sentencing this date (12-16-93).

### PRE PLEA BARGAIN:

None - Jury trial.

### RELATED COURT DATA:

The Court Referral form states "defendant previously admitted prior felony conviction." No Penal Code section was indicated. The Probation Officer is not certain that an enhancement is alleged and the DA who was contacted was unable to clarify this issue at the time.

### THE OFFENSE:

SOURCES OF INFORMATION for this section

DA FILE; SDSO REPORTS, 93-032091, 4-16-91; PRELIMINARY HEARING TRANSCRIPT

---

Since the Court is familiar with this case, as defendants Flores and Gonzales went to trial, a synopsis of the occurrences leading to the arrest of the defendants is being provided.

On 4-13-93, at approximately 4:50 p.m., Angelica Leticia Gonzales went to the residence of the victim, Maria Isordia. Ms. Gonzales left the residence, informing the victim that she was going to a local telephone booth to call some friends to come and pick her up. Moments later, three armed men entered the residence. One of the subjects put a gun to the victim's head and forced her out of the house. The subjects also placed a substance, which caused the victim to feel sleepy and nauseated, over her mouth.

The victim's 88-year-old mother was also present during the abduction. One of the subjects poured an unknown substance into his hand, placed it to the mouth of the victim's mother, and told her to keep quiet. As he was removing his hand the two other subjects forced the victim and Ms. Gonzales out of the front door.

Outside the residence, witnesses observed one of the male subjects and Ms. Gonzales dragging and hitting the victim, who was screaming.

FLORES, JOSE LUIS                        3                         12-16-93
CR 140788

Ms. Gonzales was observed hitting the victim on the head and bashing the victim's head on the door to a vehicle parked outside. The male subject was seen attempting to pick up the victim, removing a gun from the vehicle, and pointing it at the victim, who was subsequently forced into the vehicle. One witness, observing the commotion yelled at the subjects to stop, but was ignored.

Before the vehicle was driven off, the victim was forced to lie on the back seat. At the Interstate 15 checkpoint at Temecula, Ms. Gonzales, who was driving, told officials that her mother was asleep in the back seat. The Border Patrolman allowed them to continue northbound. At one point during the trip, the victim was moved to the front passenger seat from which she tried to jump, while the vehicle was still moving, but was stopped by a male who was sitting in the back seat. She was then told not to try this anymore.

For the next eight days, the victim was moved to and from several locations in the Los Angeles area and Tijuana. During her first night of captivity, the victim awoke to find Ms. Gonzales sleeping next to her. This was the last time the victim saw Ms. Gonzales.

The victim told arresting officers that the substance which she had been forced to inhale had affected her nerves and stomach and thus, she was not able to eat any food for several days. When the kidnappers told the victim that she had to eat some food, the victim responded, "I don't want food, I want liberty." The victim was told that she was being taken to Tijuana, to sign some papers to sell a house that she owned. The victim told arresting officers that while in Tijuana, she was kept in a very dirty, run-down hotel, where one of the kidnappers had discharged a firearm through a window.

On 4-13-93, after the kidnapping, the victim's son, Marcos Isordia, reported that he received a telephone call from the kidnappers indicating they wanted $150,000 in ransom for his mother. The kidnappers told him that they had his mother in Mexico and that they wanted the money by the following day. Marcos Isordia went on to tell investigating officers that he and an ex-cousin-in-law, Leticia Gonzales, had been involved in a stolen vehicle "rip off" of a subject known as "Manuel." Mr. Isordia stated that he not only kept the money owed to Manuel, but that he went to Hawaii, spending Ms. Gonzales' portion as well.

During the next several days, Mr. Isodria received several telephone calls from alleged kidnappers "Manuel" and "Sergio" and negotiations were attempted.

On 4-13-93, at approximately 11:00 p.m., Mr. Isordia received a telephone call from an unidentified male, demanding $150,000 for the safe return of the victim. The caller stated that if Mr. Isordia

FLORES, JOSE LUIS  　　　　　　　　　　4　　　　　　　　　　　　12-16-93
CR 140788

wanted to see his mother, he would have to provide the first $75,000 within 24 hours and the second $75,000 within 24 hours after that. Approximately ten minutes later, Cecilio de Castro, who is Ms. Gonzales' brother, telephoned Mr. Isordia indicating that the kidnapper had telephoned him saying that they had Ms. Gonzales and her four children. Mr. de Castro told Mr. Isordia that these people were not playing around and to give them the money they demanded.

