# EXHIBIT F
# part 1 of 2

MC-275

Name  Jose L. Flores

Address  Correctional Training Facility

P.O. Box 689

Soledad, CA 93960

CDC or ID Number  J-03392

F I L E D

Clerk of the Superior Court

DEC 1 1 2006

By:_____,Deputy

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN DIEGO

(Court)

WRIT GRANTED/DENIED
DATE _____

PETITION FOR WRIT OF HABEAS CORPUS

JOSE L. FLORES,
Petitioner

vs.

BEN CURRY, Warden (A),
Respondent

No.  HC17790 - 3rd

(To be supplied by the Clerk of the Court)

CR140788

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

[ ] A conviction      [ ] Parole

[XX] A sentence      [ ] Credits

[ ] Jail or prison conditions      [ ] Prison discipline

[XX] Other (specify): PAROLE UNSUITABILITY BY PAROLE BOARD

1. Your name: **Jose L. Flores**

2. Where are you incarcerated? **Correctional Training Facility, P.O. Box 689, Soledad, CA 93960**

3. Why are you in custody? [XX] Criminal Conviction    [ ] Civil Commitment

    *Answer subdivisions a. through i. to the best of your ability.*

    a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

       **Kidnap for ransom w/use of a firearm**

    b. Penal or other code sections: **209(a) / 12022.5(a)**

    c. Name and location of sentencing or committing court: **San Diego Superior Court**

       **San Diego, California**

    d. Case number: **CR 140788**

    e. Date convicted or committed: **11/19/93**

    f. Date sentenced: **12/16/93**

    g. Length of sentence: **Life w/possibility of parole in 7 years**

    h. When do you expect to be released? **To be determined**

    i. Were you represented by counsel in the trial court? [ ] Yes. [ ] No. If yes, state the attorney's name and address:
                                         **N/A**

4. What was the LAST plea you entered? *(check one)*

    [ ] Not guilty    [ ] Guilty    [ ] Nolo Contendere    [ ] Other:
    **N/A**

5. If you pleaded not guilty, what kind of trial did you have?

    [ ] Jury    [ ] Judge without a jury    [ ] Submitted on transcript    [ ] Awaiting trial
    **N/A**

6. GROUNDS FOR RELIEF

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

PLEASE SEE APPENDIX "A" AT PAGE 6

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

PLEASE SEE APPENDIX "A" AT PAGE 6 FOR ANSWER TO 6(a)

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

PLEASE SEE APPENDIX "B" AT PAGE 15 FOR ANSWERS TO 6(b)

8. Did you appeal from the conviction, sentence, or commitment? ☐ Yes. ☐ No.    If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): N/A

b. Result: _____    c. Date of decision: _____

d. Case number or citation of opinion, if known: _____

e. Issues raised: (1) _____

(2) _____

(3) _____

f. Were you represented by counsel on appeal? ☐ Yes. ☐ No.  If yes, state the attorney's name and address, if known: N/A

_____

9. Did you seek review in the California Supreme Court? ☐ Yes. ☐ No.    If yes, give the following information: N/A

a. Result: _____    b. Date of decision: _____

c. Case number or citation of opinion, if known: _____

d. Issues raised: (1) _____

(2) _____

(3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal: N/A

_____

_____

11. Administrative Review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review: ADMINISTRATIVE REVIEW IS NOT AVAILABLE FOR PAROLE BOARD DECISIONS

_____

_____

_____

_____

_____

_____

_____

b. Did you seek the highest level of administrative review available? ☐ Yes. ☐ No. N/A
*Attach documents that show you have exhausted your administrative remedies.*

MC 275 [Rev. January 1, 1999]    **PETITION FOR WRIT OF HABEAS CORPUS**

- 3 -

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

      (2) Nature of proceeding (for example, "habeas corpus petition"): _____

      (3) Issues raised: (a) _____

           (b) _____

      (4) Result *(Attach order or explain why unavailable)*: _____

      (5) Date of decision: _____

    b. (1) Name of court: _____

      (2) Nature of proceeding: _____

      (3) Issues raised: (a) _____

           (b) _____

      (4) Result *(Attach order or explain why unavailable)*: _____

      (5) Date of decision: _____

    c. *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)
   **No delay**

_____

_____

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

_____

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

_____

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
   **This Court has original jurisdiction**

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date:    12 | 6 | 06        ▶ *Jose Luis Flores Jr*
                                         (SIGNATURE OF PETITIONER)

A P P E N D I X   "A"

Answers to 6, et seq.

I N T R O D U C T I O N

COMES NOW Jose L. Flores (hereafter Petitioner) with his writ
of habea corpus contending that the Board of Parole Hearings
(hereafter Board) finding him unsuitable for parole at his third
parole suitability hearing was not supported by the evidence.

In an order filed in the Superior Court of California, County
of San Diego, on September 19, 2005, denying Petitioner's 2004 habeas
corpus (EXHIBIT 1), the Court interpreted Petitioner's testimony
before the Board to be that Petitioner admitted to planning the kidnap
for which he was convicted in a conspiracy.  As will be demonstrated,
in evidence presented to the Board at Petitioner's parole suitability
on June 15, 2006, clearing up the confusions in the record, he neither
knew about the kidnap before it took place nor assisted in any way
the planning of the kidnap.  Petitioner's parole suitability should
be based not on the commitment offense as a whole, but rather based
on his individual culpability in the offense.

In finding Petitioner unsuitable for parole the Board relied
on the commitment offense and Petitioner's insufficient parole plans,
claiming they did not see them in the file; therefore, Petitioner
will present only the facts relevant to the reasons the Board used
to find him unsuitable for parole.

///////
///////
///////

Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION TO FIND HIM UNSUITABLE FOR
PAROLE WHEN HE HAS SATISFIED THE LEGISLATIVELY
PRESCRIBED PUNISHMENT FOR THE COMMITMENT OFFENSE AND
THERE IS NO EVIDENCE HE IS <u>PRESENTLY</u> A THREAT TO PUBLIC
SAFETY, THE DECISION BEING ARBITRARY AND AN ABUSE
OF DISCRETION

## Answers to 6(a) - Supporting facts

At the outset the Board noted that Petitioner's life term started
on August 15, 1995 and his minimum eligible parole date (MEPD) was
August 16, 2002 (EXHIBIT 2, HT 1:8-14).[1] Petitioner's controlling
offense was kidnap for ransom in violation of Penal Code § 209(a)[2]
with use of a firearm in violation of Penal Code § 12022.5(a).

After pro forma preliminary procedures, Petitioner's parole
suitability hearing begins in earnest (HT 10). Petitioner presented
a declaration under penalty of perjury stating his exact involvement
in the commitment offense (HT 10:14-18; see EXHIBIT 3). Petitioner
was then sworn to tell the truth (HT 10:19-24).

The facts of the commitment offense, which are quite lengthy,
were read into the record (HT 11:8-20:19), incorporated herein by
reference.

Petitioner was asked what was his involvement in the offense
(HT 20:22-23). Petitioner explained because of the confusion in
the record, the previous Panel requested that he document exactly
what his involvement was, so he did so in a declaration under penalty

---

1. Reference to parole hearing transcript (EXHIBIT 2) will be made by HT
   followed by page number, and line number where necessary, e.g., (HT 1:1).

2. All statutes and regulations are California, unless otherwise noted.

- 6 -

of perjury which he relies on for the facts of his involvement in the offense (HT 20:25-21:3).

In response, Commissioner Garner stated: "we will review this during our deliberations and incorporate whatever we feel is appropriate. [] And at some point we may want to put it on the record or we may adopt it by way of exhibit and get it back in the record that way" (HT 21:12-19).

Pursuant to Penal Code § 3041(d), any statements or materials considered shall be incorporated into the transcript, see also California Code of Regulations, Title 15, § 2249 ("A prisoner shall have the right to present relevant documents to the hearing panel"). In that in a conspiracy parole consideration is to be based on the prisoner's individual acts in the offense, Petitioner presents the facts of his individual involvement in the offense from his declaration (EXHIBIT 3):

On April 11, 1993, I was residing in East Palo Alto, California when I received a phone call from my former girlfriend, Letty Gonzales, who at the time told me that something terrible had happened and she and her children were in danger and I could come to El Monte, California. I asked what happened but Ms. Gonzales would not discuss it over the phone, only insisting that I come to El Monte because she and her children were in great danger.

On April 12, 1993 I flew to El Monte. When I arrived in El Monte I called Ms. Gonzales and she instructed me to go to a local Motel 6 and rent a room. After securing a room at the Motel 6, I called Ms. Gonzales.

Ms. Gonzales came to my room at the Motel 6 accompanied by a man who was introduced to me as Manuel. Ms. Gonzales informed me that Manuel had her children and was holding them to force her to help him get $90,000 back that her cousin Marcos Isordia had ripped him off for.

Manuel then told me that Ms. Gonzales' cousin, Marcos, had ripped him off for $90,000 and if he wanted his money back and if he did not get it back something would happen to somebody. When I asked Manuel what he meant, he told me that he had Ms. Gonzales' children and that I better not go to the police or he will hurt the children and rape Ms. Gonzales' daughter.

On April 13, 1993, around noon, I flew back to East Palo Alto, arriving at the San Jose airport between 3:00 and 4:00 p.m.. I went to East Palo Alto and

contacted several friends in an attempt to borrow money to pay Manuel. I raised only $1,000. I rented a room in Sunnyvale, California around 8:00 or 9:00 p.m. that night.

On April 14, 1993 I flew back to El Monte and called Ms. Gonzales upon my arrival. Ms. Gonzales instructed me to return to the Motel 6 and this time rent two rooms. I did as Ms. Gonzales instructed me and after securing the two rooms called Ms. Gonzales telling her where I was at.

Ms. Gonzales and Manuel came to the motel and I gave Manuel the $1,000 I had raised. Manuel was very upset that I had raised only $1,000. It was at that time I was told Ms. Isordia had been kidnapped.

To this point on April 14, 1993, I had only been aware that Ms. Gonzales' children were being held by Manuel and had absolutely no prior knowledge that Ms. Isordia was a victim in Manuel's attempt to get his money returned from Marcos Isordia.

On April 14, 1993, after I gave Manuel the $1,000, he told me he would release the children of Ms. Gonzales, but I would have to help him collect the money Marcos stole from him. It was then I was told of the kidnap of Mrs. Isordia and that all I would have to do is make some phone calls and collect the money from Marcos and give it to him, Manuel. I went with Manuel to where he was holding Mrs. Isordia. I made 4 or 5 phone calls and arranged to pick up some money. I was arrested on (April 19, 1993) on my way to pick up the money.

I had absolutely no prior knowledge of the kidnap of Mrs. Isordia, nor was I involved in the kidnap of Mrs. Isordia. My personal involvement was limited to being taken to where Mrs. Isordia was being held, making phone calls, and by Mrs. Isordia's own testimony, trying to comfort her and, when taking her to use a phone, telling her she can leave if she wants.

