# EXHIBIT F
# part 2 of 2

37

1  on the way back is when you got arrested, is

2  that correct.  You said, I was arrested on my

3  way to pick up the money.

4          INMATE FLORES:  Yes sir.

5          PRESIDING COMMISSIONER GARNER:  And that

6  you didn't have any prior knowledge of the

7  kidnap of Mrs. Isordia and that your involvement

8  was limited to being taken to where she was

9  being held, making phone calls and apparently

10  according to her testimony, trying to comfort

11  her and letting her use the phone.

12          INMATE FLORES:  Yes.

13          PRESIDING COMMISSIONER GARNER:  Okay.  I

14  have also been provided -- Before we move on I

15  want to put into the record some parole plans

16  that I want to make sure there's not (inaudible)

17  here.  It's dated August 12, 2003 and signed by

18  Jose Flores.  It's speaking to his skills and

19  maintaining family ties and doing self-help

20  studies.  Okay, I think that's all it said.  Any

21  follow-up questions?

22          DEPUTY COMMISSIONER PEREZ:  No, thank

23  you.

24          PRESIDING COMMISSIONER GARNER:

25  Mr. Sachs, any questions?

26          DEPUTY DISTRICT ATTORNEY SACHS:  I have

27  no questions of the inmate, Commissioner, thank

38

1    you.

2            PRESIDING COMMISSIONER GARNER:    Thank

3    you.  All right, Ms. Hurst, any questions?

4            ATTORNEY HURST:    No, I have no questions.

5            PRESIDING COMMISSIONER GARNER:    Okay,

6    Mr. Sachs, could I get you to close, please.

7            DEPUTY DISTRICT ATTORNEY SACHS:    Yes,

8    thank you very much, I appreciate it.  On behalf

9    of the People we would respectfully oppose

10   parole based on the totality of the

11   circumstances of the offense.  We feel that the

12   denial of parole is proper.  There have been

13   factors both surrounding the commitment offense

14   in which the victim was screaming while being

15   dragged out of the home, she was struck.

16   There's factors in relation to the surveillance

17   that occurred and the wiretaps which revealed

18   additional information.  The fact that he was

19   armed with a weapon at the time he was trying to

20   cross the Mexican border.  We feel that the

21   violence, the threat of bodily harm, the other

22   actual cruelty and callousness, sophistication

23   and professionalism and there has not been any

24   responsibility for the offense in any real terms

25   or meaningful terms or any history of it.  In

26   addition we feel that the programming is

27   inadequate to warrant release at this time so on

39

1   that basis we would oppose parole.  Thank you.
2         **PRESIDING COMMISSIONER GARNER:**  Thank
3   you.  Ms. Hurst.
4         **ATTORNEY HURST:**  Yes, thank you.  First
5   of all I think we need to remember that this was
6   a kidnap, it's not a murder case, although it is
7   more aggravated than many kidnapping cases.
8   Secondly, Mr. Flores has acknowledged that he
9   participated but there is no evidence that he
10  was involved in the planning stages of this
11  offense.  And I read through the letter from San
12  Diego County pretty carefully this morning and
13  it is really unclear as to exactly what
14  Mr. Flores' role was.  He has acknowledged in
15  past hearings and he certainly has acknowledged
16  in his statement that he made some phone calls.
17  He acknowledged in his last hearing that he was
18  armed in the presence of the victim on one
19  occasion.  Another thing I think that is
20  important for us to consider is that to my
21  knowledge Mr. Flores is the only individual who
22  is doing time for this crime at the present
23  time.  Ms. Gonzales I think suffered a
24  conviction and that was reversed on appeal.
25  There were other individuals who were arrested
26  and detained after Mr. Flores was already in
27  custody and to my knowledge they were not

40

1  convicted of any part of this crime.  So to the
2  extent, speaking to the issue of his accepting
3  responsibility, he not only accepts
4  responsibility, he is the only one paying any
5  price, except of course for the victim and the
6  victim's family.  He has very minimal criminal
7  history.  He has one conviction, I believe, that
8  he suffered prior to the life crime.  Since he
9  has been in prison I believe his programming has
10 been absolutely exemplary.  He has had no 115s
11 at all.  And although we do see lifers who come
12 in with that kind of a record it certainly is
13 not the norm.  It is exemplary conduct.  He has
14 upgraded educationally, obtaining his GED.  He
15 has also been a peer tutor.  He has been
16 involved in the inmate employability program.
17 He has upgraded vocationally in many different
18 fields, in vocational welding, plumbing, machine
19 shop, upholstery, so he has tremendously good
20 job skills.  He has also been involved in a
21 great deal of self-help, remaining in the AA
22 program for a long period of time.  Project
23 Change, which I think is one of the best
24 programs that they have had here and it involves
25 about 44 weeks and it's a multi-faceted program.
26 Also been involved in anger management, both
27 within the context of Project Change as well as

41

1   the IEP program.  So he's done a lot of things.
2   You will find laudatories in the back of his
3   file here and I think you mentioned some of
4   those.  The psychiatric report is extremely
5   positive in nature and I think under conclusions
6   that the doctor states that he would do better
7   than 98 percent of parolees if he were released.
8   He also mentions his family support, his many
9   vocational skills, maturation.  And in
10  conclusion he says the prognosis for a
11  successful adjustment in the community is
12  excellent.  No significant risk factors are
13  noted by Dr. Macomber in this report.  He does
14  have viable parole plans.  He will probably be
15  deported but he has alternative parole plans in
16  California if he is not deported.  I think it is
17  time consider him very seriously for parole.  I
18  don't believe he presents an unreasonable risk.
19  And if he is not found suitable today then I
20  would ask the panel to give him a one-year
21  denial rather than a two, thank you.
22          PRESIDING COMMISSIONER GARNER:  All
23  right.  Mr. Flores, this is your opportunity if
24  you would like to address the panel as to why
25  you think you're suitable.  If you're more
26  comfortable doing it in Spanish through the
27  interpreter that can be, that's your choice.

42

1      INMATE FLORES:  Thank you, I will do so.

2      INMATE FLORES (THROUGH THE INTERPRETER):

3  The reason why I think I should be found

4  suitable is because I know I am a different

5  person, I have changed a lot.  I have matured a

6  lot during this whole time and I am very aware

7  of my actions and choices.  And I think I would

8  be, once I integrate into society it would be to

9  give support to many people who have gone

10  through drugs and alcohol as I tell them my

11  story and the things I have gone through.  I

12  could then prevent many things, many bad things

13  that would happen to others.  And as you have

14  seen I haven't wasted my time.  I have tried to

15  take all the tools that have been provided to me

16  during the time that I have been incarcerated.

17  And as you have seen my family is waiting for

18  me.  I have all the support from them.  Another

19  thing also, I won't be a load, a load for the

20  state being that I will be deported.  And I also

21  ask that you take into account all the time that

22  I have spent here.  I have been doing it

23  positively.  Just that, take that into

24  consideration when you make your decision.

25      INMATE FLORES:  Thank you.  If possible,

26  please give me a release date.

27      PRESIDING COMMISSIONER GARNER:  All

43

1    right, thank you, sir.  It's 10:45 a.m. and we

2    will recess for deliberations.

3         **DEPUTY COMMISSIONER PEREZ:**  And we are

4    going to go off record.

5                    R E C E S S

6                     --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

44

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2              D E C I S I O N

3    DEPUTY COMMISSIONER PEREZ:  Okay,

4    Commissioner, we are back on record.

5              PRESIDING COMMISSIONER GARNER:  All

6    right, it is 11:01 a.m. in the matter of Jose

7    Flores, J John 03392.  Mr. Flores, the panel has

8    reviewed all the information received from the

9    public and relied on the following circumstances

10   in concluding that you are not yet suitable for

11   parole and would pose an unreasonable risk of

12   danger to society or a threat to public safety

13   if you were released from prison.  We are going

14   to deny you for a year and we've got some work

15   that you need to do, okay.  So listen up.  We

16   are going to note first we considered many

17   factors but we started with the commitment

18   offense.  And the panel noted that this offense

19   was carried out in an especially cruel manner in

20   that the victim was forced from her home, Maria

21   Isordia.  She was kidnapped.  She was held for

22   ransom in a hotel in Tijuana and then

23   transported in and around the Los Angeles County

24   area, eventually winding up in Tijuana.  The

25   offense was carried out in a very dispassionate

26   and calculated manner in that the victim was

27   JOSE FLORES  J-03392  DECISION PAGE 1   06/15/06

1  removed from her home, threatened, taken to

2  Mexico and held there for ransom for a number of

3  days.  The motive for the crime, the best we

4  could determine, the panel came up with it was

5  some economic gain that they had hoped to gain

6  from the kidnapping.  And these conclusions were

7  drawn from the statement of facts.  And

8  Ms. Hurst, without objection I am going to enter

9  the statement of facts contained in the prior

10  reading as Exhibit 2 and I would also like to

11  incorporate and enter into the record as Exhibit

12  3 the declaration that Mr. Flores provided for

13  us today.

14      **ATTORNEY HURST:**  No objection.

15      **PRESIDING COMMISSIONER GARNER:**  Okay.  So

16  far as the previous record the panel did note

17  that you did have the Bishop Police Department,

18  December 30, 1989, and that was the transporting

19  of a controlled substance, the H&S 11352 as your

20  prior record.  So far as your institutional

21  behavior you have done very well.  You have only

22  received two 128(a) counseling chronos and the

23  last was July 30 of 2005.  And this was for

24  failure to comply during a count, nothing

25  associated with any kind of violence.  The panel

26  noted the psychological report that was prepared

27  **JOSE FLORES  J-03392  DECISION PAGE 2    06/15/06**

46

1   by Dr. Macomber in May of 2006 and the report is
2   generally favorable, it's a good report for you.
3   The area that we're going to ask you to do so9me
4   work on is your parole plans. You do have plans
5   for your mother in Mammoth Lakes and also a
6   relative in East Palo Alto but we didn't find
7   any record or any supporting documents of any
8   plans or availability of services and support in
9   Mexico. We're going to need to get those, sir.
10  Did you have them?

11      INMATE FLORES:  Yes, they supposed to be
12  in the file. It's from my mother's sister, the
13  house over there.

14      DEPUTY COMMISSIONER PEREZ:  Well not only
15  that, no. The issue was the support, the
16  support in the immediate community. I know
17  Mexico has AA, has NA, has support groups that
18  are in each community. So that's something that
19  we just wanted you to include in that.

20      INMATE FLORES:  That's right there too in
21  the file. It's AA, NA, letters from them, from
22  them over there.

23      PRESIDING COMMISSIONER GARNER:  Okay,
24  I'll have him take a look. I'll tell you for
25  the record that it was not in mine. Because
26  when I went through and I asked you if that's
27  JOSE FLORES    J-03392    DECISION PAGE 3    06/15/06

47

1   all we had, that's because those were the only

2   ones that were available to me. Let me, while

3   he's looking for that -- and if there is a need

4   to modify it we'll do it. But you were here and

5   you did hear the district attorney from San

6   Diego indicate opposition to the granting of

7   parole. While he's looking for that I'll

8   indicate that during this period of time of

9   course we want you to remain disciplinary-free,

10  we want you to continue doing the self-help

11  program. And I have already made the indication

12  here but we'll wait and see that we want you to

13  do some work on the plans. Do we want to go off

14  the record for just a second?

15      DEPUTY COMMISSIONER PEREZ: Yes, let's go

16  off record.

17              (Off the record.)

18      DEPUTY COMMISSIONER PEREZ: Okay, we're

19  back on record. And for the record, thank you

20  for bringing it to our attention. For the

21  record there is support groups specifically in

22  Michoacán, Nueva Italia. Got a Little Italy

23  there huh? And also in the other, Apasigán

24  (phonetic) in Michoacán indicating support

25  services in the community that you will be, you

26  will be paroling to. Anyway, that is noted for

27  JOSE FLORES   J-03392   DECISION PAGE 4    06/15/06

48

1    the record and that will be certainly in your
2    favor.

3           PRESIDING COMMISSIONER GARNER:  Okay, and
4    those are for support?

5           DEPUTY COMMISSIONER PEREZ:  For support,
6    yes.

7           PRESIDING COMMISSIONER GARNER:  Okay.
8           DEPUTY COMMISSIONER PEREZ:  And thank
9    you.

10          PRESIDING COMMISSIONER GARNER:  So what
11   we would want you to do, support is one thing
12   but what we need to do is have with respect to
13   housing and any other kind of support, financial
14   support.  Those would be incorporated into the
15   next hearing.  It will be real important for you
16   to get to work on those quickly because we know
17   how long it takes to get things done and to get
18   them done here too.  So it's two places it's
19   real hard to get things done, in Mexico and also
20   very difficult to get things done in prison too.
21   So any additional comments, Commissioner?