During the next several days, Marcos Isordia negotiated with the kidnappers for a safe return of the victim. Mr. Isordia told the kidnappers that he could only raise $70,000 and the kidnappers agreed to that amount. On 4-15-93, Mr. Isodria advised the kidnappers that he had the $70,000 in cash and would take the deal only if he could see his mother at the time he gave the money. The kidnappers refused this request, telling Mr. Isordia, "It's your problem."

On 4-16-93, Sheriff's deputies placed an emergency tap on Mr. de Castro's home telephone. On 4-17-93, a successful tap was identified as coming from the manager's office in a Comfort Inn Hotel located in El Monte, California. Sheriff's detectives discovered that Ms. Gonzales, her four children and a male known as Jose Flores (Infante) had checked into the hotel on 4-15-93 and had checked out on 4-17-93. The hotel manager told deputies that it did not appear as if Ms. Gonzales or her children had been kidnapped.

The continuing negotiations between Manuel and Mr. Isordia became more intense with Manuel threatening to cut off the victim's ears or kill her if their demands were not met. They also threatened the lives of Mr. Isordia's two sisters.

On 4-19-93, Arturo Vasquez, husband of Ms. Gonzales, listened to a tape-recorded conversation between kidnapper Manuel and Marcos Isordia. After listening to the tape, Mr. Vasquez immediately identified the voice of Manuel as belonging to Jose Flores (Infante). It should be noted that during the preliminary examination Mr. Vasquez attempted to recant his statement, indicating that he made this statement to investigating officers as he and Ms. Gonzales were having problems.

Shortly after speaking with Sheriff's officers, Mr. Vasquez received a page from Ms. Gonzales. Mr. Vasquez returned the phone call and the conversation was recorded. During the conversation, it was learned that Ms. Gonzales was staying at a room at the Ramada Suites in El Monte, California.

Surveillance was set up on Ms. Gonzales, who was registered at the Ramada Suites Hotel. Additional residences under surveillance belonged to Mr. de Castro and Rodolfo Dimas in El Monte.

FLORES, JOSE LUIS                          5                         12-16-93
CR 140788

On 4-19-93, the negotiation with Mr. Isordia took a turn. The individual, Manuel, who did all the negotiating up to this point was no longer calling. A different individual, who said his name was Manuel started calling Mr. Isordia. This individual acted very angry and demanded that Mr. Isordia meet him with the money at a Winchell's Donut shop in El Monte at 9:30 p.m. At 9:20 p.m., detectives followed Dimas, de Castro and Gonzales to an area near Winchell's. Ms. Gonzales was dropped off at a taco shop, while Mr. Dimas and Mr. de Castro drove around the area for about 30 minutes. As Mr. Isordia did not show up, Dimas and de Castro picked up Ms. Gonzales and returned to Mr. de Castro's residence.

After the unsuccessful meeting, Mr. Isordia received several telephone calls stating that the kidnappers were not playing around and that they were going to kill the victim. These telephone calls were made by two different individuals, both of whom were very intimidating and threatening toward both victim and Mr. Isordia.

On 4-20-93, Manuel told Marcos Isordia to meet him at the Winchell's donut store between 6:00 and 6:30 p.m. The caller stated that after the money was turned over, the victim would be released. Mr. Isordia agreed to meet the kidnapper.

Surveillance units followed two vehicles from Mr. de Castro's residence to the Winchell's Donut House. Mr. Dimas was observed exiting one of the vehicles and then entering Winchell's. Mr. de Castro was observed driving and parking the same vehicle approximately 75 yards from Winchell's. A third subject, identified as Luis Arce, was observed parking a motorcycle next the Winchell's exit.

Arrest was effected on all three individuals at the same time. Incident to arrest, a fully-loaded SKS semi-automatic rifle was found hidden in the back seat of the car occupied by Mr. de Castro. A B-B gun was recovered from Mr. Arce.

The three subjects were admonished and agreed to make statements. Mr. de Castro told arresting officers that some time ago, his sister, Leticia Gonzales, did a "drug deal or something" with Marcos Isordia. Mr. Isordia took off with Ms. Gonzales' half of the money. Mr. de Castro indicated that Mr. Flores (Infante) and three others, "came up with this idea to get the money back." Mr. de Castro indicated that in addition to Mr. Flores, three other males were involved in the abduction.