Petitioner's timeline was established by motel receipts in his possession and will be made available upon an evidentiary hearing if challenged by the respondent.

Petitioner was questioned in relation to the declaration he submitted, confirming his individual involvement in the offense (HT 34:15-37:12).

Deputy District Attorney Sachs did not dispute Petitioner's involvement in the offense, but opposed "parole based on the totality of the circumstances of the offense" (HT 38:8-11).

Relative to the commitment offense and Petitioner's <u>current</u> threat to public safety, the Board reviewed the psychiatric evaluation prepared by Dr. Macomber, one of the Board's own forensic experts,

dated May 13, 2006 (HT 32:11-33:11; see EXHIBIT 4). After a two hour interview with Petitioner and reviewing his central and medical files (EXHIBIT 4, p. 1), Dr. Macomber gives Petitioner a GAF (Global Assessment of Functioning) score of 90 (EXHIBIT 4, p. 3 [90 is the highest score attainable]). Dr. Macomber goes over the commitment offense and Petitioner's involvement in the offense, and, in his expert opinion states: Petitioner's "involvement in this offense appears, in this writers opinion, to be related to his negative associates and his use of poor judgment at the time. He is not at all criminally oriented. There is no evidence of anti-social or criminal thinking or values in this case. There are many situational aspects to this case in his involvement in this situation at the time" (EXHIBIT 4, pp. 3-4).

Most importantly, under "assessment of dangerousness" it is Dr. Macomber's expert opinion, at EXHIBIT , p. 4:

"In considering potential for dangerous behavior when released to the community, I agree completely with Dr. Reed's assessment in his evaluation, dated 5/10/01 (EXHIBIT 5). He concluded that Mr. Flores poses no more risk of violence in the community than the average citizen in the community. This conclusion is supported by the administration at this time of the Level of Service Inventory-Revised. This is an actuarial measure that assesses criminal history, substance abuse history, current achievements, and social relationships and other factors to determine current risk level on parole. He obtained a score of 1.8 cumulative frequency for prison inmates. This score means that if 100 men were released on parole, he would do better on parole than 98 of them. This is an extremely low risk level. He is not a criminally oriented individual. His level of threat to the community is probably lower than the average citizen. ¶ "At this point in time, there are no significant risk factors in this case."

The Board observed: "The psychiatrist's recommendations indicate that you have a very good attitude. You have grown, changed, matured and advanced in his self-awareness and knowledge over his years of incarceration and the prognosis for successful adjustment in the community is excellent" (HT 33:2-8). Commenting, "Congratulations,

- 9 -

you have done very well in your adjustment. Certainly we don't always
see that, those kind of recommendations by the psychiatrists"
(HT 33:8-11).

The Board acknowledged that Petitioner, "[b]ecause of the INS
hold there is no likelihood of staying (in the U.S.)"(HT 23:17-18),
so he "could go back to Michoacan where you have family still living"
(HT 23:21-22) where, being a machinist "would look for work in welding
or any kind of skilled machinist work...or some kind of supermarket"
(HT 23:22-27).

Although letters of support were submitted to Petitioner's
counselor prior to the hearing, they were misplaced (HT 46:7-48:6),
or did not make it to Petitioner's file, like letters of support
for housing in Mexico (HT 49:2-11). All Commissioner Garner could
do was offer his "apologies" (HT 49:12-13).

In her letter of support, Petitioner's mother assured the Board
that if he were paroled to Mexico "he can count on us for whatever
he needs. We are able to provide moral, financial as well as work
advice and whatever else he might need" (HT 25:10-15). Mr. Reyes
writes in his letter of support that if Petitioner "were to be taken
to Mexico he also has a home there and overall a job. He will always
have support here or in Mexico" (HT 26:17-21).

Although Petitioner's institutional programming is not at issue,
relative to parole plans, he has "a vocational certificate in
plumbing"; "machine shop"; and "welding" (HT 30:23-31:11), being
congratulated on his many vocations (HT 31:13-14).

In pleading for his freedom, Petitioner told the Board in his
closing statement (HT 42:3-24):

- 10 -

"The reason why I think I should be found suitable is because I know I am a different person, I have changed a lot. I have matured a lot during this whole time and I am very aware of my actions and choices. And I think I would be, once I integrated into society it would be to give support to many people who have gone through drugs and alcohol as I tell them my story and the things I have gone through. I could then prevent many things, many bad things that would happen to others. And as you have seen I haven't wasted my time. I have tried to take all the tools that have been provided to me during the time that I have been incarcerated. And as you have seen my family is waiting for me. I have all the support from them. Another things also, I won't be a load, a load for the state being that I will be deported. And I also ask that you take into account all the time I have spent here. I have been doing positively."

### D E C I S I O N

The Board, in finding Petitioner "not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety" (HT 44:10-12) relied on the following:

"this offense was carried out in an especially cruel manner in that the victim was forced from her home, Maria Isodoria. She was kidnapped. She was held for ransom in a hotel in Tijuana and then transported in and around the Los Angeles County area, eventually winding up in Tijuana. The offense was carried out in a very dispassionate and calculated manner in that the victim was removed from her home, threatened, taken to Mexico and held there for ransom for a number of days. The motive for the crime, the best we could determine, the panel came up with it was some economic gain that they hoped to gain from the kidnapping" (HT 44:18-45:6).

Although, as it was in the past, it is not clear if the Board used Petitioner's single prior conviction for transporting a controlled substance as a reason to deny parole or was simply stating its existence for the record (HT 45:15-20), just as mentioning, almost in pro forma fashion, "you did hear the district attorney from San Diego indicate opposition to the granting of parole" (HT 47:47).

Petitioner was commended for his postconviction behavior as having done "very well" (HT 45:20-21); the psychological evaluation prepared by Dr. Macomber was "a good report" (HT 45:25-46:2).

The Board was concerned about Petitioner's parole plans, seemingly having little support from Mexico and a support system set up (HT 46:6-19). Petitioner pointed out that documents of that

very nature, AA and NA programs in the community he will parole to
in Mexico, were in his file (HT 46:20-22). Said documents were found
and acknowledged: "For the record there is support groups specifically
in Michoacan, Nueva Italia. [] And also in the other, Apasigan in
Michoacan indicating support services in the community that you will
be, you will be paroling to" (HT 47:20-26).

Once it was accepted that Petitioner had a support network in
Mexico, the Board voiced a concern about having housing in Mexico,
stating, "support is one thing but what we need to do is have with
respect to housing and any other kind of support, financial support"
(HT 48:10-14). To clarify, Petitioner asked if what the Board wants
is letters showing he has housing and family support in Mexico (HT
49:2-4). Commissioner Garner answered, "Yes" (HT 49:5). When
Petitioner stated that such letters were sent to his counselor and
should have been in his file, all Commissioner Garner could do was
offer his apologies" (HT 49:6-13 [please see HT 25:10-15, Petitioner's
mother assured the Board that if he were paroled to Mexico he would
be provided "moral, financial as well as work advice and whatever
else he might need"; HT 26:17-21, Mr. Reyes in his letter of support
writes if Petitioner "were to be taken to Mexico he also has a home
there and overall a job. He will always have support here or in
Mexico"]).

Counsel for Petitioner asked the Board if they would have seen
the documents of support discovered during the decision during the
evidence portion of the hearing, would the decision have been
different (HT 50:5-7). Commissioner Garner admitted "it would have
been persuasive" (HT 50:8-9).

The only recommendations the Board made was for Petitioner "to remain disciplinary-free, and we want you to continue in the self-help program" (HT 47:9-11).

The documents supporting Petitioner's parole plans to Mexico "would be incorporated into the next hearing" (HT 48:14-15).

### C O N C L U S I O N

Based on the foregoing facts, court records in this case, and the attached memorandum of law, it is respectfully requested that the Court grant an Order to Show Cause for the Board to provide evidence, other than a pro forma hearing with a predetermined outcome, why Petitioner is <u>presently</u> too dangerous to grant a fixed parole release date and why he should not therefore be granted relief and the Board fix Petitioner's term in accord with due process and his individual culpability, not based on the commitment offense as a whole and the conduct of coconspirators.

Date: _12/06/06_

Respectfully submitted,

_Jose Luis Flores J_
Jose L. Flores
Petitioner in pro per

- 13 -

## V E R I F I C A T I O N

I, Jose L. Flores, hereby declare that I have read the foregoing facts and state that they are true and correct, and having reviewed the exhibits in support of the facts state that they are true copies of the originals. Doing so this ___6___ day of ___December___ , 2006 at Soledad, California.

_Jose luis Flores II_
Jose L. Flores
Petitioner in pro per


## P R A Y E R   F O R   R E L I E F

I, Jose L. Flores, state that I am a prisoner of the state of California and have no other plain or speedy relief save habeas corpus. I respectfully pray that this Honorable Court therefore:

1. Issue an Order to Show Cause why relief should not be granted;

2. Appoint counsel to protect the rights of Petitioner;

3. Grant discovery as necessary to further develop and proof Petitioner's claims;

4. Grant an evidentiary hearing as necessary to resolve any conflict in the facts;

5. Declare the rights of the Petitioner;

6. Grant any other relief the Court deems necessary in the furtherance of justice and to preserve judicial integrity.

Date: _12/06/06_

Prayerfully requested,

_Jose luis Flores II_
Jose L. Flores
Petitioner in pro per

- 14 -

A P P E N D I X   "B"

M E M O R A N D U M   O F   L A W

### Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION TO FIND HIM UNSUITABLE FOR
PAROLE WHEN HE HAS SATISFIED THE LEGISLATIVELY
PRESCRIBED PUNISHMENT FOR THE COMMITMENT OFFENSE AND
THERE IS NO EVIDENCE HE IS <u>PRESENTLY</u> A THREAT TO PUBLIC
SAFETY, THE DECISION BEING ARBITRARY AND AN ABUSE
OF DISCRETION

---

### I N T R O D U C T I O N

It would appear from the decision to find Petitioner unsuitable
for parole that the Board relied solely on the commitment offense,
and then pro forma noted Petitioner's single prior nonviolent
conviction for a drug offense and the district attorney's opposition
to parole, just as the Board noted in passing Petitioner's positive
psychological evaluation. Indeed, the only statutory reason to deny
parole is the gravity and timing of the commitment offense. The
Board then tried to use as a reason to support the decision
Petitioner's lack of parole plans for Mexico, but that quickly
evaporated as the evidence was presented. Thus, Petitioner will
focus on the only clear reason which he can decipher the decision
relies upon--the commitment offense, and there being absolutely no
evidence he is "presently too dangerous to grant a fixed parole
release date."

The issue is consistent with the Due Process Clause of the United
States Constitution: Would the state's penological interest be served
by continued imprisonment who has satisfied the legislatively
prescribed punishment under the determinate sentencing law when there

the evidence clearly demonstrates he is rehabilitated and therefore no evidence he is presently a threat to public safety under the indeterminate sentencing law?