22          DEPUTY COMMISSIONER PEREZ:  A year, a
23   year is not a lot of time so do what you can to,
24   to get your ducks in order to get those parole
25   plans firmed up.

26          INMATE FLORES:  Can --

27   JOSE FLORES   J-03392   DECISION PAGE 5   06/15/06

50

1    bring it to the hearing. That way if they mess
2    up and don't get into our packets you can give
3    those to us at the hearing and we can consider
4    it at that time. Okay?

5         ATTORNEY HURST: If you had seen copies
6    of those documents today might the panel have
7    made a different decision at this time?

8         PRESIDING COMMISSIONER GARNER: I think
9    it would have been persuasive. I wouldn't want
10   to give you a firm yes or no. But obviously by
11   granting a year it is our impression that
12   Mr. Flores is making progress and is getting
13   himself very close to getting out of here.

14        ATTORNEY HURST: Okay. Because it was, I
15   felt that the residential offer was in the file.

16        DEPUTY COMMISSIONER PEREZ: Well that
17   wasn't our only consideration. But certainly --
18   And I want to reaffirm what Mr. Gardner
19   indicated. You are certainly at the cusp of
20   compliance and so you're almost there.

21        PRESIDING COMMISSIONER GARNER: All
22   right, it is now 11:08 a.m. and that does
23   conclude this hearing.

24        DEPUTY COMMISSIONER PEREZ: Good luck to
25   you.

26        INMATE FLORES: Thank you.
27   JOSE FLORES  J-03392  DECISION PAGE 7  06/15/06

51

1          DEPUTY COMMISSIONER PEREZ:  And we're

2    going to go off record.

3                    --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED ONE YEAR

24    THIS DECISION WILL BE FINAL ON:_____    OCT 1 3 2006

25    YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    JOSE FLORES   J-03392   DECISION PAGE 8   06/15/06

52

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, RAMONA COTA, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 51, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of JOSE FLORES, CDC NO. J-03392, on JUNE 15, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated September 19, 2006, at Sacramento County, California.

RAMONA COTA
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT 3

In the matter of:

Jose Flores

_____/

DECLARATION OF
JOSE FLORES

I, Jose Flores, hereby declare under penalty of perjury, that I provide this declaration in the interest of justice to clarify confusion in the facts and timeline of my involvement in the kidnap for ransom of Mrs. Isordia.

1. This declaration is necessitated by the fact that during my parole hearing conducted on December 17, 2003, on page 10, when questioned about the kidnap of Mrs. Isordia there is a misunderstanding that creates confusion. When asked if I was aware of what was happening I answered that I was, but was not able to complete my answer of exactly what I was aware of and when I was aware of it. I now clarify the confusion.

2. On April 11, 1993, I was residing in East Palo Alto, California, when I received a phone call from my former girlfriend, Letty Gonzales, who at that time told me that something terrible had happened and she and her children were in danger, and could I come to El Monte, California. I asked what happened but Ms. Gonzales would not discuss it over the phone, only insisting that I had to come to El Monte because she and her children were in great danger.

3. On April 12, 1993, I flew to El Monte. When I arrived in El Monte I called Ms. Gonzales and she instructed me to go to a local Motel 6 and rent a room. After securing a room at the Motel 6, I called Ms. Gonzales.

4. Ms. Gonzales came to my room at the Motel 6 accompanied by a man who was introduced to me as Manuel. Ms. Gonzales informed me that Manuel had her children and was holding them to force her to help him get $90,000 back that her cousin Marcos Isordia had ripped him off for.

6. Manuel then told me that Ms. Gonzales' cousin, Marcos, had ripped him off for $90,000 and he wanted his money back and if he did not get it back something would happen to somebody. When I asked Manuel what he meant, he told me that he had Ms. Gonzales' children and that I better not go to the police or he will hurt the children and rape Ms. Gonzales' daughter.

7. On April 13, 1993, around noon, I flew back to East Palo Alto, arriving at the San Jose airport between 3:00 and 4:00 p.m.. I went to East Palo Alto and contacted several friends in an attempt to borrow money to pay Manuel. I raised only $1,000. I rented a room in Sunnyvale, California around 8:00 or 9:00 p.m. that night.

DECLARATION OF JOSE FLORES
Page two

8.   On April 14, 1993, I flew back to El Monte and called Ms.
     Gonzales upon my arrival. Ms. Gonzales instructed me to return
     to the Motel 6 and this time rent two rooms. I did as Ms.
     Gonzales instructed me and after securing the two rooms called
     Ms. Gonzales telling her where I was at.

9.   Ms. Gonzales and Manuel came to the motel and I gave Manuel
     the $1,000 I had raised. Manuel was very upset that I had raised
     only $1,000. It was at that time I was told that Mrs. Isordia
     had been kidnapped.

10.  To this point on April 14, 1993, I was only aware that Ms.
     Gonzales' children were being held by Manuel and had absolutely
     no prior knowledge that Mrs. Isordia was a victim in Manuel's
     attempt to get his money returned from Marcos Isordia.

11.  On April 14, 1993, after I gave Manuel the $1,000, he told me
     he would release the children of Ms. Gonzales, but I would have
     to help him collect the money Marcos stole from him. It was
     then I was told of the kidnap of Mrs. Isordia and that all
     I would have to do is make some phone calls and collect the
     money from Marcos and give it to him, Manuel. I went with Manuel
     to where he was holding Mrs. Isordia. I made 4 or 5 phone calls
     and arranged to pick up some money. I was arrested on my way
     to pick up the money.

12.  I had absolutely no prior knowledge of the kidnap of Mrs.
     Isordia, nor was I involved in the kidnap of Mrs. Isordia.
     My personal involvement was limited to being taken to where
     Mrs. Isordia was being held, making phone calls, and by Mrs.
     Isordia's own testimony, trying to comfort her and, when taking
     her to use a phone, telling her she can leave if she wants.

13.  I accept responsibility for my actions, not calling the police
     as soon as I was aware that Ms. Gonzales' children were being
     held against their will, and thereafter involving myself in
     the kidnap of Mrs. Isordia by agreeing to make phone calls and
     collect the money for Manuel.

I, Jose Flores, declare under penalty of perjury that the foregoing
is true and correct, doing so this  8th  day of June, 2006, at
Soledad, California.

                                    S/ _Jose Luis Flores_
                                    Jose Flores

EXHIBIT 4

# MENTAL HEALTH EVALUATION FOR
## THE BOARD OF PRISON HEARINGS
### June, 2006 Lifer Calendar

## CORRECTIONAL TRAINING FACILITY SOLEDAD
### MAY, 2006

| | |
|---|---|
| **NAME:** | **FLORES, JOSE** |
| **CDC#:** | **J-03392** |
| **DOB:** | 1/31/70 |
| **OFFENSE:** | **PC 209 (a) KIDNAP FOR RANSOM** |
| **DATE OF OFFENSE:** | 4/13/93 |
| **SENTENCE:** | **7 YEARS TO LIFE, PLUS 4 YEARS** |
| **MEPD:** | 8/16/02 |
| **EVALUATION DATE:** | 5/13/06 |

## I.    IDENTIFYING INFORMATION:

Mr. Jose Flores is a 36 year old, first term, single, Hispanic male from San Diego County. He is a Christian. He has served 13 years in custody. Mr. Flores has an immigration hold, and he plans to return to Mexico as soon as he is released.

## SOURCES OF INFORMATION:

This evaluation is based upon a single, two hour interview with Mr. Flores. In addition, the central and medical files were reviewed. Mr. Flores was able to communicate quite well in English. He does have a strong accent. However, he has achieved his GED, which is evidence that he has good English skills. An interpreter was not needed for this clinical evaluation. However, Mr. Flores wants an interpreter to help him in the BPH hearing.

The psychological evaluation, dated 5/10/01, completed at CTF-Soledad for the BPT by Dr. Reed, Psychologist, contains a Psychosocial Assessment. This information was reviewed with the inmate and is still current and valid. As a result, this information will not be repeated at this time.

**FLORES, JOSE**
**J-03392**
**5/13/06**
**PAGE 2**

## CLINICAL ASSESSMENT

### XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Flores related during the interview in a serious, sober, non-defensive and cooperative manner. His mental status was within normal limits. He was alert and well oriented. His thinking was rational, logical and coherent. His speech was normal, fluent and goal oriented. English is his second language. His affect was appropriate. There was no evidence of anxiety or of depression. His eye contact was good. Intellectually, he was functioning in the average to high average ranges. His memory was intact. His judgment was intact. His insight and self-awareness were very good.

Mr. Flores stated that he has a history of cocaine abuse. He started cocaine use about three years before the commitment offense, using about two times a month. He continues to attend Alcoholics Anonymous and Narcotics Anonymous. He has very strong values at this time against any drug use. He described how he was attracted to cocaine use in order to achieve a state of happiness. Now he realizes that happiness comes from inside. Happiness is due to the fact that he has the love of Christ in his heart. Happiness does not reside in material things or the outside world. He stated that he would like to communicate with children in the schools in Mexico, explaining the dangers of drug use to them. He wants to explain where drug use will lead a person, and the trouble they will get into. He would like to explain the consequences of drug use that will occur to them in their bodies and in their lives.

Mr. Flores has remained entirely disciplinary free during his 13 years of incarceration. Even though drug use is available to him, he is very firm in his commitment to totally abstain. His determination to live a life free from drugs and alcohol appears to be very sincere and quite convincing.

Mr. Flores has obtained his GED in English, which is his second language. This is a remarkable achievement, because it is very difficult for a person to obtain a GED in a second language. Also, he has completed Vocational Welding, and he also was trained in Vocational Machine Shop for two years before he was transferred out. He now is working in PIA Upholstery. He stated that he is near to completing the 1300 hours necessary to be certified in this field. He also has skills as a plumber, because he worked in that field for two years.

FLORES, JOSE
J-03392
5/13/06
PAGE 3

Since Mr. Flores has remained clean and sober for 13 years, and since he has strong determination to remain clean and sober in the future, cocaine abuse is no longer a problem in his life. As a result, this will not be listed as a current diagnostic problem.

## CURRENT DIAGNOSTIC IMPRESSION

Axis I:        No mental disorder
Axis II:       No personality disorder
Axis III:      No physical disorder
Axis IV:       Life term incarceration
Axis V:        Current GAF: 90

## XIII.    REVIEW OF LIFE CRIME

Mr. Flores discussed details of the commitment offense at length. He accepts full responsibility for his roll in the commitment offense. He stated that he was not involved in the planning of this crime. He was not one of the main three kidnappers. He was brought into this situation by his girlfriend, Leticia Gonzales, who called him and asked for help, because her four children had been kidnapped. She told him that she also would be killed, if he didn't help her. In desperation, he tried to help out. The result was that he contacted the kidnappers and was told to cooperate with them. He stated that after he was arrested, he was mistakenly identified as Manual, who made threats during demanding phone calls to hurt the victims. He stated that his main mistake was not calling the police and telling them what he knew about this situation. He stated that he really believed that the children were kidnapped. He repeated several times that he is totally responsible for his choices. He stated that everyone has choices to make, and he made poor choices at that time. He stated that there is no excuse for what he did in not contacting authorities as he should have. Although he thought he was doing the right thing at the time, he now realizes that his choices were wrong, and that he is suffering the consequences of his bad choices. He takes full responsibility for his actions in this offense. His feelings of remorse appear to be sincere and genuine. He stated that all of the individuals involved in this offense were involved in drug use. He is very aware of how his own drug use caused him to associate with undesirable, criminal individuals.

Mr. Flores' involvement in this offense appears, in this writer's opinion, to be related to his negative associates and his use of poor judgment at the time. He is not at all criminally oriented. There is no evidence of anti-social or criminal

**FLORES, JOSE**
**J-03392**
**5/13/06**
**PAGE 4**

thinking or values in this case. There are many situational aspects to this case that resulted in his involvement in this situation at the time.

## XIV.   ASSESSMENT OF DANGEROUSNESS

A.  In considering potential for dangerous behavior in the institution, Mr. Flores has remained entirely disciplinary free. This is a commendable achievement. This institution is having ongoing racial altercations, especially among the Hispanics. It is very difficult to remain uninvolved in these situations, because if a person is not involved, defending his racial group, there could be retaliation against him. The fact that he is not involved is commendable. It is evident, compared to other inmates, that potential for dangerous behavior is definitely below average.