Mr. de Castro allowed the victim to remain at his residence for two days, although he did not want her there as he "did not want to go to jail." Mr. de Castro indicated that he knew the victim had

FLORES, JOSE LUIS                          6                           12-16-93
CR 140788

been kidnapped as somebody was with her wherever she went. While being held at his residence, the victim was kept in his cousin, Mr. Arce's bedroom.

Mr. de Castro admitted making the ransom calls to Mr. Isordia but stated he only made the calls to assist in the release of the victim as he "believed they were trying to put pressure on Marcos."

Mr. de Castro indicated that on 4-19-93, he went to see Ms. Gonzales at the Ramada Inn in El Monte. An unidentified subject involved in the initial kidnapping called de Castro and wanted him to set up a meeting with Mr. Isordia. The caller stated that Jose Flores had been arrested and was in the San Diego County Jail. Mr. de Castro subsequently arranged for two meetings with Mr. Isordia. Prior to the second meeting, Ms. Gonzales showed up at the de Castro residence with her four children. At the second meeting, Mr. Arce was to accept the money from Mr. Isordia and meet the others back at the de Castro's residence. Mr. de Castro indicated he took the loaded rifle with him "to make sure nobody gets hurt."

Mr. de Castro maintained that the victim was being held in Tijuana. He also stated he did not take part in the abduction. Mr. de Castro stated he believed he was to get between $45,000 to $70,000 from Mr. Isordia but was to receive no money for his participation.

Mr. Arce told detectives that Mr. de Castro and Ms. Gonzales asked Arce if he wanted to earn "a couple hundred" dollars for picking up a bag of money. Mr. Arce stated he was told by them to go to Winchell's Donut House in El Monte, where he would meet an unknown man and to pick up the money. Mr. Arce went to the Winchell store twice at their direction. At the first meeting, no one showed up.

At the second meeting, Ms. Gonzales told Mr. Arce that her brothers, de Castro and Dimas, would go with him to Winchell's. Mr. Arce drove to Winchell's and sat in the parking lot on his motorcycle waiting. Messrs. Dimas and de Castro arrived and Mr. Dimas went inside Winchell's to wait. Mr. Arce admitted calling Mr. Isordia telling him to quit playing games and threatened to kill the victim. Mr. Arce maintained that Ms. Gonzales had written these statements down for him on a piece of paper.

Mr. Arce indicated that it was not until one or two days prior to arrest that he realized that someone was being held. Mr. Arce denied telling Isordia that he was going to cut off the victim's ear but admitted that he said he was going to shoot her. Mr. Arce indicated that he believed Ms. Gonzales was calling the shots of the kidnapping, stating, "She's the one that offered me a couple hundred bucks to pick up the money. She's probably the boss here. She's the one responsible for everything."

FLORES, JOSE LUIS                          7                          12-16-93
CR 140788

After being shown a picture of the victim, Mr. Arce indicated he had seen her at the de Castro house, while she was being kidnapped. Arce indicated he did not know where the victim was at the present time.

Mr. Dimas told detectives that the first time he was aware of the kidnapping was on 4-15-93. Ms. Gonzales advised him that as Mr. Isordia would not pay her the money he stole from her, Mr. Flores and others kidnapped his mother and would hold her until the money was received. Mr. Dimas overheard telephone conversations between Ms. Gonzales and Mr. Isordia, regarding an exchange of money for the release of the victim. Ms. Gonzales asked Mr. Dimas and Mr. de Castro for their assistance in picking up the money from Isordia. As Ms. Gonzales was troubled that Mr. Isordia did not show up at the pre-arranged meeting, she asked Mr. Dimas to speak with him on the telephone and pretend to be "Manuel." Mr. Dimas subsequently had several conversations with Mr. Isordia. After Mr. Isordia again failed to show up after two meetings were planned, Mr. Dimas told him to deliver the money or his mother would be hurt. Mr. Dimas indicated that he was only doing what Ms. Gonzales asked him to do.

Mr. Dimas and Mr. de Castro agreed to help Ms. Gonzales pick up the money from Mr. Isordia at Winchell's Donut House in El Monte. Mr. de Castro took his rifle for protection. The plan was for a friend, Mr. Arce, to drive a motorcycle to pick up the money while Mr. de Castro and Mr. Dimas would follow. Dimas maintained that he was not to receive any monetary compensation for his participation.