Answers to 6(b) - Supporting cases and authorities

## STANDARD OF EVIDENCE

It is axiomatic, Petitioner has a liberty interest in parole and therefore "an expectation that [he] will be granted parole unless the Board finds, in the exercise of its discretion, that [he] is unsuitable for parole in light if the circumstances specified by statute and by regulation" (In re Rosenkrantz (2002) 29 Cal.4th 616, 654). The Rosenkrantz Court held, in 2002, relying on Superintendent v. Hill (hereafter Hill) (1985) 472 U.S. 445, 456, "that the due process clause of the federal Constitution was satisfied as long as there was 'some basis in fact' and 'some evidence' to support the Board's findings" (Id., at 655). That is no longer the case, however.

It has been presumed that the Supreme Court in Hill meant that "some evidence" applied at the administrative level of executive review, thus the Board only needed "some evidence" to support a decision. Then, on judicial review the courts only needed to assure a decision to deny parole the Board had "some evidence." Thus the Hill decision was ambiguous in its application, leaving no way for the "some evidence" standard to apply itself. That ambiguity was cleared up in the recent Supreme Court decision of Hamdi v. Rumsfeld (2004) 542 U.S. 507, 124 S.Ct. 2633. The High Court held at 124 S.Ct., 2651: "As the Government itself has recognized, we have utilized the 'some evidence' standard in the past as a standard of

- 16 -

review, not as a standard of proof. .... This standard is ill suited to the situation in which a habeas petitioner has received no prior opportunity to rebut the Executive's factual assertions before a neutral decisionmaker." The "some evidence" standard is to be used as "a standard of review" not as "a standard of proof" (Id.). Indeed, although it has been ignored, the Board's own regulations require that parole decisions be supported by "a preponderance of the evidence" (California Code of Regulations, Title 15 (hereafter Cal. Code Regs., tit. 15, § 2000(b)(50)).

Moreover, a parole suitability hearing is _not_ a prison disciplinary hearing and "the conduct of the Board is not the equivalent of conduct of individual correctional officials. In procedural and substantive terms, this type of determination is more analogous to the sentencing determination made by the court" (In re Roberts (2005) 36 Cal.4th 575, 587-588). Justice requires, therefore, if "attacking a parole denial is a challenge to the length of sentence, i.e., the sentence itself" (Id., at 586); the Board's own regulations require "a preponderance of the evidence" standard of proof for the decision, and international terrorists who are enemy combatants of this great nation are entitled to "a preponderance of the evidence" standard at the administrative review level, are prisoners who are eligible for parole entitled to anything less?

Whether by "a preponderance of the evidence standard" or the "some evidence" standard, the Board's decision that Petitioner is presently a threat to public safety is not supported by any evidence (In re Lee (2006) _143_ Cal.App.4th_1400_, 2006 DJDAR 1396 (10-19-06), at 13963 ["The test is not whether some evidence supports the _reasons_

the [Board] cites for denying parole, but whether some evidence
indicates a parolee's release <u>unreasonably endangers public safety.</u>
(Citations.)  Some evidence of the existence of a particular factor
does not necessarily equate to some evidence the parolee's release
unreasonably endangers public safety." Emphasis in original]).

A.  <u>THE BOARD IMPROPERLY DENIED PAROLE BASED UPON CONDUCT OF
    PETITIONER'S COCONSPIRATORS RATHER THAN HIS INDIVIDUAL
    CULPABILITY.</u>

The Board's discretion is broad, but it is not absolute (<u>In
re Powell</u> (1988) 45 Cal.3d 894, 902), the Board's discretion being
structured by statutes and regulations (<u>In re Rosenkrantz</u>, <u>supra</u>,
29 Cal.4th, at 654).  Factor's restricting the Board's determination
in case at bench are set forth in Cal. Code Regs., tit. 15, § 2281,
subd. (c) as follows (with emphasis added):

Circumstances tending to indicate unsuitability include:
(1) Commitment Offense.  The <u>prisoner</u> committed the offense in an especially
heinous, atrocious or cruel manner.  The factors to be considered include:
  (A) Multiple victims were attacked, injured or killed in the same or separate
incidents.
  (B) The offense was carried out in a dispassionate and calculated manner, <u>such
as an execution-style murder.</u>
  (C) The victim was abused, defiled or mutilated during or after the offense.
  (D) The offense was carried out in a manner which demonstrates an exceptionally
callous disregard for human suffering.
  (E) The motive for the crime is inexplicable or very trivial in relation to
the offense.
(2) Previous record of Violence.  The prisoner on previous occasions inflicted
or attempted to inflict serious injury on a victim, particularly if the prisoner
demonstrated serious assaultive behavior at an early age.
(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous
relationships with others.
(4) Sadistic Sexual Offenses.  The prisoner has previously assaulted another
in a manner calculated to inflict unusual pain or fear upon the victim.
(5) Psychological Factors.  The prisoner has a lengthy history of severe mental
problems related to the offense.
(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in
prison or jail.

At the 2006 hearing, the presiding commissioner gave the following
reason finding Petitioner unsuitable for parole (HT 44:18-45:3):

- 18 -

"[T]his offense was carried out in an especially cruel manner in that the victim was forced from her home, Maria Isodoria. She was kidnapped. She was held for ransom in a hotel in Tijuana and then trasported in and around the Los Angeles County Area, eventually winding up in Tijuana. The offense was carried out in a very dispassionate and calculated manner in that the victim was removed from her home, threatened, taken to Mexico and held there for ransom for a number of days."

"Any participant in a conspiracy may be equally culpable as a matter of law. The parole inquiry into the offense severity is much more factual, however, and focuses on the 'actual offense behavior' of the individual prisoner" (Roberts v. Corrothers (9th Cir. 1987) 812 F.2d 1173, 1180).

Firstly, by the Board's own regulations, a crime is "carried out in a dispassionate and calculated manner" when it is of the level of "an execution-style murder," and case at bench is not a murder; and, although kidnapping, always a crime by force, demonstrates "a callous disregard for human suffering," what the Board describes is inherent to what would normally take place in a kidnap for ransom. One cannot be kidnapped without being forced from wherever the location is. The information did not charge Petitioner with any kind of bodily injury enhancement, thus there are no circumstances in and of the offense itself that constitute "a dispassionate and calculated manner, such as an execution-style murder."

Secondly, the Board denied Petitioner for the totality of the offense when evidence, before the Board, affirms that Petitioner did not participate nor have prior knowledge of the kidnapping of the victim, but got involved after the fact and can therefore be held accountable for only coming in contact with the victim after she was transported to Tijuana (see the Appellate Court opinion, EXHIBIT 6, p. 9; EXHIBIT 3). That was Petitioner's conduct. The

- 19 -

district attorney did not contest Petitioner's testimony of his
individual involvement at the hearing (HT 38:8-11).

The inquiry under 2281 is whether "the <u>prisoner</u> committed the
offense in an especially heinous, atrocious or cruel manner"--<u>not</u>
whether the <u>crime</u> was committed "in an especially heinous, atrocious
or cruel manner." (Emphasis added.) What the coconspiritors,
Angelica Gonzalez, Rodolfo Dimas, Luis Arce and Cecilio de Castro
did was done "in an especially heinous, atrocious or cruel manner"
if it can be deemed such. The conduct of Petitioner, getting involved
after the fact, caring for Mrs. Isordia, by her own testimony trying
to comfort her and, when taking her to use the phone even telling
her she can leave (see EXHIBIT 3, ¶ 12), by no stretch of the
imagination meet that standard. There is <u>no evidence</u> that
<u>Petitioner's</u> conduct was "especially heinous, atrocious or cruel."

Contrary to the prior decision by the superior court (EXHIBIT
1, p. 2:21-3:12), interpreting half answered questions during
Petitioner's 2003 parole hearing, Petitioner absolutely did not have
prior knowledge of the kidnap nor participate in the kidnap.
Petitioner has never admitted such and will not admit to what would
be a lie. After the Board stated Petitioner's involvement was not
clear and asked that he write it out, Petitioner did exactly that,
clearly defining his individual involvement (EXHIBIT 3). Did
Petitioner make phone calls? Yes, as instructed in the beginning.
Petitioner never made a call threatening violence. Mr. Arce, however,
admitted, although denying he stated "he was going to cut off the
victim's ears," did admit stating "he was going to shoot her" (EXHIBIT
7, p. 6), which is consistent with "Manuel" calling and threatening

- 20 -

the same (EX. 7, p. 4), <u>after</u> Petitioner's arrest on April 19, 1993).

The fact of the matter is, no one but Petitioner and Ms. Gonzales, whose version changed many times and is therefore unreliable, know exactly what Petitioner's individual involvement was; all else is speculation based on groundless accusations from which Petitioner cannot escape, because professions of lesser involvement become admissions of greater involvement and only confessions are accepted. In this cynical atmosphere, laws of evidence and constitutional guarantees are suspended. The only defendant in this crime whose version of involvement has remained consistent without waiver from the beginning is that of Petitioner. Truth may not always be accepted, but truth always remains constant. Moreover, it was observed by Mr. Arce that it was "Ms. Gonzales who was calling the shots of the kidnapping," stating, she's "the boss here" and the "one responsible for everything" (EX. 7, p. 6).

This case, although not a murder, presents a situation not unlike <u>In re Smith</u> (2003) 109 Cal.App.4th 489. The governor had reversed the Board's finding of suitability, largely based on the commitment offense. The Court of Appeal affirmed a trial court order granting a petition for a writ of habeas corpus. The evidence showed that the petitioner had not been the coconspirator who shot the victim. The court said of the <u>petitioner's</u> conduct: "[T]here is no evidence to suggest it was committed in 'a especially heinous, atrocious, or cruel manner'" (<u>Id.</u>, at 506).

Here, too, there is no evidence that what <u>Petitioner</u> did was committed in "an especially heinous, atrocious or cruel manner." Petitioner participated after the actual kidnap, made nonthreatening

- 21 -

phone calls, attempted to comfort the victim, and told the victim
she could leave when taking her to use the phone. Yet, Petitioner
is the only coconspirator still in prison. The Board violated
Petitioner's right to due process by considering his parole
suitability on the totality of the offense based on his coconspirators
behavior and not his individual behavior during the offense.

B.   **Having Satisfied The Legislatively Prescribed Punishment For
     The Seriousness Of The Offense And Its Threat To Public Safety,
     The Offense Is No Longer Reliable Evidence In Determining Current
     Threat To Public Safety.**

     The only statutory reason to deny Petitioner parole is the
"timing and gravity" of the offense (Penal Code § 3041(b)).  Our
Supreme Court has taken this to mean an indeterminately sentenced
prisoner is to be granted parole unless the prisoner "is presently
too dangerous to grant a fixed parole release date" (In re Dannenberg
(2005) 34 Cal.4th 1061, 1080), the "abiding concern that the Board
not schedule the release of any life-maximum prisoner who is still
dangerous" (Id., at 1088).