B.  In considering potential for dangerous behavior when released to the community, I agree completely with Dr. Reed's assessment in his evaluation, dated 5/10/01. He concluded that Mr. Flores poses no more risk of violence in the community than the average citizen in the community. This conclusion is supported by the administration at this time of the Level of Service Inventory-Revised. This is an actuarial measure that assesses criminal history, substance abuse history, current achievements, and social relationships and other factors to determine current risk level on parole. He obtained a score of 1.8 cumulative frequency for prison inmates. This score means that if 100 men were released on parole, he would do better on parole than 98 of them. This is an extremely low risk level. He is not a criminally oriented individual. His level of threat to the community is probably lower than the average citizen in the community.

C.  At this point in time, there are no significant risk factors in this case.

Flores                    J-03392                    CTF-Soledad
                                                                              5/13/06

**FLORES, JOSE**
**J-03392**
**5/13/06**
**PAGE 5**

## XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with routine parole planning. Mr. Flores has an immigration hold, and he plans to return to Mexico, when he is released. He has family support in Mexico. He plans to live in Mexico with his mother on the family farm. He has three vocational skills that will enable him to secure employment in the community. He is in the process of completing his fourth vocational skill--upholstery. He has a very good attitude. He has grown, changed, matured and advanced in his self-awareness and knowledge over his years of incarceration. The prognosis for successful adjustment in the community is excellent.


M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad


B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

**D:**    **5/13/06**
**T:**    **5/14/06**

# EXHIBIT 5

MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
JULY 2001 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JULY 5, 2001

This is a mental health evaluation for the Board of Prison Terms for inmate Jose Flores, CDC# J-03392. This report is based upon a personal clinical interview of the inmate, conducted on 07/05/01, as well as a review of his Central file and unit health record. This clinical interview and a review of all pertinent documents were for the express purpose of preparing this report.

## PSYCHOSOCIAL ASSESSMENT

I.   **IDENTIFYING INFORMATION**:

Inmate Flores is a 31-year-old, single, Hispanic male whose date of birth is 01/31/70. He is a Mexican citizen. Spanish is his primary language, although he has good English-speaking conversational-level skills. He has no obvious unusual physical characteristics and he denies ever using any nicknames or aliases.

II.  **DEVELOPMENTAL HISTORY**:

Inmate Flores denies any significant developmental history. He denies any childhood history of physical or sexual abuse as either a perpetrator or a victim.

III. **EDUCATIONAL HISTORY**:

Inmate Flores states that he completed the third grade in Mexico. He subsequently received his GED while at CDC in 1999. In 1999, his measured grade point level was 9.1 TABE. He has no history of special education or academic or behavioral problems in school. He currently has no involvement or interest in educational activities.

IV.  **FAMILY HISTORY**:

Inmate Flores denies any significant familial criminal history. He also denies a family history of

FLORES        J-03392        CTF-NORTH        05/10/01        gmj

FLORES, JOSE
CDC NUMBER:  J-03392
BPT MENTAL HEALTH EVALUATION
PAGE TWO

significant drug abuse.  He states he has no history of
physical abuse with his family members.

V. **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**

Inmate Flores states that he is a heterosexual male.
He denies any history of sexual aggression or high-risk
sexual behavior.

VI. **MARITAL HISTORY:**

Inmate Flores states that he has never been married and
has no children.

VII. **MILITARY HISTORY:**

Records indicate this inmate has no military history.

VIII. **EMPLOYMENT/INCOME HISTORY:**

Inmate Flores states that his preincarceration work
history includes working about 11 years as a farm
worker in Mexico and in the US.  He subsequently worked
approximately four years as a hotel and restaurant
worker.

During his incarceration, he received his GED.  He
worked as a plumber from 1997 until 1998.  He completed
vocational welding in 1999 and became certified in
vocational welding in 2001.  He received vocational
machine shop training from 1999 until 2000, which ended
due to institutional transfer.

IX. **SUBSTANCE ABUSE HISTORY:**

Inmate Flores acknowledges a history of cocaine abuse.
He reports that he abused cocaine for about three years
and used the drug approximately two times a month or
less.  He states that he has been abstinent for
approximately eight years, since his incarceration.

He also reports that he has attended Alcoholics
Anonymous and Narcotics Anonymous since 1998 and has

FLORES, JOSE
CDC NUMBER:  J-03392
BPT MENTAL HEALTH EVALUATION
PAGE THREE

regularly attended until the current date.  This inmate does have a significant cocaine abuse history.

X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Flores does not have a significant history of psychiatric or medical hospitalizations.  He does have prior psychiatric diagnoses of Alcohol Abuse and Cocaine Abuse, in full remission in a controlled environment.  He has no history of suicidal behavior.

He has no significant history of serious accidents, including head injuries.  He does not have a history of seizure or other neurological conditions.  He does not have a history of significant impairments or illnesses. He is currently not taking any significant medications.

XI.    PLANS IF GRANTED RELEASE:

If granted parole, inmate Flores plans to be deported to Mexico.  He plans to live with his family in Mexico. His financial and vocational plans include working in his own welding shop and as a market worker.  His prognosis for community living appears to be very good.

CLINICAL ASSESSMENT

XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

During the clinical interview, inmate Flores was alert and oriented to person, place and time.  He was well dressed and groomed.  His speech was articulate and contextually meaningful, especially given that English is his secondary language.  His mood and affect were within normal limits and his behavior was appropriate to the setting.  No evidence of a mood or thought disorder was demonstrated.  His estimated level of intellectual functioning was within the average to high average range.

FLORES, JOSE
CDC NUMBER:  J-03392
BPT MENTAL HEALTH EVALUATION
PAGE FOUR


CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:      Cocaine Abuse, in sustained full remission
             in a controlled environment.
AXIS II:     No Contributory Personality Disorder.

AXIS III:    No Contributory Physical Disorder.
AXIS IV:     Incarceration.
AXIS V:      GAF = 90.

Inmate Flores' current level of insight and judgment in
general and specifically regarding his commitment
offense is very good and supports a positive prediction
of successful adaptation to community living.

In addition to attending Alcoholics Anonymous and
Narcotics Anonymous, this inmate also attended another
self-help group.  In 1999, he completed 12 months of
coursework in the Yoke Fellows program.

XIII. REVIEW OF LIFE CRIME:

Inmate Flores described the circumstances surrounding
his commitment offense, involving Kidnapping for Ransom
with a Firearm.  He acknowledged his responsibility for
the kidnapping, stating that it was a very stupid thing
to do, and that he was heavily influenced by criminally
minded persons with whom he associated.  He showed good
understanding of his lifestyle involving cocaine abuse.
He showed good empathy towards the damage done toward
the victim and he seemed genuinely remorseful.

XIV. ASSESSMENT OF DANGEROUSNESS:

A.   His violence potential within a controlled setting
     is considered to be significantly below average
     relative to this Level II inmate population.  This
     conclusion is based upon several factors.

     On the one hand, he was convicted of Cocaine
     Possession in 1989.  Also in 1989, he received a
     CDC-128 involving a property violation.


FLORES      J-03392      CTF-NORTH      05/10/01      gmj

FLORES, JOSE
CDC NUMBER:  J-03392
BPT MENTAL HEALTH EVALUATION
PAGE FIVE

On the other hand, however, this inmate has no
significant childhood history of criminal activity.
He has no history of gang involvement.  He is a
first-termer.  He has received no CDC-115
violations while at CDC.  Importantly, he has not
received a single disciplinary for violent behavior
during his eight years of incarceration within CDC.

He has gained good insight into the negative
consequences of his drug abuse lifestyle and its
relationship to the current offense.  He presents
with remorse, good empathy and good behavioral
controls.  No sociopathy was observed during the
clinical interview.  He has shown good
responsibility during his tenure within CDC and his
attainment of his GED within CDC is highly
commendable.

Therefore, in light of these factors, his violence
potential is considered to be significantly below
average relative to this Level II inmate
population.

B.  If released to the community, his violence
potential is considered to be no more than that of
the average citizen in the community.

C.  Cocaine abuse is a risk factor which may be a
precursor to violence for this individual.

XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.  This inmate is competent and responsible for his
behavior.  He has the capacity to abide by
institutional standards and has largely done so
during his incarceration.

B.  This inmate does not have a mental health disorder
which would necessitate treatment either during his
incarceration period or following upon parole.

C.  This inmate does have a significant cocaine abuse
history, and continued attendance within Narcotics

FLORES, JOSE
CDC NUMBER:   J-03392
BPT MENTAL HEALTH EVALUATION
PAGE SIX


Anonymous or a similar program is suggested, both
during his incarceration within CDC and as a
contingency for parole.


JOE REED, Ph.D.
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD


R. S. COATE, Psy.D.
Senior Supervising Clinical Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

JR/gmj

D:   07/05/01
T:   07/10/01

# EXHIBIT "6"



Stephen M. Kelly, Clerk

MAY 3 1 1995

Court of Appeal Fourth District

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

THE PEOPLE,

    Plaintiff and Respondent,

           v.

~~ANGELICA LETICIA GONZALEZ~~ Jose Luis Flores et al.,

    Defendants and Appellants.

)
)
)
)
)  D020291
)
)
)  (Super. Ct. No. CR140788)
)

APPEAL from judgments of the Superior Court of San Diego County, Frederic L. Link, Judge. Reversed as to Gonzalez; affirmed as to Flores.

Angelica Leticia Gonzalez and Jose Luis Flores appeal judgments convicting them of conspiracy to commit kidnapping for ransom (Pen. Code,[1] §§ 182, subd. (a)(1), 209, subd. (a)), kidnapping for ransom (§ 209, subd. (a)), and kidnapping (§ 207, subd. (a)). Gonzalez's convictions were each enhanced by possession of a firearm (§ 12022, subd. (a)(1)). Flores's conviction for conspiracy was enhanced by possession of a firearm

---

[1]   All statutory references are to the Penal Code unless otherwise specified.

(§ 12022, subd. (a)(1)), and his conviction for kidnapping was enhanced by personal use of a weapon (§ 12022.5, subd. (a)). Flores was also convicted of possession of a firearm by a felon (§ 12021, subd. (a)).

Gonzalez contends the court erred in giving a cautionary instruction regarding the testimony of an accomplice and in imposing an unwarranted restitution fine. Flores joins Gonzalez in further contending the court erred in failing to instruct sua sponte that the defense of duress could be supported by her fear of danger to her own kidnapped children and for the victim; instructing the jury to consult each other's notes before asking for testimony to be read back; and not finding simple kidnapping to be a necessarily included offense of kidnapping for ransom. In addition, Flores separately contends the court's error in refusing to allow him or his counsel to be present during readback of testimony to the jury requires reversal and it erred in ordering a restitution fine without a finding of ability to pay.

I

On April 13, 1993, Gonzalez went to the home of her husband's aunt, Maria Isordia, in Imperial Beach. She left the house to make a phone call and returned a short time later. Soon after she returned, three armed men came into the house and forced Maria to go with them and Gonzalez. Maria was detained in various locations before being released eight days later. The apparent motive was to recover money from Maria's son, Marco, allegedly owed to someone

95 JUN 14 PH 2:04

CSP. CORONADO
RECORDS OFFICE

2

named Manuel[2] who claimed to have been ripped-off in a drug deal
arranged after Gonzalez introduced Marco and Manuel. Gonzalez
claimed she participated only because Manuel had kidnapped her
children and threatened her and her children's lives after which
she called her boyfriend, Flores, for help.

Gonzalez, Flores and three codefendants were charged with
conspiring to commit a crime; burglary (§ 459); kidnapping for
ransom; and kidnapping while armed with a firearm. The three
codefendants pled guilty to various charges.

Gonzalez was sentenced to life with possibility of parole for
kidnapping for ransom plus one year for the firearm enhancement.
The sentences for conspiracy and kidnapping were stayed (§ 654). A
restitution fine of $1,000 was ordered (Gov. Code, § 13967).

Flores was sentenced to life with possibility of parole for
kidnapping for ransom plus four years for the firearms
enhancements. His sentences for conspiracy, kidnapping and
possession of a firearm were stayed (§ 654) and a restitution fine
of $1,000 was imposed (Gov. Code, § 13967).

II

The People concede the court erred in instructing jurors on
the need to find independent corroboration before accepting the
testimony of an accomplice as true. That is because Gonzalez was
the only person to whom the jurors could relate the court's

---

2    Manuel was not a defendant in this case and the prosecution
demonstrated some skepticism he existed, preferring to suppose he
was fictitious and that Flores committed the acts attributed to
Manuel.

advisement that an accomplice's testimony must be corroborated. Because she testified on her own behalf, she argues the jurors may have believed her testimony needed corroboration or, at least, they would have been confused.