Sheriff deputies then went to the de Castro residence and arrested Ms. Gonzales. The deputies admonished Ms. Gonzales and told her that Messrs. de Castro, Dimas and Arce had been arrested and gave an identical story regarding their involvement in Ms. Gonzales' organization and participation in the kidnap-for-ransom. Ms. Gonzales gave the following account of the instant offense: Marcos Isordia cheated her friend Manuel by placing a gun to Manuel's head and taking his drug money. As Ms. Gonzales was unable to get the money back she went to the home of Mr. Isordia's mother, the victim, and told everyone at the home that they needed to leave as Marcos was in trouble.

Ms. Gonzales then told detectives that she called her residence because she had left her four children with a babysitter. When she called, an unknown male answered the phone and told her that he had her children and that they would be killed or her daughter raped if Ms. Gonzales did not help get the money back. Ms. Gonzales indicated she attempted to negotiate with Marcos prior to the kidnapping.

Ms. Gonzales went on to state that both she and the victim were kidnapped at gunpoint and put in her vehicle, which the kidnappers

FLORES, JOSE LUIS                              8                              12-16-93
CR 140788

were driving.  From that point, Ms. Gonzales began helping the kidnappers as she felt her life and the lives of her children were in danger.

Ms. Gonzales stated the three kidnappers were friends of Manuel and unknown to her.  Ms. Gonzales indicated she helped Manuel but did not want the victim to get hurt as the victim was like a mother to her.  Ms. Gonzales indicated that she was supposed to meet the kidnappers at the Tijuana border, where she would exchange the money for the victim.

During the interview, Ms. Gonzales changed her story several times regarding her involvement in the abduction.  She initially stated that she did not leave in the vehicle with the kidnappers and victim.  She then recanted indicating that the plan was for her to go to the victim's house and take the victim out.  As Ms. Gonzales failed to do this, the men walked into the house and put a gun to the victim's head.  The kidnappers then put some kind of substance in the face of the victim and Ms. Gonzales to make them fall asleep.  When they were getting into the car, one of the men was going to hit the victim on the head with a gun because she was screaming, but Gonzales pushed the man out of the way causing him to drop his gun.

Ms. Gonzales went on to state she was driving the vehicle and speeding on the freeway in order to get the attention of police.  The men told her that if she did not want her kids to get hurt she should be careful.  They also told her to tell the Border Patrol that the victim was her mother, which she did.  At one point, Ms. Gonzales told the victim to try to get the attention of police, but one of the men put the victim back into the car.

Ms. Gonzalez stated after the kidnapping they all went to the de Castro residence.  After one day, Ms. Gonzales left on her own and the kidnappers did not bother her or the children nay more.  One of them kept her keys and left in her vehicle.

When the kidnappers could not reach Marcos Isordia, they threatened to take Ms. Gonzales and her kids again if she would not deal with Marcos.  It was at this time that she asked her brothers to help and told them what to do.  Ms. Gonzales indicated that Mr. Flores became involved as he was trying to protect Ms. Gonzales and her children.

Ms. Gonzales stated that at one point, the men told her that they were going to shoot the victim.  Ms. Gonzales told them to go ahead, do what they want, that she "was sick of their shit," and for them to "just forget it."  She said they had already taken $47,000 from her and that she had an additional $17,000 in hr purse at the time.

FLORES, JOSE LUIS                              9                              12-16-93
CR 140788

Ms. Gonzales continued to change her story several times. She finally told detectives that it was Mr. Flores who had been talking to Mr. Isordia the entire time and that the only way detectives could find the victim was through Mr. Flores. Ms. Gonzales admitted she did plan everything to turn the money over to the men. When questioned a second time regarding the amount of money she had given the kidnappers, she indicated that she gave them $37,000. When asked why she did not notify the authorities, she indicated that she did not want to get involved as she feared retaliation.

On 4-19-93, Jose Flores entered the United States from Mexico. The vehicle in which he was riding was turned over to secondary inspection. A loaded, .25-mm semi-automatic handgun with the safety off and hammer cocked, was found under the front passenger seat where Mr. Flores was sitting. Mr. Flores was arrested after a computer check revealed he had a prior felony conviction and an outstanding felony arrest warrant.

On 4-20-93, Sheriff detectives contacted Mr. Flores in County Jail. Mr. Flores was admonished and declined statement.