     In finding Petitioner unsuitable for parole based on the
commitment offense, it appears the Board was relying on Cal. Code
Regs., tit. 15, § 2402(c)(1)(D): "The offense was carried out in
a dispassionate and calculated manner, such as an execution-style
murder." It is simply irrational to compare a kidnap for ransom
in which there was no injury to the victim to that of an "execution-
style murder." The Board uses such language without regard for the
facts as though it is some kind of magic incantation. There was
not even a bodily injury allegation in this case. Regardless, this
is an immutable factor that will never change and is therefore not
to be viewed and weighed as though the offense occurred yesterday,

- 22 -

but how Petitioner is today and his <u>current</u> threat to public safety.

While it is true when determining a prisoner's parole suitability the Board considers all relevant and reliable information, including the timing and gravity of the offense, it is just as true that the offense is not to be viewed in a vacuum as though it occurred yesterday, but is to be put into perspective relative to time, "entailing primarily what a man is and what he may become rather than simply what he has done" (<u>Greenholtz v. Inmates of Nebraska Penal and Correctional Complex</u> (hereafter <u>Greenholtz</u>) (1979) 442 U.S. 1, 10). Moreover, "the ultimate purpose of parole is...the long-range objective of rehabilitation" (<u>Id.</u>, at 13); and, although the commitment offense is a consideration in any particular case, "[t]he behavior record of an inmate during confinement is critical in the sense that it reflects the degree to which the inmate is prepared to adjust to parole release" (<u>Id.</u>, at 15; <u>In re Minnis</u> (1972) 7 Cal.3d 639, 645 [in prison conduct and potential for rehabilitation are of "paramount importance"; see also <u>Biggs v. Terhune</u> (9th Cir 2003) 334 F.3d 910, 916-917; <u>In re Scott</u> (2005) 133 Cal.App.4th 573, 595). Thus, "[p]arole decisions are based in large measure on occurrences subsequent to the commission of the offense" (<u>In re Rodriguez</u> (1975) 14 Cal.4th 639, 652). As it was observed in <u>In re Andrade</u> (2006) 141 Cal.App.4th 807, at 823, Pollak J., dissenting, "This record, like that in numerous recent cases, strongly suggests that California parole authorities are losing sight of that fact[,]" so can it be said in case at bench.

Every crime will have unique facts. Merely reciting those facts, as a prelude to moral outrage, does not amount to "a preponderance

of the evidence" or even "some evidence." The focus of the courts have been on murder, so there are no cases to guide the Board or lower courts on kidnaps for robbery or ransom. But in analogy, if, once a petitioner convicted of second degree murder "reaches that point" in time such that he would be "eligible for parole if he had been convicted of first degree murder" it is necessary to "consider if his offense would still be considered especially egregious for a first degree murder" (In re Rosenkrantz, supra, 29 Cal.4th, at 690, J. Moreno concurring, emphasis in original), then for one convicted of kidnap for ransom once reaching the point in time he would be eligible for parole if convicted of second degree murder the consideration must be is the offense particularly egregious for a second degree murder. See In re Lee, supra, 2006 DJDAR 13961, 13963-13964 for a "yardstick" as to what constitutes "particularly heinous, atrocious or cruel." Since, however, a kidnap is far from murder but there can be a correlation between second degree and first degree murder, there really can be no comparison of a kidnap to murder, unless, perhaps, torture was involved, and that certainly is not the case here.

Petitioner is now eligible for parole if he had been convicted of second degree murder. Thus, the Board must not merely recite in rote fashion that the offense was exceptionally cruel, but must rationally explain how Petitioner is presently a threat to public safety after reaching the legislatively prescribed punishment for second degree murder.

Penal Code § 3041(a) mandates that the Board" shall normally set a release date...in a manner that will provide uniform terms

for offenses of similar gravity and magnitude in respect to their
threat to the public[,]" and "[t]he board shall establish criteria
for the setting of parole release dates." In implementing the
legislative mandate for uniform term in accord to various offenses
and their threat to the public, the Board promulgated Cal. Code Regs.,
tit. 15, § 2280 et seq., § 2280: "A parole release date set under
this article shall be set in a manner that provides uniform terms
for offenses of similar gravity and magnitude with respect to threat
to the public." The offense for which Petitioner was convicted,
kidnap for ransom, "with respect to the threat to the public" has
been fixed at 9-11-13 years (Cal. Code Regs., tit. a5, § 2282(c)
(B-I) [extensive movement with victim unharmed or minor injury]).
Petitioner has satisfied the punishment for the crime, and there
is no evidence that he, as a person, is a <u>current</u> threat to the
public.

C.  Other Factors

     It is not clear if the Board used Petitioner's prior drug
conviction, opposition of district attorney, and the motive in denying
Petitioner parole. One should not have to guess as to the reasons
parole was denied. Since the Board found the motive to be "economic
gain" it cannot be said the motive was "inexplicable," and the
district attorney did not contest Petitioner's statement of personal
involvement nor introduce any new revelations that have been in the
record for years. Therefore, Petitioner will not argue them here,
but will preserve them in the event any of them become an issue by
the Board in a response ordered by the Court.
///////

D.  **The Decision To Deny Parole Was Made Before The Hearing Started Based On False Information In Petitioner's File And Positive Information Overlooked.**

From all appearances, the Board's decision was made before the hearing began, the real reason denying parole being a lack of parole plans, which evaporated during the decision when finally found in Petitioner's file and presented to the Board, the Commissioner admitting that the outcome may have been different if they would have had the information earlier (HT 50:5-9).  The Board was also given a false impression of Petitioner prior to the hearing when reviewing his file and there was information of Petitioner having, among other offenses, a prior convicted of murder (HT 21:19-23:7).  Although that being the wrong rap sheet misplaced in Petitioner's file, the damage was done.  Certainly, the Board having the impression Petitioner not only did not have adequate parole plans, but a prior conviction for murder, he was found unsuitable for parole before the hearing even began.  First impressions are the most important impressions, and it is only human nature that the commissioners were influenced by the grossly false information in Petitioner's file before the hearing began.

E.  **Evidence, With The Passage Of Time, Support Parole.**

Petitioner's offense was 14 years ago, and he has been disciplinary free during that entire time, having an exemplary postconviction record.  Petitioner participated in and completed several self-help programs, has marketable skills and realistic parole plans for Mexico to which he will be deported, and the forensic experts who evaluated Petitioner found absolutely no evidence he is <u>currently</u> a threat to public safety.  The Board presents no

contravening evidence other than their lay opinion, which contradicts the evidence.

### C O N C L U S I O N

The Board's decision was not only fixated on immutable factors, but the Board presented no contravening evidence to the psychological forensic experts finding that Petitioner is no more a threat to the public than the average citizen in the community, nor did the Board make any rational connections between its findings and Petitioner's present threat to public safety.

WHEREFORE, it is respectfully requested that this Court issue an Order to Show Cause why the writ should not be granted and order the Board's decision vacated and Petitioner's term fixed pursuant to his culpability. It is further requested that counsel be appointed.

Date: _12/06/06_

Respectfully submitted,

_Jose Luis Flores +_
Jose L. Flores
Petitioner in pro per

EXHIBIT 1

F I L E D

Clerk of the Superior Court

SEP 1 9 2005

By: S. Brice, Deputy

1
2
3
4
5
6
7
8

**THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**IN AND FOR THE COUNTY OF SAN DIEGO**

9
10
11

IN THE MATTER OF THE APPLICATION OF:          )  HC 17790 (2nd Petition)
                                               )  CR 140788
12  JOSE FLORES,                                )
                                               )  ORDER DENYING PETITION FOR
13                                             )  WRIT OF HABEAS CORPUS
                                               )
14                       Petitioner.           )
                                               )
15  _____)

16          AFTER REVIEWING THE PETITION FOR WRIT OF HABEAS CORPUS AND THE

17  SUBSEQUENT FILINGS OF THE PARTIES, THE COURT FINDS AS FOLLOWS:

18          On November 19, 1993, a jury convicted Petitioner of conspiracy to commit kidnapping

19  for ransom, kidnapping for ransom, kidnapping, and possession of a firearm by a felon.

20  Allegations that he possessed and personally used a weapon in the commission of the offenses

21  were also found to be true. He was subsequently sentenced to an indeterminate sentence of life

22  with the possibility of parole plus a determinate term of four years. His minimum eligible parole

23  date was August 16, 2002.

24          On October 18, 2004, Petitioner filed a petition for writ of habeas corpus challenging the

25  December 17, 2003 decision of the Board of Prison Terms (Board) denying him parole.

26  Petitioner contends the Board's decision was arbitrary and capricious and unsupported by even

27  "some evidence." The Court requested an informal response to the petition, after which it issued

28  an order to show cause why the relief sought should not be granted. For the reasons that follow,

the petition is denied.

1    In *In re Rosenkrantz* (2002) 29 Cal.4th 616 the California Supreme Court confirmed the

2    application of the standard first applied in *In re Powell* (1988) 45 Cal.3d 894 to the review of

3    decisions denying parole.  In *Powell*, the Court held that the Board's discretion in parole-related

4    matters is very broad and that decisions by the Board may not be set aside by the courts unless it

5    acts "without information, fraudulently, or on mere personal caprice." *In re Powell, supra*, 45

6    Cal.3d at p. 903 - 904.  Due process is satisfied as long as there is "some evidence" to support

7    the findings made at the hearing.  (*Id.*)  The Board is charged with the difficult task of balancing

8    the interests of the inmate and of the public.  To do so, it must not be "subject to second-guessing

9    upon review." (*Id.*)

10    The Board's conclusion that Petitioner is not yet suitable for parole and would pose an

11    unreasonable risk of danger to society or a threat to public safety if released from prison was

12    based in part on the commitment offense.  The Board found that "the crime was carried out in an

13    especially cruel and callous manner ... [and] the motive for the crime is inexplicable and very

14    trivial in relation to the offense." Petition, Ex. 2, p. 48.[1]

15    The Court was initially concerned with Petitioner's argument that there was no evidence

16    his involvement in the offense was especially heinous, atrocious or cruel and that this kidnapping

17    did not involve any acts beyond the minimum necessary to sustain the conviction.  Upon further

18    review of the record and recent appellate decisions, the Court finds the Board's reliance on the

19    commitment offense as a factor in finding him unsuitable for parole is adequately supported by

20    the record.

21    Although Petitioner previously denied knowing about the kidnapping in advance, he

22    admitted at his most recent suitability hearing that he was involved before the kidnapping took

23    place.  Ex. 2, pp. 9 – 11.  This is consistent with evidence in the record that Petitioner was

24    involved in planning the kidnapping from the outset and his conviction on conspiracy charges.

25    Return, Ex. 2, p. 1 & Ex. 3, pp. 5 & 10.  The victim was the mother of a person involved in a

26    drug sale rip off.  She was set up by one of Petitioner's accomplices, who facilitated the entry of

27    three men armed with handguns into the victim's home.  The victim was seized in the presence

28

---

[1] All further references to "Ex." are to exhibits to the petition unless otherwise specified.

of her 88-year old mother. A gun was placed on the victim's right temple with such force that it left an imprint and caused her head to hurt for several days. Her nose and mouth were covered with toilet paper saturated with something that made her feel nauseous and drunk. This made her feel like she was dying. She was moved repeatedly, including being taken out of the country, and her captors kept their guns visible. One of the men shot out of the window at one of the motels where she was kept. She felt like they were going to kill her any minute. The victim was held in this manner for 7 – 8 days.