However, the instructions given did not include the cautionary admonition found harmful in People v. Fowler (1987) 196 Cal.App.3d 79, 85-86, that testimony of an accomplice is to be viewed with distrust. Instead, the jurors were told "[a] defendant cannot be found guilty based upon the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such defendant with the commission of the offense."

While the accomplice issue was totally irrelevant, the instructions specifically stated they would apply only to increase the People's burden in proving guilt, unlike those in Fowler which implied the defendant's own testimony should be viewed with caution because he was alleged to be an accomplice. Even so, Gonzalez argues the jurors may have misunderstood the instructions and believed her defensive testimony could not be accepted without corroboration. That argument is speculative only and the purport of the instructions given is stated plainly. We are satisfied from the record this instructional error, standing alone, would be harmless by any standard. The error does not, however, stand alone.

### III

Gonzalez's separate defenses were duress and necessity. Although the court instructed on the elements of both, the court failed to inform jurors duress would be a defense if Gonzalez's

4

actions were due to her fear for her children's safety because of threats to harm her children, and for the victim in addition to only fear for her own safety. She claims violation of her rights to due process under the Fourteenth Amendment to the United States Constitution. She is joined in this contention by Flores.

> "'[T]he duty to give instructions, <u>sua sponte</u>, on particular defenses and their relevance to the charged offense arises only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case. . . .". (<u>People</u> v. <u>Wickersham</u> (1982) 32 Cal.3d 307, 326, citing <u>People</u> v. <u>Sedeno</u> (1974) 10 Cal.3d 703, 716.)

The defense of duress is based on section 26, subdivision (6).[3] Threats of harm to third parties may satisfy the requisite coercive circumstance. (<u>People</u> v. <u>Pena</u> (1983) 149 Cal.App.3d Supp. 14, 25.) The threat or menace on which the defense is premised must be immediate. A death threat to be carried out at some undefined future time will not diminish criminal culpability. (<u>People</u> v. <u>Bacigalupo</u> (1991) 1 Cal.4th 103, 125.)

The defenses of duress and necessity are not the same. Their burdens of proof are significantly different. Duress is offered to negate the element of capacity and need only raise a reasonable doubt. Necessity is an affirmative defense, requiring a defendant

---

[3]    Section 26, subdivision (6) states: "All persons are capable of committing crimes except those belonging to the following classes: . . . Persons . . . who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."

to submit proof by a preponderance of the evidence. (People v. Beach (1987) 194 Cal.App.3d 955, 973; People v. Dewberry (1992) 8 Cal.App.4th 1017, 1020; People v. Graham (1976) 57 Cal.App.3d 238, 240.)

The court gave CALJIC No. 4.40[4] regarding duress relating to threats to Gonzalez, but not relating to the threats to her children or her concern for the victim. The instruction on necessity, CALJIC No. 4.43, included threats of bodily harm to oneself or another person. The jury was instructed the defendant has the burden of proof in a necessity defense and given the elements to be proven. However, the jury was not told Gonzalez need only raise a reasonable doubt as to whether she acted under duress.

The court had a sua sponte duty to instruct on the duress defense in terms of its application to Gonzalez's fear for the safety of her children, because there was substantial evidence that she relied on that defense. (People v. Wickersham, supra, 32 Cal.3d at p. 326.) She testified she received a telephone call on March 31, 1993, from "Manuel" stating her four children living in

---

[4]     CALJIC No. 4.40 reads:  "A person is not guilty of a crime when [he][she] engages in conduct, otherwise criminal, when acting under threats and menaces under the following circumstances:

"1.  Where the threats and menaces are such that they would cause a reasonable person to fear that [his][her] life would be in immediate danger if [he][she] did not engage in the conduct charged, and

"2.  If such person then believed that [his][her] life was so endangered.

"This rule does not apply to threats, menaces, and fear of future danger to [his][her] life."

Milpitas were in danger unless she convinced her cousin Marco, in San Diego, to return the $80,000 from a drug transaction to "Manual" and his friends who had taken the children. Frightened, she flew to San Diego, but was unable to convince Marco to reimburse "Manuel." By April 2, Gonzalez was still unable to make arrangements with Marco, but "Manuel" told her he had the children and wanted her to return to Milpitas. She returned to find "Manuel" and two other men in her home, but the children missing. "Manuel" told her she needed to help them or they would rape her daughter, kill her or one of her children. She believed them. She was taken to San Diego after she agreed to cooperate. On April 13, she went to a residence accompanied by the three men. She entered only to find Marco was not there. When she gave this information to the men, they asked her to reenter the house and get Marco's mother, the victim, out of the house. She refused, but the men followed her into the house and "pulled" both herself and the victim from the house at gunpoint. During the next two days the men told Gonzalez they would kill Marco's mother unless she helped them get the money back.

There is, of course, substantial evidence tending to refute Gonzalez's story that she was so concerned for the welfare of her children or the victim that she was forced to relay ransom demands or otherwise cooperate with the males during the kidnapping. However, because ample evidence supported her theory of third party duress, the court was obligated to instruct accordingly.

An instructional error is considered harmless where the factual question posed by the omitted instruction is resolved under

another properly given instruction. (People v. Lemus (1988) 203 Cal.App.3d 470, 478.) The People contend this standard is satisfied because the jurors were instructed on the defense of necessity which is somewhat related. Because that defense places the burden of proof by a preponderance on the defendant, the People's argument fails.

On the other hand, duress is no defense unless Gonzalez reasonably believed her children were in immediate danger if she did not engage in the charged conduct, i.e. conspiracy to kidnap or kidnapping. However, we cannot say as a matter of law no reasonable person would believe these child hostages were not in danger of immediate harm from their armed captors if Gonzalez had gone to the police or failed to cooperate during the two weeks before they were returned to her on April 14, the day after the victim was forcibly removed from her home at gunpoint.

The critical question is whether this instructional error is harmless beyond a reasonable doubt. (Chapman v. California (1967) 386 U.S. 18, 24.) Clearly, once Gonzalez was reunited with her children on April 14, she had several reasonable alternatives to protect both herself and her children from harm. She roamed freely, taking her children to a motel where they played in the pool and stayed for two days. From that time on, there is no credible evidence either Gonzalez or the children were in imminent danger. Even so, her claim to have acted out of fear the victim being held by armed men was in imminent danger even after April 14, and until her actual release on April 20, was not affected by the children's return. Gonzalez therefore argues she was entitled to

8

the third-party duress instruction during the entire time period during which the conspiracy and kidnapping for ransom allegedly spanned, April 1 through April 21.

Because Gonzalez was charged with nine separate overt acts in pursuance of the conspiracy before April 14th, including the actual seizure of the kidnap victim, jurors could have convicted her based solely on conduct occurring before her children were returned. Since these all transpired at a time her children were allegedly held hostage, we cannot say beyond a reasonable doubt this instructional error is harmless.

However, although Flores seeks to benefit from the court's error, he cites no evidence he was entitled to the defense of duress. Flores did not testify, but his admissions of involvement in the efforts to collect ransom money <u>after</u> the kidnapping, contained his statement he participated only because he feared for Gonzalez's children's safety. However, he was already aware the children had been returned by that time and he had spent leisure time with them and their mother at a motel after their return.

IV

Gonzalez and Flores contend the court's instruction that jurors consult each other's notes before asking for the trial transcript or a readback was prejudicial error. The instructions relating to jurors' notes included CALJIC No. 17.48 and additional procedures requested by the court. The court instructed:

"You have been given notebooks and pencils. You will be able to take them into the jury room when you deliberate. Notes [are] only an aid to memory and should not take precedence [over] independent

9

recollection.  A juror that does not take notes should rely on his or her independent recollection and not be influenced by the fact other jurors do take notes.  Notes are for the note-taker's own personal use for refreshing his or her recollection of the evidence.

"Finally, should any discrepancy exist in a juror's recollection of the evidence and his or her notes, he or she may request that the reporter [read] back the relevant proceedings and the trial transcript must prevail over the notes.

"Now, on this point, I want you to follow the following procedure:  I am not in any way saying don't ask for trial transcript.  I am not encouraging you to ask for trial transcript, but I want you as a jury to go through the following procedure before you ask for trial transcript.

"First as to a certain point you are trying to remember or discussing, if you can't remember it, consult your memory, consult your independent recollection.  If that doesn't cause you to remember, then go to your notes.  If you still have a problem in remembering consult your fellow jurors, consult their independent recollection, consult their notes.  If you have done that and you still have a question that was said, please by all means, ask for trial transcript and [the court reporter] will come in and read it to you."

The written instructions given to the jury to use in deliberations included only an adapted copy of CALJIC No. 17.48 as read above, not the additional instructions.

California has given implicit statutory approval to note taking.  (§ 1137.)  Note taking is not free from risks and the "better practice" is to give a cautionary instruction.  (People v. Whitt (1984) 36 Cal.3d 724, 747.)  This does not mean, however, such instructions are required to be given. (People v. Marquez (1992) 1 Cal.4th 553, 578.)  Any error in the instructions will only be considered prejudicial if it is reasonably probable the

jury would have reached a verdict more favorable to the defendant absent the perceived error.  (People v. Ghent (1987) 43 Cal.3d 739, 758.)

The instructions given here substantially complied with principles endorsed by the above cases.  (People v. Whitt, supra, 36 Cal.3d at p. 748.)  The complete instructions directed the jurors in the correct use of their notes by using the approved CALJIC No. 17.48.  The additional verbal directions merely requested the jurors to be sure they could not remember a particular part of the testimony before they requested the trial transcript.  The fact the jury actually asked for trial transcript does not suggest other jurors' notes improperly influenced any juror.

V

Gonzalez and Flores contend for the purposes of this case, kidnapping as defined in Count 3 of the Information is a lesser included offense of kidnapping for ransom as pled in Count 2. Since a defendant may not be convicted of both a greater and lesser included offense (People v. Pearson (1986) 42 Cal.3d 351, 355), they argue their convictions for kidnapping must be reversed.

> "Ordinarily, when all of the elements of one offense carrying lesser penalties are expressly contained within the elements of another offense carrying greater penalties, the former is a lesser included offense of the latter."  (People v. Rush (1993) 16 Cal.App.4th 20, 23.)

The parties agree kidnapping for ransom as statutorily defined does not necessarily include simple kidnapping because kidnapping for ransom may occur without asportation.  (People v. Bigelow (1984) 37

11

Cal.3d 731, 755, fn. 14.)  Gonzalez and Flores both emphasize the
ransom pleadings here charge them in the conjunctive with both
"seizing" and "carrying away" the victim with the intent to extract
ransom and with holding and detaining her for ransom, and therefore
asportation became a necessary element of proof by the choice of
language in the pleading.

It has been held an offense is necessarily included within a
charged offense "if under the statutory definition of the charged
offense it cannot be committed without committing the lesser
offense, or if the charging allegations of the accusatory pleading
include language describing the offense in such a way that if
committed as specified the lesser offense is necessarily
committed."  (People v. Geiger (1984) 35 Cal.3d 510, 517, fn. 4.)

> "This broader standard protects the defendant's
> due process right to adequate notice before being
> convicted of a lesser offense instead of the
> charged offense; it does not apply to
> considerations of whether multiple convictions are
> proper."  (People v. Miranda (1994) 21 Cal.App.4th
> 1464, 1467.)

Initially, the analysis of whether an offense is necessarily
included "is conducted in the  abstract, without reference to the
pleadings or facts of the particular case." (In re Joseph G. (1995)
32 Cal.App.4th 1735, 1742, citing People v. Rush, supra, 16
Cal.App.4th at p. 23.)  Strict statutory construction shows
kidnapping is not a lesser included offense of kidnapping for
ransom.  However, Gonzalez and Flores argue the proper analysis
requires we look to the wording of the pleading.  (See People v.
Toro (1989) 47 Cal.3d 966, 972.)  They point to the information

which charges kidnap for ransom as follows: "did . . . seize, confine, inveigle, entice, decoy, abduct, conceal, kidnap, and carry away [the victim] . . . ." This specific pleading language is cited as limiting the ransom kidnap to one in which the victim is "carried away," necessarily including all elements of simple kidnapping.