On 4-21-93, in the early morning hours, three, as of yet unidentified, kidnappers entered the room, in which the victim was staying and told her she could leave. The kidnappers told her to give them five minutes, enough time to leave the area and then she could leave. They made her promise not to identify them, ever. Ms. Isordia waited five minutes, left the hotel room and ran to a residence where she was allowed to use the telephone. She then telephoned her family, who picked her up and took her home to Imperial Beach.

On 4-21-93, at approximately 4:30 a.m., Sheriff's detective received a call from Marcos Isordia who stated that his mother was safe and in good condition. He indicated she was very nervous and reluctant to return home but was convinced by her family to return.

FLORES, JOSE LUIS                           10                            12-16-93
CR 140788

**VICTIMS:**

---

RESTITUTION: UNKNOWN

VICTIM NOTIFIED OF P&S HEARING: YES          INTENDS TO APPEAR: UNKNOWN

SOURCES OF INFORMATION for this section

PRELIMINARY HEARING TRANSCRIPT; TELEPHONE CONTACT WITH VICTIM'S DAUGHTER SYLVIA

---

A letter was sent to the victim, 49-year-old Maria Betran Isordia on 11-23-93. As of the date of the filing of this report, we have heard nothing from Ms. Isordia. The Probation Officer made several attempts to reach Sylvia Isordia, the victim's daughter, at her place of employment. During a telephone contact with Sylvia on 11-22-93, the Probation Officer requested that she act as an interpreter for her mother during interview at South Bay Probation or at the victim's own home. Sylvia stated she would have to discuss this with her mother and would notify the Probation Officer. We were subsequently unable to reach Sylvia again at work or at her cellular phone number and she did not respond to her pager.

During preliminary testimony Maria Isordia said,"Lety" (Angelica Gonzales, co-defendant) had come to visit. Angelica is the estranged wife of Mrs. Isordia's nephew, Arturo Vasquez. As there was no phone at the Isordia's residence, Lety went out to make a phone call. When she returned to the Isordia home she left the security gate unlocked.

Three men armed with handguns entered the Isordia home. They forced Angelica Gonzales and Mario Isordia out of the residence. Mrs. Isordia's 88-year-old mother watched in terror. Mrs. Isordia stated she had the imprint of the gun on her right temple and her head hurt for a few days. They covered her nose and mouth with toilet paper saturated with something that smelled strong. This made her feel like she was dying, like she was drunk. They forced her into the backseat of her vehicle and then she noticed that Lety was driving. When they arrived in El Monte they took her to a bedroom where she slept. Jose Flores, whom she identified as being one of the three armed men who entered her home, had been to the victim's home a few days earlier, at which time Angelica Gonzales had identified him as being her brother.

The kidnappers permitted her to talk to her son Marcos. She was told to tell him that it would be very bad for her if they did not get the money. She told her son, "Sell the house; rescue me."

FLORES, JOSE LUIS                             11                           12-16-93
CR 140788

She was moved from El Monte to a house in Tijuana. She stayed there a couple of days and was moved to a hotel where she stayed two additional days. She was then moved to another hotel but was confused about how long she was there.

She was nervous the entire time she was a prisoner because they would "move the guns, take them out of the pack." One of the kidnappers shot out the window at one of the hotels. The whole time she was a prisoner the victim felt like "they were going to kill me any minute."

When she last saw the kidnappers who were guarding her in Tijuana after 8 days and 6 1/2 hours they told her she was "free but to wait five minutes for them to get out." She was subsequently able to identify for authorities the places she had been detained.

**DEFENDANT'S STATEMENT:**

SOURCES OF INFORMATION for this section

INTERVIEW WITH DEFENDANT AT SAN DIEGO COUNTY JAIL, 11-30-93

Interview of the defendant was accomplished in English and Spanish with the assistance of a Spanish interpreter who was available throughout the interview. The defendant did not submit a probation questionnaire nor has he submitted a written statement regarding his involvement in this offense.