In addition to now admitting being involved in planning the kidnapping, Petitioner admits he made several of the ransom phone calls and displayed a semi-automatic weapon at least once when he was with the victim in Mexico. Ex. 2, pp. 16 & 37 – 38. The display of the gun alone constitutes an act beyond the minimum necessary to sustain the conviction for kidnapping for ransom.

The Board's determination that Petitioner is not yet suitable for parole was also based on his escalating pattern of criminal conduct. This finding was also supported by the record.

Petitioner admitted that prior to the commitment offense he had been convicted of transportation and sale of cocaine. Petition, p. 7. He also admitted abusing cocaine for three years. Ex. 2, p. 26. At the time of his arrest, Petitioner also had an outstanding felony arrest warrant. Return, Ex. 3, p. 9. As this Court previously noted, kidnappings are violent offenses involving great risk of injury to its victims. As the kidnapping in this case was drug-related, the Board's assessment that Petitioner's criminal conduct was escalating at the time of the commitment offense is amply supported.

The Board also noted that the District Attorney was opposed to parole and recommended that he continue to participate in self-help programs. The Board properly considered the position of the District Attorney (Penal Code § 3046(c)), and its recommendation that Petitioner continue to participate in self-help programs was supported by the reports of the correctional counselor and psychologist evaluating his suitability for parole. (Ex. 3 & 5.)

1       The Board commended Petitioner for receiving no 115's while incarcerated, obtaining

2 two vocational certificates and a GED, and his participation in self-help programs.  However, the

3 Board determined these positive aspects of his behavior do not outweigh the unsuitability factors

4 outlined in its decision.  As the importance attached to any circumstance or combination of

5 circumstances in a particular case is left to the judgment of the panel and no abuse of the Board's

6 discretion is apparent in this case, their decision cannot be set aside by this Court.

7       A copy of this order shall be served on Deputy Public Defender Matthew Braner on

8 behalf of Petitioner, Deputy Attorney General Heather Bushman on behalf of Respondent and

9 the Appellate Division of the Office of the District Attorney.

10       IT IS SO ORDERED.

11

12 DATED:_____9-19-05_____

                              BROWDER A. WILLIS III

13                            JUDGE OF THE SUPERIOR COURT

14 I hereby certify that the foregoing instrument is a
full, true & correct copy of the original on file in

15 this office, that said document has not been revoked,
annulled or set aside, and it is in full force and effect.

16 Attest:    SEP 21 2005

17            Clerk of the Superior Court of the State
of California, in and for the County of San Diego

18          By_____Deputy

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number J-03392
                          )
JOSE FLORES )
                          )
_____)

# INMATE
# COPY


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JUNE 15, 2006

9:55 A.M.



PANEL PRESENT:

JACK GARNER, Presiding Commissioner
FERNANDO PEREZ, Deputy Commissioner

OTHERS PRESENT:

JOSE FLORES, Inmate
MARCIA HURST, Attorney for Inmate
RICHARD SACHS, Deputy District Attorney (video)
Araceli Zavala, Interpreter
CORRECTIONAL OFFICERS, Unidentified



CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No      See Review of Hearing
_____  Yes     Transcript Memorandum



Ramona Cota            Peters Shorthand Reporting

ii

## INDEX

                                                              PAGE

Proceedings...................................... 1

Case Factors.................................... 11

Pre-Commitment Factors........................ 21

Post-Commitment Factors....................... 28

Parole Plans.................................... 24

Closing Statements.............................. 38

Recess.......................................... 43

Decision........................................ 44

Adjournment..................................... 51

Transcriber Certification....................... 52

--oOo--

1

1          P R O C E E D I N G S

2          PRESIDING COMMISSIONER GARNER:    All

3    right, this is a Subsequent Parole Consideration

4    Hearing for Jose Flores, F-L-O-R-E-S, CDC number

5    J like John 03392.  The date today is June 15,

6    2006, it's 9:55 a.m. we are located at the

7    Correctional Training Facility in Soledad.  The

8    inmate was received on January 5, 1994, the life

9    term started on August 16, 1995 from San Diego

10   County.  The offense is kidnap for ransom, case

11   number C like Charles, R like Robert, 140788.

12   Count number two is PC 209(a).  The term was

13   seven years to life plus four years and the

14   minimum eligible parole date is August 16, 2002.

15   Other commitment offenses include use of a

16   firearm, PC 12022.5(a), same county, same case

17   number and same count number.  Stayed offenses

18   include conspiracy for kidnapping and ransom, PC

19   182(a)(1), PC 209(a), same county, same case

20   number.  That's count number one.  Use of a

21   firearm, 12022.5(a), same county, same case

22   number, count number one.  Kidnap 207, same

23   county, same case number, count number three is

24   that.  Possession of a weapon by an ex-felon is

25   12021(a), San Diego County, same case number,

26   and that's count number six.  Okay, this hearing

27   is going to be tape-recorded and for purposes of

2

1   voice identification for the transcriber each of
2   us is going to be required to give our first
3   name, last name, spelling the last name.  And
4   when we get to you, Mr. Flores, if you would
5   give us your CDC number, please.  I'll start and
6   go to my left.  I'm Jack Garner, G-A-R-N-E-R,
7   Commissioner.
8          DEPUTY COMMISSIONER PEREZ:  My name is
9   Fernando Perez.  It's P-E-R-E-Z.  Deputy
10  Commissioner, Board of Parole Hearings.
11         ATTORNEY HURST:  Marcia Hurst, H-U-R-S-T,
12  counsel for Mr. Flores.
13         INMATE FLORES:  My name is Jose Luis
14  Flores, F-L-O-R-E-S.  My CDC number is J-03392.
15         INTERPRETER ZAVALA:  Araceli Zavala, Z-A-
16  V-A-L-A, interpreter.
17         PRESIDING COMMISSIONER GARNER:
18  Mr. Sachs, could you identify yourself.
19         DEPUTY DISTRICT ATTORNEY SACHS:  Richard
20  Sachs, S-A-C-H-S, deputy district attorney.
21         PRESIDING COMMISSIONER GARNER:  Okay, and
22  for the record the interpreter was previously
23  sworn at an earlier hearing and we haven't
24  established on the record (inaudible).  All
25  right.  And we do have two correctional peace
26  officers in the room for purposes of security.
27  Mr. Flores and Ms. Hurst, I have the reasonable

3

1    accommodation form, the BTP 1073 that Mr. Flores

2    signed on August 11, 2005.  And it indicates

3    that no disabilities were identified from the

4    file review and that other than an interpreter

5    and legal assistance that he didn't need any

6    other help for the hearing.  I do note a grade

7    point level of 7.4 and that Mr. Flores does,

8    does speak English.  Again, the services of an

9    interpreter were requested for the legal matters

10   and also an understanding of those.  Let me ask

11   you, since August 11 of last year have you

12   developed any other kind of condition that we

13   would need to provide an accommodation for?

14   Hearing, seeing, anything like this?

15        INMATE FLORES:  No sir.

16        PRESIDING COMMISSIONER GARNER:  No other

17   problems?

18        INMATE FLORES:  No.

19        PRESIDING COMMISSIONER GARNER:  Okay.

20   Are you on any prescription medications?

21        INMATE FLORES:  Right now I have one for

22   my cholesterol, it's high, yeah.

23        PRESIDING COMMISSIONER GARNER:  All

24   right.  You take that daily?

25        INMATE FLORES:  Yes.

26        PRESIDING COMMISSIONER GARNER:  And

27   you're all current?  Do you take it in the

4

1    morning or in the afternoon?

2        INMATE FLORES:  In the evenings.

3        PRESIDING COMMISSIONER GARNER:  The

4    evening, okay.  Did you take it last night?

5        INMATE FLORES:  Yes.

6        PRESIDING COMMISSIONER GARNER:  Okay.  So

7    you're ready to go?

8        INMATE FLORES:  Yes sir.

9        PRESIDING COMMISSIONER GARNER:

10   Ms. Hurst?

11       ATTORNEY HURST:  Yes.

12       PRESIDING COMMISSIONER GARNER:  All

13   right, thank you.  This hearing is being

14   conducted pursuant to Penal Code Section 3041

15   and 3042 and the rules and regulations of the

16   Board of Parole Hearings governing parole

17   consideration hearings for life inmates.  Let me

18   stop now.  If there is some time that I get

19   going a little too fast, you don't understand

20   something, just call a stop and we'll go back

21   and make sure you have a good understanding,

22   okay.

23       INMATE FLORES:  Yes sir.

24       PRESIDING COMMISSIONER GARNER:  The

25   purpose of today's hearing is to consider your

26   suitability for parole.  In doing so we will

27   consider the number and nature of the crimes

5

1   that you were committed for, your prior criminal

2   and social history and your behavior and

3   programming since your commitment. We have had

4   the opportunity to review your Central File and

5   your prior hearing transcript. You will be

6   given the opportunity to correct or clarify the

7   record. We will consider your progress since

8   your commitment and since your last hearing.

9   Your updated counselor's report and

10  psychological report will also be considered and

11  any change in parole plans should be brought to

12  our attention. We will reach a decision today

13  and inform you whether or not we find you

14  suitable for parole and the reasons for our

15  decision. If you are found suitable for parole

16  the length of your confinement will be explained

17  to you. This hearing will be conducted in two

18  phases. I will discuss with you the crime you

19  were committed for, your prior criminal and

20  social history, your parole plans and any

21  letters of support or opposition that may be in

22  the file. Commissioner Perez will discuss with

23  you your progress since your commitment, your

24  counselor's report and your psychological

25  evaluation. Once that is concluded the

26  Commissioners, the district attorney and your

27  attorney will be given the opportunity to ask

6

1   you questions.  The questions from the district

2   attorney will be asked through the Chair and you

3   should direct your answers back to the panel.

4   Before we recess for deliberations the district

5   attorney, your attorney and you will be given an

6   opportunity to make a final statement regarding

7   your parole suitability.  Your statement should

8   be directed to why you feel you are suitable for

9   parole.  We will then recess, clear the room and

10  deliberate.  Once we have completed our

11  deliberations we will resume the hearing and

12  announce our decision.  The California Code of

13  Regulations states that regardless of time

14  served a life inmate shall be found unsuitable

15  for and denied parole if in the judgment of the

16  panel the inmate would pose an unreasonable risk

17  of danger to society if released from prison.

18  Now Mr. Flores, you have certain rights.  The

19  rights include a timely notice to this hearing,

20  the right to review your Central File, and the

21  right to present relevant documents.  I'd ask

22  you at this time, have those rights been met?