Gonzalez's and Flores's argument rests on the erroneous premise that use of the conjunctive "and" in the pleading made their conviction of a ransom kidnap impossible without first finding an asportation. However, the jury was instructed correctly that mere confinement, detention or concealment alone were sufficient if done with the requisite intent. (CALJIC No. 9.53 (1991 rev.).) Because asportation was not an element required to convict them of the ransom charge, simple kidnapping is not a necessarily lesser offense, statutorily or as charged.

When the jury asked if the charges of kidnapping for ransom and kidnapping included the complete period from April 13th to the April 21st or only the specific act on April 13th, the court read from Parnell v. Superior Court (1981) 119 Cal.App.3d 392, 408, as applying to both charges, "[t]he forcible detention of the victim is an implied element of the crime of kidnapping and therefore as long as the detention continues the crime continues." Since the kidnapping was not a lesser included offense, it was proper for the jury to look at the entire time for both offenses. There is no error in this clarification.

13

VI

During deliberations, the jury asked the court to have portions of the victim's testimony describing events from the time she arrived at a home in Tijuana until she was released read back. This testimony is now included in pages 130 to 179 of the reporter's transcript on appeal. Flores's trial counsel advised it was his policy to be present when the jury heard testimony read back.

Outside the presence of the jury, and unreported, counsel and the court confirmed the portions of the victim's testimony to be read back to the jurors in response to their request. Just before having the reporter go into the jury room to read the trial transcript, the court acknowledged counsel's request to be present at the readback but summarily refused it. Counsel even offered to waive Flores's right to be personally present so long as he could attend. This too was denied without explanation. When the attorney expressed concern that misinformation might be presented from comments made by the court during trial which he believed alluded to facts not established by the evidence, the court assured him the reporter would read only the relevant portion of her notes plus the partial trial transcript which counsel had reviewed. The court erred.

A jury request for readback of testimony is a critical stage of the prosecution during which the right to counsel applies. (<u>People</u> v. <u>Price</u> (1991) 1 Cal.4th 324, 414.)  All communications with the jury must be in open court after notification of counsel. (<u>People</u> v. <u>Garrison</u> (1989) 47 Cal.3d 746, 783, citing <u>People</u> v.

14

Hogan (1982) 31 Cal.3d 815, 849.)  Any error in rereading testimony
in the absence of counsel must be found to be harmless beyond a
reasonable doubt.  (People v. Garrison, supra, 47 Cal.3d at p. 783,
citing Chapman v. California, supra, 386 U.S. at p. 24.)

The mere fact that Flores's counsel was present in chambers
and participated in discussing what portions of the transcript and
the reporter's notes should be read, in no way assures the
information actually imparted to the jurors was accurate or
complete.

Certainly counsel's presence would have protected against an
inaccurate readback or the court reporter's improper influence by
voice inflection or emphasis.  Moreover, it would have satisfied
concern about improper comments or gestures.  Because the reading
back of trial testimony is a critical stage of a trial, a defendant
and counsel are entitled to be present and, in the absence of a
waiver, it is error to proceed without their presence.  (See People
v. Pride (1992) 3 Cal.4th 195, 251.)  Here, there was no waiver on
behalf of either Flores or his counsel.  The error requires
reversal unless the People can establish it is harmless beyond a
reasonable doubt (Chapman v. California, supra, 386 U.S. at p. 24),
a determination we cannot make on this record.  In arguing it is
Flores's burden to establish he was denied a fair trial, the People
cite People v. Garrison, supra, 47 Cal.3d at page 782 and People v.
Bloyd (1987) 43 Cal.3d 333, 359-360.  However, in Garrison, the
defendant had expressly waived his right to be present at a
readback, and the court held the readback of favorable testimony of
a defense witness in the absence of an attorney who the court could

15

not locate, was harmless beyond a reasonable doubt.  That is, the People carried their burden imposed by <u>Chapman</u> v. <u>California</u>, <u>supra</u>, 386 U.S. at page 24.

In <u>People</u> v. <u>Bloyd</u>, <u>supra</u>, 43 Cal.3d at page 359, footnote 13, defense counsel stipulated to the testimony to be read back and agreed the court reporter could enter the jury room for the readback.  There is no suggestion defense counsel expressed any desire to be present at the readback or that he did not waive his right to be present, a waiver counsel is entitled to make.  (See <u>People</u> v. <u>Medina</u> (1990) 51 Cal.3d 870, 904, and cases cited therein.)

After some discussion, the People have conceded it is their burden to show the error in refusing defense counsel's request to be present at the readback is harmless beyond a reasonable doubt. This they attempt to do by referring to the court's admonition to counsel that the court reporter would read only the transcripts of testimony of which counsel had been made aware.

As stated in <u>People</u> v. <u>Pride</u>, <u>supra</u>, 3 Cal.4th at page 251, counsel's awareness and approval of the material to be read back prevents a presumption of misreading or misconduct from arising merely because counsel was absent.  In <u>Pride</u>, however, the court had received valid waivers of the presence of both counsel and defendant.  Thus, absent evidence of prejudice or a presumption, the defendant could not carry <u>his burden</u> to show prejudice.  Here, however, it is not enough for the People to assert Flores is not entitled to a presumption in waiver cases, because it is their affirmative obligation to show lack of prejudice beyond a

16

reasonable doubt.  In this regard, the People allege the evidence
of guilt is overwhelming, in spite of the testimony of Gonzalez
that Flores was not involved in any crime.  The People's burden,
however, is to establish no error occurred during the readback, or
if it did, that it was harmless beyond a reasonable doubt.
Here, as in People v. Odle (1988) 45 Cal.3d 386, 407, defense
counsel was present when the court reporter identified and read
back outside the presence of the jurors that portion of her notes
which the jurors requested, and counsel reviewed the material
already transcribed, and agreed it was proper.  This participation
was described as a sufficient safeguard to eliminate the ordinary
presumption of prejudice which otherwise arises from counsel's
and/or defendant's absence during readback.  (Id. at p. 407; People
v. Pride, supra, 3 Cal.4th at p. 251.)

    The portion of testimony read back concerned Flores's
involvement beginning several days after the kidnapping, a time
during which Flores admits he was engaged in making ransom demands
and had been at a Tijuana motel in the presence of the kidnapped
victim.  Flores presented no evidence to dispute the victim's
graphic portrayal of his involvement as a gun-wielding participant
during the Tijuana and later portion of her detention.  Because of
the overwhelming nature of the evidence of guilt, and the
participation of defense counsel in reviewing and approving the
material to be read back, we are satisfied beyond a reasonable
doubt, the court's obvious error in permitting the readback to
occur without the presence of counsel and Flores absent waiver, is
harmless.

## RESTITUTION FINES

Gonzalez and Flores both complain their restitution fines of $1,000 are improper. Gonzalez argues there was no determination of her ability to pay, therefore the fine must be reduced to the minimum of $200. Flores contends since there was no determination of his ability to pay and no evidence in the record to support the fine, the fine must be stricken or the matter remanded for a hearing on his ability to pay. Because there is ample evidence to support an implied finding of each defendant's ability to pay these minimal amounts, we reject both claims.

## DISPOSITION

The judgment as to Gonzalez is reversed. The judgment as to Flores is affirmed.

_____
WORK, Acting P.J.

WE CONCUR:

_____
BENKE, J.

_____
FROEHLICH, J.

95 JUN 14 PM 2:04

CSR, CENTRAL A
RECORDS OFFICE
RECEIVED

EXHIBIT 7

SAN    JO COUNTY PROBATION DEPAI    NT

ADULT SERVICES

PROBATION OFFICER'S REPORT

| THE PEOPLE OF THE STATE OF CALIFORNIA | COURT NO.<br>CR 140788 | DEPT. & JUDGE<br>SDSC 4 LINK, F | |
|---|---|---|---|
| v. | DA FILE NO.<br>26247 | ATTORNEY<br>THIELEN, R | APPT_X<br>RET____ |
| RN: FLORES, JOSE LUIS<br><br>CN:  FLORES, JOSE LUIS<br><br>AKA:  INFANTE, JOSE LUIS | HEARING DATE/TIME<br>12-16-93 8:30 A.M. | PROB CASE NO.<br>A 743811 | |
| | PROBATION OFFICER<br>B.GERLACH:prb | PO TEL. NO.<br>(619) 531-6084 | |
| ADDRESS<br>2596 Annapolis<br>East Palo Alto, California | TEL. NO.<br>None | BIRTHPLACE/CITIZENSHIP<br>Michoacan, MX<br>MX | |

| BIRTH DATE<br>1-31-70 | AGE<br>23 | RACE<br>H | SEX<br>M | HT<br>5-7 | WT<br>160 | EYES<br>BRO | HAIR<br>BRO |
|---|---|---|---|---|---|---|---|

| SOC. SEC. NO.<br>616 26 9967 | DRIVER'S LIC. NO. |__ | INS. NO. | | OTHER ID DATA |
|---|---|---|---|---|

| DATE OFFENSE COMMITTED<br>4-13-93 | DATE CONVICTED<br>11-19-93 | HOW<br>GJ | CUSTODY STATUS<br>CUSTODY |
|---|---|---|---|

| INVESTIGATING ARRESTING AGENCY<br>SDSO | DATE INFORMATION FILED<br>10-27-93 | SDSO SYSTEM NO.<br>93111 131735 |
|---|---|---|

| CII NO.<br>09270664 | FBI NO. |__ | ARREST REPORT NO. | SDSO BOOKING NO.<br>93127992B |
|---|---|---|---|

## CONVICTED OF:

Count One: PC 182(a)(1):  Conspiracy to Commit a Crime..  In support of this count there are alleged 12 Overt Acts; also attached to this count are Allegations 12022(a)(1), that the defendant was armed with a firearm, to wit: a handgun and 12022.5(a) PC that the defendant Personally Used a Firearm, to Wit: a Handgun.

Count Two:  PC 209(a), Kidnapping for Ransom plus allegations that the defendant was armed with a firearm, within the meaning of PC 12022(a)(1).

Count Three:  PC 207(a), Kidnapping, plus allegations that the defendant was armed with a firearm, to wit, a handgun, within the meaning of PC 12022(a)(1) and 12022.5(a) PC that the defendant used a firearm, to wit:  a handgun.

Count Six: PC 12021(a) Possession of a Firearm by a Convicted Felon.

The defendant previously admitted a prior felony conviction.

## RECOMMENDATION:  STATE PRISON

FLORES, JOSE LUIS                                    2                              12-16-93
CR 140788

CODEFENDANT(S):

Angelica Leticia Gonzales,  Rodolfo Dimas, Luis Gabriel Arce, Cecilio
de Castro all scheduled for probation hearing and sentencing this
date (12-16-93).

PRE PLEA BARGAIN:

None - Jury trial.

RELATED COURT DATA:

The Court Referral form states "defendant previously admitted prior
felony conviction." No Penal Code section was indicated.  The
Probation Officer is not certain that an enhancement is alleged and
the DA who was contacted was unable to clarify this issue at the
time.

THE OFFENSE:

SOURCES OF INFORMATION for this section

DA FILE; SDSO REPORTS, 93-032091, 4-16-91; PRELIMINARY HEARING
TRANSCRIPT

Since the Court is familiar with this case, as defendants Flores and
Gonzales went to trial, a synopsis of the occurrences leading to the
arrest of the defendants is being provided.

On 4-13-93, at approximately 4:50 p.m., Angelica Leticia Gonzales
went to the residence of the victim, Maria Isordia.  Ms. Gonzales
left the residence, informing the victim that she was going to a
local telephone booth to call some friends to come and pick her up.
Moments later, three armed men entered the residence.  One of the
subjects put a gun to the victim's head and forced her out of the
house. The subjects also placed a substance, which caused the victim
to feel sleepy and nauseated, over her mouth.

The victim's 88-year-old mother was also present during the
abduction.  One of the subjects poured an unknown substance into his
hand, placed it to the mouth of the victim's mother, and told her to
keep quiet.  As he was removing his hand  the two other subjects
forced the victim and Ms. Gonzales out of the front door.

Outside the residence, witnesses observed one of the male subjects
and Ms. Gonzales dragging and hitting the victim, who was screaming.

FLORES, JOSE LUIS
CR 140788
3
12-16-93

Ms. Gonzales was observed hitting the victim on the head and bashing the victim's head on the door to a vehicle parked outside. The male subject was seen attempting to pick up the victim, removing a gun from the vehicle, and pointing it at the victim, who was subsequently forced into the vehicle. One witness, observing the commotion yelled at the subjects to stop, but was ignored.

Before the vehicle was driven off, the victim was forced to lie on the back seat. At the Interstate 15 checkpoint at Temecula, Ms. Gonzales, who was driving, told officials that her mother was asleep in the back seat. The Border Patrolman allowed them to continue northbound. At one point during the trip, the victim was moved to the front passenger seat from which she tried to jump, while the vehicle was still moving, but was stopped by a male who was sitting in the back seat. She was then told not to try this anymore.