The defendant explains his ultimate participation in this offense indicating that he had been living in East Palo Alto, California having moved there from southern California in 1990 in order to "get away from bad friends." In approximately September, 1992, he met Leticia Gonzales who was living in Milpitas, California, a nearby community and established a boyfriend-girlfriend relationship with her. She was at that time living with her four children and separated from her husband. He states, "I always had a respectful relationship with her and we did things together with her and her children as a family." He explains that in April, 1993, Lety called and was very distraught and said her children were kidnapped and going to be killed unless he helped her. She was at that time staying in El Monte. He claims he flew down here to try and help her and was told that $90,000 had to be collected to ransom her children. The defendant stated he had no idea why they called him as he had no access to that kind of money and told them that he was not able to help. He states that after two days he went back home to East Palo Alto, where he tried to borrow money from friends and relatives. He states that on the 13th he flew back to El Monte to hand over $2,000 that he was able to borrow from various friends. He then went back

FLORES, JOSE LUIS                           12                          12-16-93
CR 140788

home again and a day or so later received another phone call from Lety who said she and her children and Maria Isordia had been kidnapped. The defendant states he came back to San Diego where three men picked him up and drove him to a motel and enlisted his assistance in calling Marcos Isordia to demand money and to make threats against the victim if the money was not delivered. The defendant states that he made one call to Marcos of this nature and on one occasion spoke to his mother, the victim, "encouraging her" to communicate the seriousness of this situation to Marcos. He claims that he never saw Lety or the children after that until April 15.

The defendant states the three men who were only known by nicknames took him to various places and told him to make phone calls to the victim or to Marcos and to stress the need for money or "something was going to happen to the victim, the victim's family or to Lety's children. The defendant states that on 4-16 or 4-17, Marcos agreed to turn over some money and that a time and place of meeting was arranged but Marcos failed to appear. Later the men called Lety to complain that he did not show up. Lety stated to the defendant that she had managed to collect $30,000 in a paper bag and gave the money to the defendant to deliver to the kidnappers. The defendant states that on 4-19, accompanied by one of the kidnappers, he took the bag of money to a location in Tijuana where he handed it over. The defendant states he was always accompanied by at least one of the three kidnappers. The one he knew as Manuel had accompanied him to Tijuana and was in the car with him on the way back to Tijuana when they were stopped by the Border Patrol. Manuel told the defendant that he had a gun and that he placed the gun on the floor of the car under the defendant's seat. He told the defendant to admit ownership of the gun or "bad things would happen to los ninos."

The defendant complains that after his arrest and after the proceedings began he was mistakenly identified as "Manuel" who made threats during demand phone calls to "cut off the ears" or "shoot" the victim. He denies all this. He states, "The only reason I got involved in any of this was to help. I never, ever expected to get any money. My only mistake was not telling the police as soon as I found out what was going on. I really believed the children were kidnapped. I knew nothing about Marcos stealing money from anyone."

**CRIMINAL HISTORY:**

SOURCES OF INFORMATION for this section

STATE & LOCAL RECORDS, 11-24-93

AKA:   Infante, Jose Luis Flores

FLORES, JOSE LUIS                          13                          12-16-93
CR 140788

| 12-30-89 | Bishop PD | 11352 H&S<br>11353 H&S<br>11550(a) H&S | 3-2-90 Inyo Sup Ct case 17244 def conv ct 1 11352 H&S, Fel 5 yr unspv prob 270 dys jl, fine |

The defendant states that he, a 17-year-old friend and a 19-year-old friend were in his car getting gas in a station. For some reason, the police came and searched the car and found less that 1 oz of cocaine in a jacket pocket in the trunk of the car. The defendant states he pled guilty to something. He did not know it was Sales, because no one in Court spoke Spanish.

## PERSONAL HISTORY

The following information was offered by the defendant. Unless noted otherwise it has not been verified.

### Significant Family Information:

The defendant was born in Michoacan, one of four children. The majority of his family remains in Mexico. He has two brothers who have minor criminal histories. Six years ago he came to California where he has been residing on a temporary residency card and established a residence most recently in the San Jose - East Palo Alto area.

### Education:

Ten years in Mexico.

### Employment History:

The past five years the defendant has worked as a cook at various locations. He last worked for the Reed Rite cafeteria full time for one year. He was laid off in February, 1993. Between 2/93 and 4/93 he did temporary placements.

### Source of Support:

Self

### Financial Condition:

Poor

### Number of Dependents & Ages/Relationship to Defendant:

None

FLORES, JOSE LUIS  　　　　　　　　　14　　　　　　　　　　　12-16-93
CR 140788

**Military Status:**

Not applicable

**Marital Status:**

Single

**Psychological/Medical Problems:**

None

**Physical Health:**

Good

**Substance Abuse History:**

The defendant states that for two or three months in 1989 he was a user of cocaine. He used it a total of less than ten times. He moved from southern California to northern California at that time in order to get away from the friends who were "encouraging him" to use drugs.