23          INMATE FLORES:  Certain, yes sir.  Other

24  ones are late.  I didn't have chance to get to

25  the file, I believe.

26          ATTORNEY HURST:  That's all right, we can

27  turn those in today.

7

1          PRESIDING COMMISSIONER GARNER:  Yes,
2    that's the right to present documents.
3          DEPUTY COMMISSIONER PEREZ:  Yes, we'll
4    give you an opportunity to present them.
5          INMATE FLORES:  Thank you.
6          PRESIDING COMMISSIONER GARNER:  So with
7    that right everything has been met?
8          INMATE FLORES:  Yes sir.
9          PRESIDING COMMISSIONER GARNER:  Okay,
10   good.  You also have the right to be heard by an
11   impartial panel.  Today your panel will consist
12   of myself and Commissioner Perez.  Any
13   objections to the panel?
14         INMATE FLORES:  No sir.
15         PRESIDING COMMISSIONER GARNER:  Thank
16   you.  You will receive a copy of our written
17   tentative decision today.  That decision is
18   subject to review by the Decision Review Unit
19   and a copy of the tentative decision and a copy
20   of the transcript will be sent to you.  You may
21   recall from a previous hearing that back in May
22   of 2004 the appeal procedure of any panel
23   decision has changed and you have to go through
24   the courts.  Were you aware of that?
25         INMATE FLORES:  Yes sir.
26         PRESIDING COMMISSIONER GARNER:  Okay, all
27   right.  And you are not required to admit your

8

1  offense or discuss your offense if you do not

2  wish to do so.  However, this panel does accept

3  as true the findings of the court and you are

4  invited to discuss the facts and circumstances

5  of the offense if you desire.  The Board will

6  review and consider any prior statements you

7  have made regarding the offense in determining

8  your suitability for parole.  And at this time I

9  will ask Commissioner Perez if there is

10  confidential material in your Central File and

11  if we'll be using it?

12      DEPUTY COMMISSIONER PEREZ:  Yes,

13  Commissioner, there is confidential material in

14  Mr. Flores' Central File.  However, for purposes

15  of hearing they will not be entered into the

16  record.

17      PRESIDING COMMISSIONER GARNER:  Thank

18  you.  Ms. Hurst, the hearing checklist, do you

19  have all the documents?

20      ATTORNEY HURST:  Yes, I do have all the

21  documents.

22      PRESIDING COMMISSIONER GARNER:  Okay.

23  Officers, could I get that.  Mr. Sachs?

24      DEPUTY DISTRICT ATTORNEY SACHS:  Yes, I

25  stipulate I do have those documents,

26  Commissioner.

27      PRESIDING COMMISSIONER GARNER:  Thank

9

1    you.  All right, I'll ask now if we do have

2    additional documents that would like to be

3    submitted today?

4        ATTORNEY HURST:   The three.  Did you pass

5    them over yet or not?

6        PRESIDING COMMISSIONER GARNER:   Just give

7    them to the officer, thank you.

8        DEPUTY COMMISSIONER PEREZ:   And we'll

9    give these back to you.  Make sure they get into

10   the file.

11        INMATE FLORES:   Thank you sir.

12        ATTORNEY HURST:   And you already received

13   the document under the declaration of

14   Mr. Flores, which of course Mr. Sachs does not

15   have at this time.

16        INTERPRETER ZAVALA:   I'm sorry, one of

17   them is a letter, which I guess is for parole

18   plans.

19        DEPUTY COMMISSIONER PEREZ:   Yes, this one

20   is in Spanish.

21        INTERPRETER ZAVALA:   It's in Spanish.

22        DEPUTY COMMISSIONER PEREZ:   With a

23   (indiscernible) addition, okay.

24        PRESIDING COMMISSIONER GARNER:   And what

25   we'll do when we get to the section I'll pass

26   these back over to you for the translation,

27   thank you.  All right, any preliminary

10

1  objections, Ms. Hurst?

2       ATTORNEY HURST:  No, there are none.

3       PRESIDING COMMISSIONER GARNER:  How about

4  Mr. Flores, is he going to be speaking with the

5  panel today?

6       ATTORNEY HURST:  Yes he will.

7       PRESIDING COMMISSIONER GARNER:  On all

8  matters?

9       ATTORNEY HURST:  Well yes on all matters,

10  although he has provided a statement of facts.

11  But he will answer questions as well if you have

12  any.

13       PRESIDING COMMISSIONER FARMER:  Okay,

14  okay.  We just today were provided with this

15  report that you did about your involvement in

16  the situation.  I started reading it.  What we

17  can do is during, during our deliberations I'll

18  make sure I'll get all the way through it.  All

19  right, if I could get you to raise your right

20  hand, sir.  Do you solemnly swear or affirm that

21  the testimony you give at this hearing will be

22  the truth, the whole truth and nothing but the

23  truth?

24       INMATE FLORES:  Yes sir.

25       PRESIDING COMMISSIONER GARNER:  Thank

26  you.  All right, let's get the summary of the

27  commitment offense on the record.  And this is,

11

1   this is very lengthy.  I've read it twice now.

2   It doesn't get any shorter either time.  All

3   right, we are going to be reading from a report

4   that was prepared for the December 2005 Board

5   Report and it was prepared by Correctional

6   Counselor H. Staten, S-T-A-T-E-N, Correctional

7   Counselor I.

8           "On April 13, 1993 at

9           approximately 4:50 p.m. Angelica,

10          A-N-G-E-L-I-C-A, Leticia, L-E-T-I-

11          C-I-A, Gonzales --"

12  And Gonzales is with an S at the end.

13          "-- went to the residence of the

14          victim Maria Isordia, I-S-O-R-D-I-

15          A, and subsequently left the

16          residence.  Moment's after

17          Ms. Gonzales left three armed men

18          entered the residence.  One of the

19          men put a gun to the victim's head

20          and forced her out of the house.

21          The men also placed a substance

22          which caused the victim to feel

23          sleepy and nauseated over her

24          mouth.  They also placed an

25          unknown substance on the mouth of

26          the victim's 88-year-old mother

27          and told her to keep quiet.

12

1          Outside of the residence witnesses

2          observed one of the men and

3          Mrs. Gonzales dragging the victim,

4          who was screaming.  The victim,

5          Maria Isordia, was seen being

6          forced out of the house by

7          Ms. Gonzales and one of the men

8          with a gun pointed to her.  The

9          victim yelled at the subjects to

10         stop but was ignored.  Before the

11         vehicle was driven off the victim

12         was forced to lie in the backseat.

13         At one point when the victim was

14         placed in the front seat she tried

15         to jump while the vehicle was

16         still moving but was stopped by a

17         male who was sitting in the

18         backseat.  For the next eight days

19         the victim was moved to and from

20         several locations in the Los

21         Angeles area and Tijuana, Mexico.

22         The victim told arresting officers

23         that the substance which had been

24         forced, that she had been forced

25         to inhale had affected her nerve

26         and stomach and thus she was not

27         able to eat any food for several

13

1    days.  She was told that she was

2    being taken to Tijuana to sign

3    some papers to sell the house she

4    owned.  She was kept in a very

5    dirty, rundown hotel where one of

6    the kidnappers had discharged a

7    firearm through a window.  On

8    April 13, 1993 after the

9    kidnapping the victim's son,

10   Marcos Isordia, reported that he

11   had received a telephone call from

12   the kidnappers indicating they

13   wanted $150,000 in ransom for his

14   mother.  The kidnappers told him

15   that they had his mother in Mexico

16   and that they wanted the money by

17   the following day.  The caller

18   stated that if Mr. Isordia wanted

19   to see his mother he would have to

20   provide the first $75,000 within

21   24 hours and the second $75,000

22   within 24 hours after that.

23   Approximately ten minutes later

24   Cecilio, C-E-C-I-L-I-O, Decastro,

25   and that's D-E-C-A-S-T-R-O, who is

26   Ms. Gonzales brother, telephoned

27   Mr. Isordia indicating that the

14

1    kidnappers had telephoned him to

2    say that they had Ms. Gonzales and

3    her four children.  Mr. Decastro

4    told Mr. Isordia that these people

5    were not playing around and to

6    give the money they demanded.

7    Marcos Isordia went on to tell

8    investigating officers that he and

9    his ex-cousin-in-law, Leticia

10    Gonzales, had been involved in a

11    stolen vehicle, quote, rip-off,

12    end quote, of a subject know as,

13    quote, Manuel, end quote.

14    Mr. Isordia stated that he not

15    only kept the money owed to Manuel

16    but that he went to Hawaii,

17    spending Ms. Gonzales' portion as

18    well.  During the next several

19    days Mr. Isordia received several

20    telephone calls from the alleged

21    kidnappers, quote, Manuel, end

22    quote, and quote, Sergio, end

23    quote, and negotiations were

24    attempted.  During the next

25    several days Marcos Isordia

26    negotiated with the kidnappers for

27    the safe return of the victim.

15

1          Isordia told the kidnappers that

2          he could only raise $75,000 in

3          cash and would take the deal only

4          if he could see his mother at the

5          time he gave the money.  The

6          kidnappers refused his request,

7          telling Mr. Isordia, quote, it's

8          your problem, end quote.  On April

9          16, 1993 sheriff's deputies placed

10         an emergency tap on Mr. Decastro's

11         telephone, home telephone.  On

12         April 17, 1993 a successful tap

13         was identified as coming from the

14         manager's office in a Comfort, C-

15         O-M-F-O-R-T, Inn Hotel located in

16         El Monte, California.  Sheriff's

17         deputies discovered that

18         Ms. Gonzales left her four

19         children and a male known as Jose

20         Flores, parens Infante, I-N-F-A-N-

21         T-E, end of parens, had checked

22         into the hotel on May 15, 1993 and

23         had checked out on May 17, 1993.

24         The hotel manager told deputies

25         that he did not appear --"

26    I'll read it verbatim.

27         "-- that he did not appear as if

16

1    Ms. Gonzales or the children had

2    been kidnapped.  The continuing

3    negotiations between Manuel and

4    Mr. Isordia became more intense

5    with Manuel threatening to cut off

6    the victim's ear or kill her if

7    their demands weren't met.  They

8    also threatened the lives of

9    Mr. Isordia's two sisters.  On

10   April 19, 1993 Arturo Vasquez, --"

11   And Vasquez is with a Z on the end.

12   "-- husband of Ms. Gonzales,

13   listened to the tape-recorded

14   conversation between kidnapper

15   Manuel Marquez and Isordia.  After

16   listening to the tape Mr. Vasquez

17   immediately identified the voice

18   of Manuel as belonging to Jose

19   Flores Infante.  Later on Vasquez

20   retracted his statement.  On April

21   19, 1993 the negotiations with

22   Mr. Isordia took a turn.  The

23   individual, Manuel, who did all

24   the negotiating up to this point,

25   was no longer calling.  A

26   different individual who said his

27   name was Manuel called

17

1    Mr. Isordia.  This individual

2    acted very angry and demanded that

3    Mr. Isordia meet him with the

4    money at Winchell's Doughnut Shop

5    in El Monte.  The first attempt to

6    collect the money fell through

7    when Mr. Isordia didn't show up.