For the next eight days, the victim was moved to and from several locations in the Los Angeles area and Tijuana. During her first night of captivity, the victim awoke to find Ms. Gonzales sleeping next to her. This was the last time the victim saw Ms. Gonzales.

The victim told arresting officers that the substance which she had been forced to inhale had affected her nerves and stomach and thus, she was not able to eat any food for several days. When the kidnappers told the victim that she had to eat some food, the victim responded, "I don't want food, I want liberty." The victim was told that she was being taken to Tijuana, to sign some papers to sell a house that she owned. The victim told arresting officers that while in Tijuana, she was kept in a very dirty, run-down hotel, where one of the kidnappers had discharged a firearm through a window.

On 4-13-93, after the kidnapping, the victim's son, Marcos Isordia, reported that he received a telephone call from the kidnappers indicating they wanted $150,000 in ransom for his mother. The kidnappers told him that they had his mother in Mexico and that they wanted the money by the following day. Marcos Isordia went on to tell investigating officers that he and an ex-cousin-in-law, Leticia Gonzales, had been involved in a stolen vehicle "rip off" of a subject known as "Manuel." Mr. Isordia stated that he not only kept the money owed to Manuel, but that he went to Hawaii, spending Ms. Gonzales' portion as well.

During the next several days, Mr. Isodria received several telephone calls from alleged kidnappers "Manuel" and "Sergio" and negotiations were attempted.

On 4-13-93, at approximately 11:00 p.m., Mr. Isordia received a telephone call from an unidentified male, demanding $150,000 for the safe return of the victim. The caller stated that if Mr. Isordia

FLORES, JOSE LUIS                          4                          12-16-93
CR 140788

wanted to see his mother, he would have to provide the first $75,000 within 24 hours and the second $75,000 within 24 hours after that. Approximately ten minutes later, Cecilio de Castro, who is Ms. Gonzales' brother, telephoned Mr. Isordia indicating that the kidnapper had telephoned him saying that they had Ms. Gonzales and her four children. Mr. de Castro told Mr. Isordia that these people were not playing around and to give them the money they demanded.

During the next several days, Marcos Isordia negotiated with the kidnappers for a safe return of the victim. Mr. Isordia told the kidnappers that he could only raise $70,000 and the kidnappers agreed to that amount. On 4-15-93, Mr. Isodria advised the kidnappers that he had the $70,000 in cash and would take the deal only if he could see his mother at the time he gave the money. The kidnappers refused this request, telling Mr. Isordia, "It's your problem."

On 4-16-93, Sheriff's deputies placed an emergency tap on Mr. de Castro's home telephone. On 4-17-93, a successful tap was identified as coming from the manager's office in a Comfort Inn Hotel located in El Monte, California. Sheriff's detectives discovered that Ms. Gonzales, her four children and a male known as Jose Flores (Infante) had checked into the hotel on 4-15-93 and had checked out on 4-17-93. The hotel manager told deputies that it did not appear as if Ms. Gonzales or her children had been kidnapped.

The continuing negotiations between Manuel and Mr. Isordia became more intense with Manuel threatening to cut off the victim's ears or kill her if their demands were not met. They also threatened the lives of Mr. Isordia's two sisters.

On 4-19-93, Arturo Vasquez, husband of Ms. Gonzales, listened to a tape-recorded conversation between kidnapper Manuel and Marcos Isordia. After listening to the tape, Mr. Vasquez immediately identified the voice of Manuel as belonging to Jose Flores (Infante). It should be noted that during the preliminary examination Mr. Vasquez attempted to recant his statement, indicating that he made this statement to investigating officers as he and Ms. Gonzales were having problems.

Shortly after speaking with Sheriff's officers, Mr. Vasquez received a page from Ms. Gonzales. Mr. Vasquez returned the phone call and the conversation was recorded. During the conversation, it was learned that Ms. Gonzales was staying at a room at the Ramada Suites in El Monte, California.

Surveillance was set up on Ms. Gonzales, who was registered at the Ramada Suites Hotel. Additional residences under surveillance belonged to Mr. de Castro and Rodolfo Dimas in El Monte.

FLORES, JOSE LUIS                           5                        12-16-93
CR 140788

On 4-19-93, the negotiation with Mr. Isordia took a turn.  The
individual, Manuel, who did all the negotiating up to this point was
no longer calling.  A different individual, who said his name was
Manuel started calling Mr. Isordia.  This individual acted very angry
and demanded that Mr. Isordia meet him with the money at a Winchell's
Donut shop in El Monte at 9:30 p.m.  At 9:20 p.m., detectives
followed  Dimas, de Castro and Gonzales to an area near Winchell's.
Ms. Gonzales was dropped off at a taco shop, while Mr. Dimas and Mr.
de Castro drove around the area for about 30 minutes.  As Mr. Isordia
did not show up, Dimas and  de Castro picked up Ms. Gonzales and
returned to Mr. de Castro's residence.

After the unsuccessful meeting, Mr. Isordia received several
telephone calls stating that the kidnappers were not playing around
and that they were going to kill the victim.  These telephone calls
were made by two different individuals, both of whom were very
intimidating and threatening toward both victim and Mr. Isordia.

On 4-20-93, Manuel told Marcos Isordia to meet him at the Winchell's
donut store between 6:00 and 6:30 p.m.  The caller stated that after
the money was turned over, the victim would be released.  Mr. Isordia
agreed to meet the kidnapper.

Surveillance units followed two vehicles from Mr. de Castro's
residence to the Winchell's Donut House.  Mr. Dimas was observed
exiting one of the vehicles and then entering Winchell's.  Mr. de
Castro was observed driving and parking the same vehicle
approximately 75 yards from Winchell's.  A third subject, identified
as Luis Arce, was observed parking a motorcycle next the Winchell's
exit.

Arrest was effected on all three individuals at the same time.
Incident  to arrest, a fully-loaded SKS semi-automatic rifle was
found hidden in the back seat of the car occupied by Mr. de Castro.
A B-B gun was recovered from Mr. Arce.

The three subjects were admonished and agreed to make statements.
Mr. de Castro told arresting officers that some time ago, his sister,
Leticia Gonzales, did a "drug deal or something" with Marcos Isordia.
Mr. Isordia took off with Ms. Gonzales' half of the money.  Mr. de
Castro indicated that Mr. Flores (Infante) and three others, "came up
with this idea to get the money back."  Mr. de Castro indicated that
in addition to Mr. Flores, three  other males were involved in the
abduction.

Mr. de Castro allowed the victim to remain at his residence for
two days, although he did not want her there as he "did not want to
go to jail."  Mr. de Castro indicated that he knew the victim had

FLORES, JOSE LUIS
CR 140788

6

12-16-93

been kidnapped as somebody was with her wherever she went. While being held at his residence, the victim was kept in his cousin, Mr. Arce's bedroom.

Mr. de Castro admitted making the ransom calls to Mr. Isordia but stated he only made the calls to assist in the release of the victim as he "believed they were trying to put pressure on Marcos."

Mr. de Castro indicated that on 4-19-93, he went to see Ms. Gonzales at the Ramada Inn in El Monte. An unidentified subject involved in the initial kidnapping called de Castro and wanted him to set up a meeting with Mr. Isordia. The caller stated that Jose Flores had been arrested and was in the San Diego County Jail. Mr. de Castro subsequently arranged for two meetings with Mr. Isordia. Prior to the second meeting, Ms. Gonzales showed up at the de Castro residence with her four children. At the second meeting, Mr. Arce was to accept the money from Mr. Isordia and meet the others back at the de Castro's residence. Mr. de Castro indicated he took the loaded rifle with him "to make sure nobody gets hurt."

Mr. de Castro maintained that the victim was being held in Tijuana. He also stated he did not take part in the abduction. Mr. de Castro stated he believed he was to get between $45,000 to $70,000 from Mr. Isordia but was to receive no money for his participation.

Mr. Arce told detectives that Mr. de Castro and Ms. Gonzales asked Arce if he wanted to earn "a couple hundred" dollars for picking up a bag of money. Mr. Arce stated he was told by them to go to Winchell's Donut House in El Monte, where he would meet an unknown man and to pick up the money. Mr. Arce went to the Winchell store twice at their direction. At the first meeting, no one showed up.

At the second meeting, Ms. Gonzales told Mr. Arce that her brothers, de Castro and Dimas, would go with him to Winchell's. Mr. Arce drove to Winchell's and sat in the parking lot on his motorcycle waiting. Messrs. Dimas and de Castro arrived and Mr. Dimas went inside Winchell's to wait. Mr. Arce admitted calling Mr. Isordia telling him to quit playing games and threatened to kill the victim. Mr. Arce maintained that Ms. Gonzales had written these statements down for him on a piece of paper.

Mr. Arce indicated that it was not until one or two days prior to arrest that he realized that someone was being held. Mr. Arce denied telling Isordia that he was going to cut off the victim's ear but admitted that he said he was going to shoot her. Mr. Arce indicated that he believed Ms. Gonzales was calling the shots of the kidnapping, stating, "She's the one that offered me a couple hundred bucks to pick up the money. She's probably the boss here. She's the one responsible for everything."

FLORES, JOSE LUIS
CR 140788

7

12-16-93

After being shown a picture of the victim, Mr. Arce indicated he had seen her at the de Castro house, while she was being kidnapped. Arce indicated he did not know where the victim was at the present time.

Mr. Dimas told detectives that the first time he was aware of the kidnapping was on 4-15-93. Ms. Gonzales advised him that as Mr. Isordia would not pay her the money he stole from her, Mr. Flores and others kidnapped his mother and would hold her until the money was received. Mr. Dimas overheard telephone conversations between Ms. Gonzales and Mr. Isordia, regarding an exchange of money for the release of the victim. Ms. Gonzales asked Mr. Dimas and Mr. de Castro for their assistance in picking up the money from Isordia. As Ms. Gonzales was troubled that Mr. Isordia did not show up at the pre-arranged meeting, she asked Mr. Dimas to speak with him on the telephone and pretend to be "Manuel." Mr. Dimas subsequently had several conversations with Mr. Isordia. After Mr. Isordia again failed to show up after two meetings were planned, Mr. Dimas told him to deliver the money or his mother would be hurt. Mr. Dimas indicated that he was only doing what Ms. Gonzales asked him to do.

Mr. Dimas and Mr. de Castro agreed to help Ms. Gonzales pick up the money from Mr. Isordia at Winchell's Donut House in El Monte. Mr. de Castro took his rifle for protection. The plan was for a friend, Mr. Arce, to drive a motorcycle to pick up the money while Mr. de Castro and Mr. Dimas would follow. Dimas maintained that he was not to receive any monetary compensation for his participation.

Sheriff deputies then went to the de Castro residence and arrested Ms. Gonzales. The deputies admonished Ms. Gonzales and told her that Messrs. de Castro, Dimas and Arce had been arrested and gave an identical story regarding their involvement in Ms. Gonzales' organization and participation in the kidnap-for-ransom. Ms. Gonzales gave the following account of the instant offense: Marcos Isordia cheated her friend Manuel by placing a gun to Manuel's head and taking his drug money. As Ms. Gonzales was unable to get the money back she went to the home of Mr. Isordia's mother, the victim, and told everyone at the home that they needed to leave as Marcos was in trouble.

Ms. Gonzales then told detectives that she called her residence because she had left her four children with a babysitter. When she called, an unknown male answered the phone and told her that he had her children and that they would be killed or her daughter raped if Ms. Gonzales did not help get the money back. Ms. Gonzales indicated she attempted to negotiate with Marcos prior to the kidnapping.

Ms. Gonzales went on to state that both she and the victim were kidnapped at gunpoint and put in her vehicle, which the kidnappers

FLORES, JOSE LUIS                          8                    12-16-93
CR 140788

were driving.  From that point, Ms. Gonzales began helping the
kidnappers as she felt her life and the lives of her children were in
danger.

Ms. Gonzales stated the three kidnappers were friends of Manuel and
unknown to her.  Ms. Gonzales indicated she helped Manuel but did not
want the victim to get hurt as the victim was like a mother to her.
Ms. Gonzales indicated that she was supposed to meet the kidnappers
at the Tijuana border, where she would exchange the money for the
victim.