**COLLATERAL INFORMATION:**

SOURCES OF INFORMATION for this section

MEXICAN CONSULAR

On 11-30-93, we were contacted by Julio Tejada, telephone 531-8414, extension 48 who represented himself to be a member of the Mexican Consulate. He wished to speak in behalf of the defendant. It was not clear as to whether he was speaking at someone else's request or because of a personal acquaintance with the defendant. He submits that since the defendant's first conviction for drug involvement in 1990, he has made every effort to maintain himself as a law abiding and contributing member of the community. He moved to a small community in northern California, East Palo Alto, where he began a dedicated program of church involvement and community volunteer work. Mr. Tejada describes the defendant as naive and thinking he needs to help whenever he is asked. Mr. Tejada states that there are many persons from the community and from the defendant's church who wish to submit their comments in behalf of the defendant. Mr. Tejada was advised to have those persons write character reference letters and send them to the court or the defendant's attorney. Should any of those letters reach the Probation Officer they will be attached to the Probation report.

FLORES, JOSE LUIS                      15                    12-16-93
CR 140788

**SENTENCING DATA:**

**Possible Circumstances in Mitigation:**

Rule 423(a)(5): The defendant argues that he had no apparent predisposition to this crime but was induced by his need to offer assistance to the "kidnapped children" of the co-defendant Gonzales to participate in this crime. (Counts One, Two and Three)

Rule 423(b)(1): The defendant has a limited prior record of criminal conduct amounting to one felony conviction. (As to all counts.)

**Possible Circumstances in Aggravation:**

Rule 421(a)(1): The crime involved great violence, the threat of great bodily harm and other acts disclosing a high degree of cruelty, viciousness or callousness. The victim was forcibly and violently dragged from her home at gunpoint and witnesses report seeing the victim struck on the back of the head prior to being shoved into a waiting vehicle. (Counts One, Two and Three.)

Rule 421(a)(3): The victim was particularly vulnerable being attacked in her own home in the presence of her 88-year-old mother and other relatives. (Counts One, Two and Three.)

Rule 421(a)(8): The manner in which this crime was carried out indicates planning, sophistication or professionalism. The number of people involved in the occurrences over the eight days during which the victim was in their custody indicates that some master plan was being applied and that premeditation had occurred. (Counts One, Two and Three.)

Rule 421(b)(1): The defendant has engaged in violent conduct in this matter which indicates he is a serious danger to society. He was identified by the victim as one of three armed kidnappers who dragged her from her home. (As to all counts.)

Rule 421(b)(4): The defendant was on probation to the Court in Inyo County for a felony conviction involving drug sales. (As to all counts.)

**Prison Term Analysis:**

**Indeterminate Term:**

Count Two, PC 209(a) carries a term of life with possibility of parole. Count Two is selected as the primary term.

FLORES, JOSE LUIS                          16                          12-16-93
CR 140788

The attached PC 12022(a)(1) carries an additional one year term to be served consecutively.

Count One, PC 182(a)(1) carries a term of life with possibility of parole. Punishment for Count One is barred per PC 654 as it represents the overt act outlined in Count Two. Punishment for Conspiracy to Commit Illegal Acts and for the Illegal acts themselves violate PC 654 if the conspiracy has no other objective than the specific acts charged. The attached PC 12022(a)(1) and PC 12022.5(a) would therefore also be barred per PC 654.

Determinate Terms:

Count Three, PC 207(a), carries a sentence range of three years, five years or eight years in State Prison. The upper term is recommended, based on the nature of the Aggravating Factors. This count also depicts actions taken by the defendant and co-defendants in Count Two and therefore punishment is barred per PC 654.

The attached enhancements per PC 12022(a)(1) and 12022.5(a) similarly would be barred from punishment per section 654 of the Penal Code.

Count Six, PC 12021(a) carries a sentence range of 16 months, two years or three years. The Probation Officer is recommending the middle term of two years as there appears to be no justification for deviation from the mid term. Count Six is recommended at full, mid term, consecutive, because it is the only count under the determinate sentencing scheme. Therefore the defendant's total prison exposure under this recommendation scheme would appear to be life with the possibility of parole plus three years.