8    Dimas, D-I-M-A-S, Decastro and

9    Gonzales left the area and

10   returned to the Decastro house.

11   After the unsuccessful meeting

12   Mr. Isordia received several

13   telephone calls stating that the

14   kidnappers were not playing around

15   and that they were going to kill

16   the victim.  On April 19, 1993

17   Jose Flores entered the United

18   States from Mexico.  The vehicle

19   in which he was riding was turned

20   over to a secondary inspection.  A

21   loaded .25 millimeter

22   semiautomatic handgun with the

23   safety off and hammer cocked was

24   found under the front seat where

25   Mr. Flores was sitting.

26   Mr. Flores was arrested after a

27   computer check revealed that he

18

1    had a prior felony conviction and

2    an outstanding felony warrant.  On

3    April 20, 1993 Manuel told Marcos

4    Isordia to meet him at the

5    Winchell's store between 6 and

6    6:30 p.m.  The caller stated that

7    after the money was turned over

8    the victim would be released.

9    Mr. Isordia agreed to meet the

10    kidnapper.  Surveillance units

11    followed the two vehicles from

12    Mr. Decastro's residence to the

13    Winchell's Doughnut House.

14    Mr. Decastro was observed exiting

15    one of the vehicles and then

16    entering Winchell's.  Mr. Decastro

17    was observed driving and parking

18    the same vehicle approximately 75

19    yards from Winchell's.  A third

20    subject identified as Luis Arce,

21    A-R-C-E, was observed parking a

22    motorcycle next to the Winchell's

23    exit.  Arrest was effected at the

24    same time.  Subsequent to the

25    arrest a fully loaded SKS

26    semiautomatic rifle was found

27    hidden in the back seat of the car

1    occupied by Mr. Decastro.  In the

2    county jail Mr. Flores was

3    admonished and declined to make a

4    statement.  On April 21, 1993 in

5    the early morning hours three of

6    the unidentified kidnappers

7    entered the room in which the

8    victim was staying and told her

9    she could leave.  The kidnappers

10    told her to give them five

11    minutes, enough time to leave the

12    area, and then she could leave.

13    They made her promise not to

14    identify them ever.  Ms. Isordia

15    waited five minutes, left the

16    hotel room and ran to a residence

17    where she was allowed to use the

18    telephone.  She then telephoned

19    her family who picked her up and

20    took her home to Imperial Beach.

21    On April 21, 1993 at approximately

22    4:30 a.m. a sheriff's detective

23    received a call from Marcos

24    Isordia who stated that his mother

25    was safe and in good condition.

26    According to the three men, Dimas,

27    Decastro and Arce, who were

1         arrested on April 20, 1993, the

2         kidnapping scheme was conceived

3         because sometime before kidnapping

4         Leticia Gonzales did a quote, drug

5         deal or something, end quote, with

6         Marcos Isordia.  Mr. Isordia took

7         off with Ms. Gonzales' half of the

8         money.  One of the men stated that

9         Jose Flores came up with the idea

10        to get the money back.  By the

11        time the men were arrested there

12        were several involved.  When they

13        received a phone call that Flores

14        was in Mexico they continued the

15        negotiation.  Ms. Gonzales was

16        arrested at her brother Decastro's

17        house.  According to one of the

18        men she was in charge of the

19        operation with Flores."

20 Okay.  That rather kind of lengthy, kind of

21 weaving itself around a lot of different ways.

22 Let me ask you, Mr. Flores, what was your

23 involvement in this?  I know it's here but let's

24 get it on the record.

25     **INMATE FLORES:**  I explain it better, I

26 tried to explain it my best way I could so there

27 won't be no more confusion.  The way I explained

21

1    it last time on the record went back and forth.

2    I finally put everything together the way the

3    Deputy Commissioner asked me last time to do.

4         PRESIDING COMMISSIONER GARNER:   So

5    basically your version that you wish this panel

6    to consider of the crime, your version will be

7    what you've provided to us here.  Is that

8    correct?

9         INMATE FLORES:  Yes sir.

10        PRESIDING COMMISSIONER GARNER:  Okay, all

11   right.  What we'll do then is we will, again as

12   I said earlier, we will review this during our

13   deliberations and incorporate whatever we feel

14   is appropriate.

15        INMATE FLORES:  Okay.

16        PRESIDING COMMISSIONER GARNER:  And at

17   some point we may want to put it on the record

18   or we may adopt it by exhibit and get it back in

19   the record that way.  Okay.  Let's talk about

20   your prior record.  I show an arrest in

21   Montclair, California in January of '79 for

22   petty theft.  Do you recall that?  It's on your

23   rap sheet.  And that one went to a court in

24   Ontario and you were -- the judgment was

25   withheld.  You got 12 months probation.

26        INMATE FLORES:  Excuse me, I think that's

27   the wrong one.  I think (inaudible).

22

1        ATTORNEY HURST:   (Inaudible).

2        PRESIDING COMMISSIONER GARNER:

3    Unfortunately they just gave me the first page

4    and I'm not even finding a name on it.  This was

5    a, this was a rap sheet that was provided to us.

6        INMATE FLORES:   Oh, she make a -- my

7    other counselor, she make a, she find all the

8    Jose Flores and everybody in there.

9        PRESIDING COMMISSIONER GARNER:   All

10   right.

11       INMATE FLORES:   All the Jose Flores

12   people.  I don't know why she did that.

13       PRESIDING COMMISSIONER GARNER:   And they

14   may have had some pages joined.  How about

15   November 30, '89, Mammoth Lakes, for under the

16   influence of a controlled substance?

17       INMATE FLORES:   Yes.

18       PRESIDING COMMISSIONER GARNER:   That

19   accusation was set aside.  Bishop PD for H&S

20   352, transportation and sale of a controlled

21   substance.  And on that one you got 270 days in

22   county jail and five years probation.

23       INMATE FLORES:   Yes sir.

24       PRESIDING COMMISSIONER GARNER:   Is that

25   correct.

26       INMATE FLORES:   That is correct.

27       PRESIDING COMMISSIONER GARNER:   Okay,

23

1    let's take a look at the probation report to see
2    if there's -- The probation report consists of
3    what we just read so that will give us our
4    summary.  And then of course that led us to the
5    commitment offense itself.  It would be
6    interesting to see whose rap sheet this is
7    because it includes murder.
8         INMATE FLORES:  Ooh.
9         PRESIDING COMMISSIONER GARNER:  All
10   right, back on track.  Okay, it talks about your
11   plans.  And I know that there may be some
12   letters.  But in December of 2005 when you had
13   met with the correctional counselor, that if you
14   were allowed to remain in the United States that
15   you would either live with your mother in
16   Mammoth Lakes or your sister, who also lives in
17   Mammoth Lakes.  Because of the INS hold there is
18   no likelihood of staying.  We don't know.  But
19   it's good that you have parole plans both places
20   because sometimes INS things fall through the
21   cracks.  But you could go back to Michoacán
22   where you have family still living.  So far as
23   employment, that you would look for work in
24   welding or any kind of skilled machinist work.
25   And if you got deported you would try to open a
26   business.  The business would either be in
27   welding or some kind of supermarket.

24

1          INMATE FLORES:  Yes sir.

2          PRESIDING COMMISSIONER GARNER:  All

3    right, let's take a look at any letters of

4    support that are in the file.  Let me ask you,

5    did you do an Olson Review of your file?  Did

6    you look at you Central File?

7          INMATE FLORES:  Yes.

8          PRESIDING COMMISSIONER GARNER:  You did?

9    Okay.  You might want to, you might want to --

10   Next time you do it --

11         INMATE FLORES:  That wasn't, that wasn't

12   in there.

13         PRESIDING COMMISSIONER GARNER:  Okay.

14         INMATE FLORES:  No sir.

15         PRESIDING COMMISSIONER GARNER:  All

16   right.  All right, the first one was done

17   through translation services and it's

18   appropriately notarized and it was done in

19   November of 2005.  And it's from your mother.

20         "I am writing this letter to

21         support my son.  I am aware of his

22         hearing he is going to have.  I am

23         very familiar with his case and he

24         was found guilty of a very serious

25         case for which he is serving a

26         sentence that was given to him.

27         He has been incarcerated 13 years.

25

1    During his incarceration he has
2    changed a lot.  Very remorseful,
3    regrets everything he was involved
4    in.  All this has made a very
5    positive change on him.  Everyone
6    in his family are ready to help
7    him on everything he might need
8    when he has his hearing.  If he is
9    allowed to go free he can come
10   live here with us and if he is
11   deported he can count on us for
12   whatever he needs.  We are able to
13   provide moral, financial as well
14   as work advice and whatever else
15   he might need."
16   She wants to give you an opportunity.  They know
17   you're capable and well prepared to live in
18   society and work with the community, not
19   creating any problems and the whole family is
20   waiting for you.  And that's from your mother
21   and she is in, she is in Mammoth Lakes.
22        INMATE FLORES:  Yes, my family, part of
23   my family is in Mammoth Lakes.  My mom, my
24   brother.
25        PRESIDING COMMISSIONER GARNER:  They're
26   in Mammoth Lakes.
27        INMATE FLORES:  Okay.

26

1      **PRESIDING COMMISSIONER GARNER:**  Officer,
2  please give it to Ms. Zavala.  And we also have
3  a letter in Spanish.

4      **INTERPRETER ZAVALA:**  It is dated May 17,
5  '06 from a Ms. Reyes and the envelope indicates
6  Bernardina Reyes.  It's coming from East Palo
7  Alto, California.  It says:

8          "To the authorities who it
9          concerns.  I, Bernardina Reyes am
10         writing this letter to let you
11         know that the young man, Jose Luis
12         Flores, initial I, has with me a
13         home -- has here a home with me
14         and my moral support and financial
15         once he returns to the community.
16         If he were to stay here in the
17         United States or if he were to be
18         taken to Mexico he also has a home
19         there and overall a job.  He will
20         always have support here or in
21         Mexico.  Sincerely."
22  Signature and it gives a phone number also.

23     **PRESIDING COMMISSIONER GARNER:**  What was
24  the name on that?

25     **INTERPRETER ZAVALA:**  Bernardina Reyes.
26     **PRESIDING COMMISSIONER GARNER:**  Reyes,
27  okay.

27

1        INMATE FLORES:  She is my cousin, first
2   cousin.

3        PRESIDING COMMISSIONER GARNER:  Okay,
4   thank you.  All right, so the letter from your
5   first cousin in East Palo Alto and the letter
6   from your mother in Mammoth Lakes.  Are there
7   any others that we have missed?

8        INMATE FLORES:  Just the last time --
9   Like I say, my mom, she includes all the family
10  together, my brothers and everybody.