During the interview, Ms. Gonzales changed her story several times
regarding her involvement in the abduction.  She initially stated
that she did not leave in the vehicle with the kidnappers and victim.
She then recanted indicating that the plan was for her to go to the
victim's house and take the victim out.  As Ms. Gonzales failed to do
this, the men walked into the house and put a gun to the victim's
head.  The kidnappers then put some kind of substance in the face of
the victim and Ms. Gonzales to make them fall asleep.  When they were
getting into the car, one of the men was going to hit the victim on
the head with a gun because she was screaming, but Gonzales pushed
the man out of the way causing him to drop his gun.

Ms. Gonzales went on to state she was driving the vehicle and
speeding on the freeway in order to get the attention of police.  The
men told her that if she did not want her kids to get hurt she should
be careful.  They also told her to tell the Border Patrol that the
victim was her mother, which she did.  At one point, Ms. Gonzales
told the victim to try to get the attention of police, but one of
the men put the victim back into the car.

Ms. Gonzalez stated after the kidnapping they all went to the de
Castro residence.  After one day, Ms. Gonzales left on her own and
the kidnappers did not bother her or the children nay more.  One of
them kept her keys and left in her vehicle.

When the kidnappers could not reach Marcos Isordia, they threatened
to take Ms. Gonzales and her kids again if she would not deal with
Marcos.  It was at this time that she asked her brothers to help and
told them what to do.  Ms. Gonzales indicated that Mr. Flores became
involved as he was trying to protect Ms. Gonzales and her children.

Ms. Gonzales stated that at one point, the men told her that they
were going to shoot the victim.  Ms. Gonzales told them to go ahead,
do what they want, that she "was sick of their shit," and for them to
"just forget it."  She said they had already taken $47,000 from her
and that she had an additional $17,000 in hr purse at the time.

Ms. Gonzales continued to change her story several times. She
finally told detectives that it was Mr. Flores who had been talking
to Mr. Isordia the entire time and that the only way detectives could
find the victim was through Mr. Flores. Ms. Gonzales admitted she
did plan everything to turn the money over to the men. When
questioned a second time regarding the amount of money she had given
the kidnappers, she indicated that she gave them $37,000. When asked
why she did not notify the authorities, she indicated that she did
not want to get involved as she feared retaliation.

On 4-19-93, Jose Flores entered the United States from Mexico. The
vehicle in which he was riding was turned over to secondary
inspection. A loaded, .25-mm semi-automatic handgun with the safety
off and hammer cocked, was found under the front passenger seat where
Mr. Flores was sitting. Mr. Flores was arrested after a computer
check revealed he had a prior felony conviction and an outstanding
felony arrest warrant.

On 4-20-93, Sheriff detectives contacted Mr. Flores in County Jail.
Mr. Flores was admonished and declined statement.

On 4-21-93, in the early morning hours, three, as of yet
unidentified, kidnappers entered the room, in which the victim was
staying and told her she could leave. The kidnappers told her to
give them five minutes, enough time to leave the area and then she
could leave. They made her promise not to identify them, ever. Ms.
Isordia waited five minutes, left the hotel room and ran to a
residence where she was allowed to use the telephone. She then
telephoned her family, who picked her up and took her home to
Imperial Beach.

On 4-21-93, at approximately 4:30 a.m., Sheriff's detective received
a call from Marcos Isordia who stated that his mother was safe and in
good condition. He indicated she was very nervous and reluctant to
return home  but was convinced by her family to return.

FLORES, JOSE LUIS                          10                        12-16-93
CR 140788

**VICTIMS:**

RESTITUTION: UNKNOWN

VICTIM NOTIFIED OF P&S HEARING: YES        INTENDS TO APPEAR: UNKNOWN

SOURCES OF INFORMATION for this section

PRELIMINARY HEARING TRANSCRIPT; TELEPHONE CONTACT WITH VICTIM'S
DAUGHTER SYLVIA

---

A letter was sent to the victim, 49-year-old Maria Betran Isordia on
11-23-93. As of the date of the filing of this report, we have heard
nothing from Ms. Isordia. The Probation Officer made several
attempts to reach Sylvia Isordia, the victim's daughter, at her place
of employment. During a telephone contact with Sylvia on 11-22-93,
the Probation Officer requested that she act as an interpreter for
her mother during interview at South Bay Probation or at the victim's
own home. Sylvia stated she would have to discuss this with her
mother and would notify the Probation Officer. We were subsequently
unable to reach Sylvia again at work or at her cellular phone number
and she did not respond to her pager.

During preliminary testimony Maria Isordia said,"Lety" (Angelica
Gonzales, co-defendant) had come to visit. Angelica is the estranged
wife of Mrs. Isordia's nephew, Arturo Vasquez. As there was no phone
at the Isordia's residence, Lety went out to make a phone call. When
she returned to the Isordia home she left the security gate unlocked.

Three men armed with handguns entered the Isordia home. They forced
Angelica Gonzales and Mario Isordia out of the residence. Mrs.
Isordia's 88-year-old mother watched in terror. Mrs. Isordia stated
she had the imprint of the gun on her right temple and her head hurt
for a few days. They covered her nose and mouth with toilet paper
saturated with something that smelled strong. This made her feel
like she was dying, like she was drunk. They forced her into the
backseat of her vehicle and then she noticed that Lety was driving.
When they arrived in El Monte they took her to a bedroom where she
slept. Jose Flores, whom she identified as being one of the three
✱ armed men who entered her home, had been to the victim's home a few
days earlier, at which time Angelica Gonzales had identified him as
being her brother.

The kidnappers permitted her to talk to her son Marcos. She was told
to tell him that it would be very bad for her if they did not get the
money. She told her son, "Sell the house; rescue me."

FLORES, JOSE LUIS
CR 140788                                    11                          12-16-93

She was moved from El Monte to a house in Tijuana. She stayed there
a couple of days and was moved to a hotel where she stayed two
additional days. She was then moved to another hotel but was
confused about how long she was there.

She was nervous the entire time she was a prisoner because they would
"move the guns, take them out of the pack." One of the kidnappers
shot out the window at one of the hotels. The whole time she was a
prisoner the victim felt like "they were going to kill me any
minute."

When she last saw the kidnappers who were guarding her in Tijuana
after 8 days and 6 1/2 hours they told her she was "free but to wait
five minutes for them to get out." She was subsequently able to
identify for authorities the places she had been detained.

DEFENDANT'S STATEMENT:

SOURCES OF INFORMATION for this section

INTERVIEW WITH DEFENDANT AT SAN DIEGO COUNTY JAIL, 11-30-93

Interview of the defendant was accomplished in English and Spanish
with the assistance of a Spanish interpreter who was available
throughout the interview. The defendant did not submit a probation
questionnaire nor has he submitted a written statement regarding his
involvement in this offense.

The defendant explains his ultimate participation in this offense
indicating that he had been living in East Palo Alto, California
having moved there from southern California in 1990 in order to "get
away from bad friends." In approximately September, 1992, he met
Leticia Gonzales who was living in Milpitas, California, a nearby
community and established a boyfriend-girlfriend relationship with
her. She was at that time living with her four children and
separated from her husband. He states, "I always had a respectful
relationship with her and we did things together with her and her
children as a family." He explains that in April, 1993, Lety called
and was very distraught and said her children were kidnapped and
going to be killed unless he helped her. She was at that time
staying in El Monte. He claims he flew down here to try and help her
and was told that $90,000 had to be collected to ransom her children.
The defendant stated he had no idea why they called him as he had no
access to that kind of money and told them that he was not able to
help. He states that after two days he went back home to East Palo
Alto, where he tried to borrow money from friends and relatives. He
states that on the 13th he flew back to El Monte to hand over $2,000
that he was able to borrow from various friends. He then went back

FLORES, JOSE LUIS                           12                           12-16-93
CR 140788

home again and a day or so later received another phone call from
Lety who said she and her children and Maria Isordia had been
kidnapped.  The defendant states that he came back to San Diego where
three men picked him up and drove him to a motel and enlisted his
assistance in calling Marcos Isordia to demand money and to make
threats against the victim if the money was not delivered.  The
defendant states that he made one call to Marcos of this nature and
on one occasion spoke to his mother, the victim, "encouraging her" to
communicate the seriousness of this situation to Marcos.  He claims
that he never saw Lety or the children after that until April 15.

The defendant states the three men who were only known by nicknames
took him to various places and told him to make phone calls to the
victim or to Marcos and to stress the need for money or "something
was going to happen to the victim, the victim's family or to Lety's
children.  The defendant states that on 4-16 or 4-17, Marcos agreed
to turn over some money and that a time and place of meeting was
arranged but Marcos failed to appear.  Later the men called Lety to
complain that he did not show up.  Lety stated to the defendant that
she had managed to collect $30,000 in a paper bag and gave the money
to the defendant to deliver to the kidnappers.  The defendant states
that on 4-19, accompanied by one of the kidnappers, he took the bag
of money to a location in Tijuana where he handed it over.  The
defendant states he was always accompanied by at least one of the
three kidnappers.  The one he knew as Manuel  had accompanied him to
Tijuana and was in the car with him on the way back to Tijuana  when
they were stopped by the Border Patrol.  Manuel told the defendant
that he had a gun and that he placed the gun on the floor of the car
under the defendant's seat.  He told the defendant to admit ownership
of the gun or "bad things would happen to los ninos."

The defendant complains that after his arrest and after the
proceedings began he was mistakenly identified as "Manuel" who made
threats during demand phone calls to "cut off the ears" or "shoot"
the victim.  He denies all this.  He states, "The only reason I got
involved in any of this was to help.  I never, ever expected to get
any money.  My only mistake was not telling the police as soon as I
found out what was going on.  I really believed the children were
kidnapped.  I knew nothing about Marcos stealing money from anyone."

## CRIMINAL HISTORY:

SOURCES OF INFORMATION for this section

STATE & LOCAL RECORDS, 11-24-93

AKA:  Infante, Jose Luis Flores

FLORES, JOSE LUIS                              13
CR 140788                                                          12-16-93

| 12-30-89 | Bishop PD | 11352 H&S<br>11353 H&S<br>11550(a) H&S | 3-2-90 Inyo Sup Ct case 17244 def conv ct 1 11352 H&S, Fel 5 yr unspv prob 270 dys jl, fine |

The defendant states that he, a 17-year-old friend and a 19-year-old friend were in his car getting gas in a station.  For some reason, the police came and searched the car and found less that 1 oz of cocaine in a jacket pocket in the trunk of the car.   The defendant states he pled guilty to something.  He did not know it was Sales, because no one in Court spoke Spanish.

## PERSONAL HISTORY

The following information was offered by the defendant.  Unless noted otherwise it has not been verified.

### Significant Family Information:

The defendant was born in Michoacan, one of four children.   The majority of his family remains in Mexico.  He has two brothers who have minor criminal histories.  Six years ago he came to California where he has been residing on a temporary residency card and established a residence most recently in the San Jose - East Palo Alto area.

### Education:

Ten years in Mexico.

### Employment History:

The past five years the defendant has worked as a cook at various locations.  He last worked for the Reed Rite cafeteria full time for one year.  He was laid off in February, 1993.  Between 2/93 and 4/93 he did temporary placements.

### Source of Support:

Self

### Financial Condition:

Poor

### Number of Dependents & Ages/Relationship to Defendant:

None

FLORES, JOSE LUIS                                14                                    12-16-93
CR 140788

**Military Status**:

Not applicable

**Marital Status**:

Single

**Psychological/Medical Problems**:

None

**Physical Health**:

Good

**Substance Abuse History**:

The defendant states that for two or three months in 1989 he was a
user of cocaine. He used it a total of less than ten times. He
moved from southern California to northern California at that time in
order to get away from the friends who were "encouraging him" to use
drugs.

**COLLATERAL INFORMATION**:

SOURCES OF INFORMATION for this section

MEXICAN CONSULAR

On 11-30-93, we were contacted by Julio Tejada, telephone 531-8414,
extension 48 who represented himself to be a member of the Mexican
Consulate. He wished to speak in behalf of the defendant. It was
not clear as to whether he was speaking at someone else's request or
because of a personal acquaintance with the defendant. He submits
that since the defendant's first conviction for drug involvement in
1990, he has made every effort to maintain himself as a law abiding
and contributing member of the community. He moved to a small
community in northern California, East Palo Alto, where he began a
dedicated program of church involvement and community volunteer work.
Mr. Tejada describes the defendant as naive and thinking he needs to
help whenever he is asked. Mr. Tejada states that there are many
persons from the community and from the defendant's church who wish
to submit their comments in behalf of the defendant. Mr. Tejada was
advised to have those persons write character reference letters and
send them to the court or the defendant's attorney. Should any of
those letters reach the Probation Officer they will be attached to
the Probation report.