**EVALUATION:**

Probation Eligibility:

Rule 413(a): The defendant is absolutely ineligible for probation pursuant to 1203.06(a)(1)(iv).

Insofar as the defendant appears to be absolutely ineligible no further discussion of probation rules will be included.

* * *

This 23-year-old single man comes to Court for sentencing having been involved in a kidnapping where threats of injury and death were made against the victim. The Probation Officer's contact with the defendant reveals an individual with a tendency to minimize the seriousness of the offense and to utilize denial and emphasize his

FLORES, JOSE LUIS            17                    12-16-93
CR 140788

"lack of sophistication," to explain how a seemingly law abiding individual came to participate over such an extended period of time in activities that were so obviously criminal.

The Probation Officer attaches little credibility to the defendant's insistence that he was only "helping his girlfriend" recover her children especially in view of the identification of the defendant by the victim as one of the three armed kidnappers.

The fact remains that the defendant and his actions terrorized the victim over an eight day period and by her own testimony convinced her that she was going to be killed.

The present matter is of such seriousness that to recommend less than the penalty called for in Count Two, Life with Possibility of Parole, would denegrate the offense.

### CUSTODY DATA:

At the time of sentencing, PC 1191.3 requires the Court to make an oral statement that statutory law permits the award of conduct and work-time credits up to one-third or one-half of the sentence that is imposed by the Court; that the award and calculation of credits is determined by the Sheriff in cases involving imprisonment in county jails; by the Department of Corrections in cases involving imprisonment in the state prison; and that credit for presentence incarceration served by the defendant is calculated by the Probation Department under current state law.

| Date Confined | Date Released        | Place              | Custody Days |
|---------------|----------------------|--------------------|--------------|
| 4-21-93       | 12-16-93 (in custody)| C.J.               | 240          |
|               |                      | PC 4019            | 120          |
|               |                      | Total CTS          | 360          |

### RECOMMENDATION:

As to the Determinate Counts:

That probation be denied and the defendant be committed to the Department of Corrections for the two years with credit for time served of 240 actual days and 120 days 4019 PC credits, a total of 360 days credit; further, that the defendant pay a restitution fine pursuant to 13967 Government Code in the amount of $2,000 to be paid forthwith or as provided in 2085.5 PC.

FLORES, JOSE LUIS                                             18                                        12-16-93
CR 140788

As to the Indeterminate Counts:

That probation be denied and the defendant be committed to the Department of Corrections for the term of life with the possibility of parole plus one year for the enhancement of PC 12022(a)(1) with zero days credit for time served.

**Term Recommendation Breakdown by Count is as Follows:**

As to Indeterminate Counts:

| Crime | Suggested Base Term | Recommended Term | Recommended Stay |
|---|---|---|---|
| Count 2<br>209(a) PC | Life with Parole | Life with Parole | 0 |
| Enhancement<br>12022(a)(1) PC | 1 year | 1 | 0 |
| Count 1<br>182(a)(1) PC | Life with Parole | 0 | Life with Parole<br>Per PC 654 |
| Enhancement<br>12022(a)(1) PC | 1 year | 0 | 1 year<br>Per PC 654 |
| Enhancement<br>12022.5(a) PC | Mid - 4 years | 0 | 4 yr<br>Per 654 PC |

FLORES, JOSE LUIS                                          19                                      12-16-93
CR 140788

As to Determinate Counts:

| | | | |
|---|---|---|---|
| Count 3<br>207(a) PC | Upper - 8 | 0 | 8 years<br>Per 654 PC |
| 12022(a)(1)PC | 1 year | 0 | 1 year<br>Per 654 PC |
| Enhancement<br>12022.5(a)PC | Mid - 4 years | 0 | 4 years<br>Per 654 PC |
| Count 6<br>12021(a) PC | Mid - 2 years | 2 | 0 |

**Total Recommended Term    Life with Parole Plus 3 years**

Respectfully submitted,

ALAN M. CROGAN
Chief Probation Officer

By:


BARBARA GERLACH
Deputy Probation Officer
531-6084

Approved_____
            MAUREEN A. GALLAHER, Supervisor

I have read and considered the foregoing report.

                                    _____
                                    JUDGE OF THE SUPERIOR COURT

BG:prb

PROB. 2185 (6-19-91)