11       PRESIDING COMMISSIONER GARNER:  And what
12  was the date on that one?  Was that read into
13  the last record?  Has that letter from your
14  mother, is that --

15       ATTORNEY HURST:  Is it (overlapping)?

16       PRESIDING COMMISSIONER GARNER:  Is it the
17  same letter?  Excuse me.  Was your mother still
18  living in Mammoth Lakes at the time that was
19  written?

20       INMATE FLORES:  Yes sir.

21       PRESIDING COMMISSIONER GARNER:  Okay,
22  then we're fine because we have one from her
23  that is more recent, okay.  And again, other
24  than that one old one from your mother we have
25  got everything that's current, letters of
26  support?

27       INMATE FLORES:  Yes sir.

28

1          PRESIDING COMMISSIONER GARNER:  Okay,
2    thank you.  We did send out the 3042 notices.
3    Those are the legal notices that went to all the
4    agencies that had a direct involvement in your
5    case.  And there is a representative from the
6    San Diego County District Attorney's Office who
7    will be speaking later in the hearing.  Okay,
8    Mr. Flores, at this time I want to ask you to
9    direct your attention over to Commissioner Perez
10   who is going to talk about your institutional
11   behavior.

12          DEPUTY COMMISSIONER PEREZ:  Good morning
13   Mr. Flores.

14          INMATE FLORES:  Good morning.

15          DEPUTY COMMISSIONER PEREZ:  The documents
16   that were reviewed for post-conviction
17   information was the information that was secured
18   from your Central File as well as the life
19   Prisoner Evaluation Report prepared for the
20   December 2005 calendar by Correctional Counselor
21   Staten.  The post-conviction progress report
22   covering the period of December 17, 2003 to the
23   present was prepared by Correctional Counselor
24   Staten again.  The psychological evaluation
25   prepared for the May 2006 calendar by
26   Dr. Macomber was also considered as well as any
27   subsequent information that you supplied for us

29

1    as well anything verbally you may choose to

2    enter into the record, we certainly will

3    consider that for post-conviction information.

4    At the time of your last parole consideration

5    hearing, Mr. Flores, which was held on December

6    17, 2003, you were housed at CTF, here at CTF.

7    At that time the Board took action to deny

8    parole for two years and recommended that you

9    the parolee remain discipline-free and

10   participate in self-help. A review of our

11   records show that you have had continuous self-

12   help and therapy with anger management as well

13   as the AA, easily over 25 entries in AA since

14   1999. You were involved in Project Change on

15   1/29/2003 as well as the Learning to be a Father

16   anger management program. It also indicates

17   that you voluntarily participated in two hours

18   of video instruction issues regarding inmate

19   employability program information. And this

20   talked about issues such as family support,

21   relationships, addiction, support groups,

22   realistic goals, preparation for employment and

23   change. And also indicates that you

24   participated in three hours of inmate

25   employability program again relating to --

26   another program on May 18, 2006 related to anger

27   management. We have, let's see, also a chrono

30

1  indicating your experience with the Prison

2  Industry Authority and your marketability in the

3  community. And we'll give you this back so you

4  can eventually put it back into the file.

5  Mr. Flores, our records show that you have

6  worked in various trades as a patio porter, as

7  an AM sanitation crew for trash collection,

8  textile garment assembly, AM cook as well as

9  other culinary duties, machine operator in

10  furniture upholstery and furniture upholsterer

11  and finisher, again for the Prison Industries.

12  Education includes ABE, peer tutor, preparation

13  for GED. Did you ever get your GED?

14        INMATE FLORES: Yes sir.

15        DEPUTY COMMISSIONER PEREZ: And what was

16  the date of your GED, ballpark?

17        INMATE FLORES: It was September 1999.

18        DEPUTY COMMISSIONER PEREZ: September

19  '99, congratulations. Okay, September 3 of '99,

20  I'm sorry. Cal-OSHA Haz-Mat, Community

21  Standards Right to Know. You were involved in

22  the instruction for HIV/AIDS prevention and

23  management. Vocation, our records show that you

24  got a vocational certificate in plumbing.

25        INMATE FLORES: Yes.

26        DEPUTY COMMISSIONER PEREZ: In machine

27  shop.

31

1        **INMATE FLORES:**  Yes.

2        **DEPUTY COMMISSIONER PEREZ:**  You were

3    involved in scullery, culinary.  You didn't get

4    a vocational certificate in that?

5        **INMATE FLORES:**  No.

6        **DEPUTY COMMISSIONER PEREZ:**  Okay, that

7    was back, it looks like the late '90s.  You

8    received training in general safety, lockout,

9    tag-out, right to know, air, eyes, back, safety

10   and sound and finishing.  You also received a

11   welding certificate.

12       **INMATE FLORES:**  Yes.

13       **DEPUTY COMMISSIONER PEREZ:**  So you've got

14   quite a number of vocations.  Congratulations,

15   that's certainly --

16       **INMATE FLORES:**  (Overlapping) use my time

17   this way.

18       **DEPUTY COMMISSIONER PEREZ:**  That's good,

19   you've got a lot of time.  Chronos indicate the

20   cause, prevention, treatment and management of

21   tuberculosis as well as employee safety

22   operation.  This was in 2003 and this

23   tuberculosis chrono was in 2006.  And as I

24   indicated you have quite a few entries in AA and

25   it has been continuous involvement since 1999.

26   A review of recommendations by your correctional

27   counselors indicate, and again this is

32

1    reaffirmed, that prior to release from prison
2    that you remain discipline-free, you participate
3    in self-help. An assessment indicates that you
4    do have family that resides in California that
5    will provide a place of residence and support.
6    Indicated that at that time that there was no
7    letter of support or references. Also indicates
8    again your vocational experience and
9    certification in maintenance plumbing,
10   vocational welding and machine shop.
11   Mr. Flores, a review of your psychiatrist's
12   diagnosis indicates that you had an Axis I of no
13   mental disorders; Axis II, no personality
14   disorders; and you have a current GAF score of
15   90.  The psychiatrist's assessment of danger
16   indicates that in considering potential for
17   dangerous behavior in the institution Mr. Flores
18   has remained entirely discipline-free. It is
19   commendable -- This is a commendable achievement
20   considering the institution has had ongoing
21   racial altercations, especially among Hispanics.
22   It is evident compared to other inmates that the
23   potential for dangerous behavior is definitely
24   below average. Mr. Flores poses no more risk of
25   violence in the community than the average
26   citizen in the community and your level of
27   threat to the community is probably lower,

33

1   again, than the average citizen in the

2   community.  The psychiatrist's recommendations

3   indicate that you have a very good attitude.

4   You have grown, changed, matured and advanced in

5   his self-awareness and knowledge over his years

6   of incarceration and the prognosis for

7   successful adjustment in the community is

8   excellent.  Congratulations, you have done very

9   well in your adjustment.  Certainly we don't

10  always see that, those types of recommendations

11  by the psychiatrists.  It indicates you have no,

12  to reaffirm you have no CDC 115s and only two

13  entries of CDC 128s, the last one being on

14  7/30/2005, failure to comply during count, and

15  products on 7/12/1999.  Have I missed anything,

16  Mr. Flores?  Anything else you want to enter

17  into the record?

18      INMATE FLORES:  No sir, I think

19  everything is in there.

20      DEPUTY COMMISSIONER PEREZ:  Okay.

21      INMATE FLORES:  Except I take all the

22  courses, the treatments of diseases.

23      DEPUTY COMMISSIONER PEREZ:  Well you're

24  making --

25      INMATE FLORES:  I complete the whole

26  courses.

27      DEPUTY COMMISSIONER PEREZ:  Well you've

34

1  made good use of your time while you are in

2  custody.  And what I'm going to do is I'm going

3  to give this back to you so you could ensure

4  that this gets into here.

5      INMATE FLORES:  Okay.

6      DEPUTY COMMISSIONER PEREZ:  Okay.  And

7  this has been entered into the record.  Counsel,

8  is there anything else we missed?

9      ATTORNEY HURST:  No, I don't think so,

10  you've covered it well.

11      DEPUTY COMMISSIONER PEREZ:  All right,

12  thank you.  Mr. Flores, thank you.

13  Commissioner.

14      PRESIDING COMMISSIONER GARNER:  Thank

15  you.  I've finished reviewing this declaration

16  that you provided today.  What I'd like to do is

17  ask you a few questions.  In the Board Report

18  there is a reference made to a Comfort Inn

19  hotel.  Is that actually the Motel 6 that is

20  referenced in your declaration or was that a

21  different hotel?

22      INMATE FLORES:  I didn't understand the

23  question, could you ask it again?  Sorry.

24      PRESIDING COMMISSIONER GARNER:  Okay.  In

25  the Board Report that I read, that real lengthy

26  thing that I read.

27      INMATE FLORES:  Yes.

35

1            PRESIDING COMMISSIONER GARNER:  It

2  mentioned that, that a telephone tap was made on

3  one of the telephone calls and it came from the

4  manager's office at a Comfort Inn hotel.  And

5  that a male known as Jose Flores had checked in

6  to the hotel on May 15 and checked out on May

7  17.  And there is some indication there that

8  Ms. Gonzales or the children didn't look like

9  they had been kidnapped.  Now in your

10  declaration there is a motel in El Monte called

11  the Motel 6 that you checked into.

12            INMATE FLORES:  Yes sir.

13            PRESIDING COMMISSIONER GARNER:  So what I

14  am trying to see, were you in two different

15  hotels or just one?

16            INMATE FLORES:  Okay.  The first hotel is

17  when she first called me.  She first called me

18  is when I first came to El Monte, at her

19  request.  The second one the same, is the same

20  thing, they connected.  The one on the 15, I

21  didn't stay there.  I don't know if they show

22  the records but I went in there to rent videos,

23  yes, and that's when they release me.  And the

24  14 in there, the Motel 6, the 14 of April,

25  that's where they ask me.  The only way they

26  will release the children to her is if I

27  cooperate with them.  And the 15 is when we have

36

1    the kids.

2            PRESIDING COMMISSIONER GARNER:  Okay.

3    And on the 14th was when you gave Manuel the

4    $1,000.

5            INMATE FLORES:  Yes.

6            PRESIDING COMMISSIONER GARNER:  And it

7    was at that time you were told of the kidnap of

8    Mrs. Isordia.

9            INMATE FLORES:  Yes sir.

10           PRESIDING COMMISSIONER GARNER:  And that

11   all you would have to do is make some telephone

12   calls.

13           INMATE FLORES:  Yes.

14           PRESIDING COMMISSIONER GARNER:  And you

15   went with Manuel to where he was holding

16   Mrs. Isordia.

17           INMATE FLORES:  Yes sir.

18           PRESIDING COMMISSIONER GARNER:  Where was

19   that?

20           INMATE FLORES:  Tijuana.

21           PRESIDING COMMISSIONER GARNER:  It was in

22   Tijuana.  At the hotel?  Was it at a hotel in

23   Tijuana?

24           INMATE FLORES:  I don't know.  When I

25   went over there she was in a hotel, yes.

26           PRESIDING COMMISSIONER GARNER:  Okay.

27   And you made some telephone calls from there and