FLORES, JOSE LUIS
CR 140788

15

· 12-16-93

## SENTENCING DATA:

### Possible Circumstances in Mitigation:

Rule 423(a)(5):  The defendant argues that he had no apparent predisposition to this crime but was induced by his need to offer assistance to the "kidnapped children" of the co-defendant Gonzales to participate in this crime.  (Counts One, Two and Three)

Rule 423(b)(1):  The defendant has a limited prior record of criminal conduct amounting to one felony conviction.  (As to all counts.)

### Possible Circumstances in Aggravation:

Rule 421(a)(1):  The crime involved great violence, the threat of great bodily harm and other acts disclosing a high degree of cruelty, viciousness or callousness.  The victim was forcibly and violently dragged from her home at gunpoint and witnesses report seeing the victim struck on the back of the head prior to being shoved into a waiting vehicle.  (Counts One, Two and Three.)

Rule 421(a)(3):  The victim was particularly vulnerable being attacked in her own home in the presence of her 88-year-old mother and other relatives.  (Counts One, Two and Three.)

Rule 421(a)(8):  The manner in which this crime was carried out indicates planning, sophistication or professionalism.  The number of people involved in the occurrences over the eight days during which the victim was in their custody indicates that some master plan was being applied and that premeditation had occurred.  (Counts One, Two and Three.)

Rule 421(b)(1):  The defendant has engaged in violent conduct in this matter which indicates he is a serious danger to society.  He was identified by the victim as one of three armed kidnappers who dragged her from her home.  (As to all counts.)

Rule 421(b)(4):  The defendant was on probation to the Court in Inyo County for a felony conviction involving drug sales.  (As to all counts.)

### Prison Term Analysis:

### Indeterminate Term:

Count Two, PC 209(a) carries a term of life with possibility of parole.  Count Two is selected as the primary term.

The attached PC 12022(a)(1) carries an additional one year term to be served consecutively.

Count One, PC 182(a)(1) carries a term of life with possibility of parole.  Punishment for Count One is barred per PC 654 as it represents the overt act outlined in Count Two.  Punishment for Conspiracy to Commit Illegal Acts and for the Illegal acts themselves violate PC 654 if the conspiracy has no other objective than the specific acts charged.  The attached PC 12022(a)(1) and PC 12022.5(a) would therefore also be barred per PC 654.

<u>Determinate Terms:</u>

Count Three, PC 207(a), carries a sentence range of three years, five years or eight years in State Prison.  The upper term is recommended, based on the nature of the Aggravating Factors.  This count also depicts actions taken by the defendant and co-defendants in Count Two and therefore punishment is barred per PC 654.

The attached enhancements per PC 12022(a)(1) and 12022.5(a) similarly would be barred from punishment per section 654 of the Penal Code.

Count Six, PC 12021(a) carries a sentence range of 16 months, two years or three years.  The Probation Officer is recommending the middle term of two years as there appears to be no justification for deviation from the mid term.  Count Six is recommended at full, mid term, consecutive, because it is the only count under the determinate sentencing scheme.  Therefore the defendant's total prison exposure under this recommendation scheme would appear to be life with the possibility of parole plus three years.

**EVALUATION:**

<u>Probation Eligibility:</u>

Rule 413(a):  The defendant is absolutely ineligible for probation pursuant to 1203.06(a)(1)(iv).

Insofar as the defendant appears to be absolutely ineligible no further discussion of probation rules will be included.

* * *

This 23-year-old single man comes to Court for sentencing having been involved in a kidnapping where threats of injury and death were made against the victim.  The Probation Officer's contact with the defendant reveals an individual with a tendency to minimize the seriousness of the offense and to utilize denial and emphasize his

FLORES, JOSE LUIS                           17                        12-16-93
CR 140788

"lack of sophistication," to explain how a seemingly law abiding
individual came to participate over such an extended period of time
in activities that were so obviously criminal.

The Probation Officer attaches little credibility to the defendant's
insistence that he was only "helping his girlfriend" recover her
children especially in view of the identification of the defendant by
the victim as one of the three armed kidnappers.

The fact remains that the defendant and his actions terrorized the
victim over an eight day period and by her own testimony convinced
her that she was going to be killed.

The present matter is of such seriousness that to recommend less than
the penalty called for in Count Two, Life with Possibility of Parole,
would denegrate the offense.

CUSTODY DATA:

At the time of sentencing, PC 1191.3 requires the Court to make an
oral statement that statutory law permits the award of conduct and
work-time credits up to one-third or one-half of the sentence that is
imposed by the Court; that the award and calculation of credits is
determined by the Sheriff in cases involving imprisonment in county
jails; by the Department of Corrections in cases involving imprison-
ment in the state prison; and that credit for presentence incarcera-
tion served by the defendant is calculated by the Probation Depart-
ment under current state law.

| Date Confined | Date Released | Place | Custody Days |
|---|---|---|---|
| 4-21-93 | 12-16-93 (in custody) | C.J. | 240 |
| | | PC 4019 | 120 |
| | | Total CTS | 360 |

RECOMMENDATION:

As to the Determinate Counts:

That probation be denied and the defendant be committed to the
Department of Corrections for the two years with credit for time
served of 240 actual days and 120 days 4019 PC credits, a total of
360 days credit; further, that the defendant pay a restitution fine
pursuant to 13967 Government Code in the amount of $2,000  to be
paid forthwith or as provided in 2085.5 PC.

FLORES, JOSE LUIS                              18                           12-16-93
CR 140788

## As to the Indeterminate Counts:

That probation be denied and the defendant be committed to the
Department of Corrections for the term of life with the possibility
of parole plus one year for the enhancement of PC 12022(a)(1) with
zero days credit for time served.

### Term Recommendation Breakdown by Count is as Follows:

## As to Indeterminate Counts:

| Crime | Suggested Base Term | Recommended Term | Recommended Stay |
|-------|---------------------|------------------|------------------|
| Count 2 209(a) PC | Life with Parole | Life with Parole | 0 |
| Enhancement 12022(a)(1) PC | 1 year | 0 | 0 |
| Count 1 182(a)(1) PC | Life with Parole | 0 | Life with Parole Per PC 654 |
| Enhancement 12022(a)(1) PC | 1 year | 0 | 1 year Per PC 654 |
| Enhancement 12022.5(a) PC | Mid - 4 years | 0 | 4 yr Per 654 PC |

FLORES, JOSE LUIS                              19                                    12-16-93
CR 140788

As to Determinate Counts:

| | | | |
|---|---|---|---|
| Count 3<br>207(a) PC | Upper - 8 | 0 | 8 years<br>Per 654 PC |
| 12022(a)(1)PC 1 year | | 0 | 1 year<br>Per 654 PC |
| Enhancement<br>12022.5(a)PC | Mid - 4 years | 0 | 4 years<br>Per 654 PC |
| Count 6<br>12021(a) PC | Mid - 2 years | 2 | 0 |

**Total Recommended Term    Life with Parole Plus 3 years**

Respectfully submitted,

ALAN M. CROGAN
Chief Probation Officer

By:

BARBARA GERLACH
Deputy Probation Officer
531-6084

Approved_____
        MAUREEN A. GALLAHER, Supervisor

I have read and considered the foregoing report.

_____
JUDGE OF THE SUPERIOR COURT

BG:prb

PROB. 2185 (6-19-91)

OFFICE OF

**JESUS RODRIGUEZ**
ASSISTANT DISTRICT ATTORNEY

# THE DISTRICT ATTORNEY
COUNTY OF SAN DIEGO

330 West Broadway, Suite 920
San Diego, CA 92101
(619) 531-4115

**BONNIE M. DUMANIS**
DISTRICT ATTORNEY

June 2, 2006

Correctional Training Facility
5 Miles North Highway 101
Soledad CA 93960

ATTN.:        D.S. Levorse, C & PR
              (831) 678-3951 Ext. 4332/4333

RE:           FLORES, JOSE  CDCR# J-03392
Hearing Date:  June 15, 2006 at 3:30 p.m.

Dear Board of Parole Hearings:

A deputy district attorney will represent this office at the above-referenced parole suitability hearing. We ask that the Board consider the materials previously submitted.

A review of the prisoner's file shows that he remains unsuitable for parole. Flores is serving a life sentence for the kidnapping of Maria Isordia for ransom.

On April 13, 1993, co-defendant Angelica Gonzales went to the home of her estranged husband's aunt, Maria Isordia, under the pretext of visiting, but her true intention was to give the kidnappers access to the house. Ms. Gonzales left the house, informing the victim that she was going to use a pay phone to call a friend. When she came back to the house, she left the security gate open. Shortly thereafter, three armed men came into the house. One of the men put a gun to Maria's temple and covered her nose and mouth with toilet paper saturated with a strong substance. The victim's 88-year-old mother was also present during the abduction.

Outside the residence, witnesses observed the victim screaming while being dragged out of her home and struck on the back of the head. She was shoved into a waiting vehicle and was forced to lie on her back as they drove off. The apparent motive was to recover money from Maria's son, Marco, allegedly owed to Ms. Gonzales after a drug deal.

Later that day, victim's son, Marcos reported that he received a phone call from the kidnappers indicating they wanted $15,000 in ransom for his mother to be paid in two days.

During the next several days Ms. Isordia was detained in various locations in Los Angeles and Tijuana. While in Tijuana, she was kept in a very dirty, run-down hotel, not knowing if she would be released or killed. Meanwhile, Marcos negotiated with the kidnappers for the safe return of his mother, but the negotiations were getting more intense with the inmate threatening to cut off the victim's ears or kill her.

Police were successful in setting up wiretaps and placing the suspects under surveillance. They were able to locate four of the kidnappers but did not move in because they were unsure of Maria's exact location.

On April 19, 1993, the inmate was arrested while trying to cross the Mexican border with a loaded semi-automatic handgun under the seat of his car. When the men watching Maria realized the plan had failed, they told Maria she was free to leave but to give them five minutes to disappear. They have never been found.

The crime involved great violence, the threat of great bodily harm and other acts disclosing a high degree of cruelty, viciousness and callousness. The victim was forcibly and violently dragged from her home at gunpoint in the presence of her 88-year-old mother.

The manner in which this crime was carried out indicates planning, sophistication and professionalism. The number of people involved in the occurrences over the eight days during which the victim was in their custody shows premeditation and that the kidnappers were working off a master plan. the inmate engaged in violent conduct in this matter which indicates he is a serious danger to society. He was identified by the victim as one of three armed kidnappers who dragged her from her home. Further, he inmate was on probation for a felony conviction involving drug sales.

The inmate does not take any responsibility for the commitment offense. Flores has proven time and time again that he cannot be trusted. He continually lies to those in authority. He lied to police numerous times about his involvement in the kidnapping and he continued his deceit about the commitment offense to his correctional counselor. There is no guarantee he will not tell a different story at his parole hearing. Further, on July 30, 2005 he received a CDCR# 128A for violating "Count & Movement."

Although Flores has participated in A/A & NA, we are concerned that he has not yet received the appropriate self-help or therapy to obtain the necessary skills for facing, understanding, and coping with stress in a nondestructive manner. Further, Flores does not have viable parole plans for his county of commitment.

It is our position that there has not been a sufficient change of circumstances which would warrant a finding of suitability. Jose Flores remains an unreasonable risk of harm to society if released. Therefore, the People of the State of California respectfully request that he be found unsuitable for parole. Thank you for your consideration of this letter. If I may be of further assistance, please call me at (619) 531-4115.

Very truly yours,
BONNIE M. DUMANIS
District Attorney

By:

RICHARD J. SACHS
Supervising Deputy District Attorney
Lifer Hearing Unit

BV
Enclosure

<u>PROOF OF SERVICE BY MAIL</u>

CASE NAME: <u>FLORES v. CURRY</u>

CASE NO. : <u>To be assigned</u>

I, <u>Jose L. Flores</u>, hereby declare that I am a party to the above titled action and am over the age of eighteen (18), and I did serve a true copy of the following:

WRIT OF HABEAS CORPUS

by placing a true copy in an envelope with first class postage fully prepaid and said envelope surrendered to correctional staff at the Correctional Training Facility for delivery to the prison mail room and therefrom delivered to the local United States Post Office the next business day from which there is postal service between the place of mailing and the addressee:

Office of Attorney General
State of California
110 W. "A" Street, # 1100
San Diego, CA 92101

I declare under penalty of perjury that the foregoing is true and correct, doing so this <u>6</u> day of <u>December</u>, 2006, at Soledad, California.

<u>Jose luis Flores I</u>