# EXHIBIT H

COPY

RECEIVED IN CRIMINAL DOCKETING
**GLORIA**
MC-275

Name  Jose L. Flores

Address **Correctional Training Facility**

P.O. Box 689

Soledad, CA 93960

CDC or ID Number  J-03392

Court of Appeal Fourth District

**FILED**

MAR 12 2007

Stephen M. Kelly, Clerk

DEPUTY

APPELLATE COURT OF CALIFORNIA

FOURTH APPELLATE DISTRICT
*(Court)*

PETITION FOR WRIT OF HABEAS CORPUS

D050470

JOSE L. FLORES,
Petitioner

vs.

BEN CURRY, Warden (A),
Respondent

No. _____

*(To be supplied by the Clerk of the Court)*

### INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

This petition concerns:

| | |
|---|---|
| ☐ A conviction | ☐ Parole |
| ☒ A sentence | ☐ Credits |
| ☐ Jail or prison conditions | ☐ Prison discipline |

☒ Other (specify): **PAROLE UNSUITABILITY BY PAROLE BOARD**

1. Your name: **Jose L. Flores**

2. Where are you incarcerated? **Correctional Training Facility, P.O. Box 689, Soledad, CA 93960**

3. Why are you in custody? ☒ Criminal Conviction  ☐ Civil Commitment

*Answer subdivisions a. through i. to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

**Kidnap for ransom w/use of a firearm**

b. Penal or other code sections: **209(a) / 12022.5(a)**

c. Name and location of sentencing or committing court: **San Diego Superior Court**

**San Diego, California**

d. Case number: **CR 140788**

e. Date convicted or committed: **11/19/93**

f. Date sentenced: **12/16/93**

g. Length of sentence: **Life w/possibility of parole in 7 years**

h. When do you expect to be released? **To be determined**

i. Were you represented by counsel in the trial court? ☐ Yes. ☐ No. If yes, state the attorney's name and address:
**N/A**

4. What was the LAST plea you entered? *(check one)*

☐ Not guilty  ☐ Guilty  ☐ Nolo Contendere  ☐ Other: _____
**N/A**

5. If you pleaded not guilty, what kind of trial did you have?

☐ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial
**N/A**

6. GROUNDS FOR RELIEF
   **Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

   PLEASE SEE APPENDIX "A" AT PAGE 6

   a. Supporting facts:
      Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

   PLEASE SEE APPENDIX "A" AT PAGE 6 FOR ANSWER TO 6(a)

   b. Supporting cases, rules, or other authority (optional):
      *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

   PLEASE SEE APPENDIX "B" AT PAGE 15 FOR ANSWERS TO 6(b)

8  Did you appeal from the conviction, sentence, or commitment?  ☐ Yes.  ☐ No.    If yes, give the following information

   a.  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):    N/A

   _____

   b.  Result _____    c  Date of decision _____

   d.  Case number or citation of opinion, if known: _____

   e.  Issues raised:  (1) _____

                       (2) _____

                       (3) _____

   f.  Were you represented by counsel on appeal?  ☐ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:
       N/A

   _____

9  Did you seek review in the California Supreme Court?  ☐ Yes.  ☐ No.    If yes, give the following information:
   N/A

   a.  Result: _____    b.  Date of decision: _____

   c.  Case number or citation of opinion, if known: _____

   d.  Issues raised:  (1) _____

                       (2) _____

                       (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
    N/A

    _____

    _____

11. Administrative Review:

    a.  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

        ADMINISTRATIVE REVIEW IS NOT AVAILABLE FOR PAROLE BOARD DECISIONS

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    b.  Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
        N/A
        *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court? [X] Yes. If yes, continue with number 13. [ ] No. If no, skip to number 15.

13 a (1) Name of court: **Superior Court of California, County of San Diego**

    (2) Nature of proceeding (for example, "habeas corpus petition"): **Habeas Corpus**

    (3) Issues raised: (a) **SAME AS RAISED HEREIN**

        (b) _____

    (4) Result (Attach order or explain why unavailable): **Denied (see ATTACHMENT A after exhibits)**

    (5) Date of decision: **February 6, 2007**

  b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

        (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
    **No delay**

16 Are you presently represented by counsel? [ ] Yes. [XX] No. If yes, state the attorney's name and address, if known:

17 Do you have any petition, appeal, or other matter pending in any court? [ ] Yes. [XX] No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:
    **This Court has original jurisdiction**

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 3/6/07

▶ *Jose Luis Flores P.*
           (SIGNATURE OF PETITIONER)

A P P E N D I X  "A"

Answers to 6, et seq.

I N T R O D U C T I O N

COMES NOW Jose L. Flores (hereafter Petitioner) with his writ of habea corpus contending that the Board of Parole Hearings (hereafter Board) finding him unsuitable for parole at his third parole suitability hearing was not supported by the evidence.

In an order filed in the Superior Court of California, County of San Diego, on September 19, 2005, denying Petitioner's 2004 habeas corpus (EXHIBIT 1), the Court interpreted Petitioner's testimony before the Board to be that Petitioner admitted to planning the kidnap for which he was convicted in a conspiracy. As will be demonstrated, in evidence presented to the Board at Petitioner's parole suitability on June 15, 2006, clearing up the confusions in the record, he neither knew about the kidnap before it took place nor assisted in any way the planning of the kidnap. Petitioner's parole suitability should be based not on the commitment offense as a whole, but rather based on his individual culpability in the offense.

In finding Petitioner unsuitable for parole the Board relied on the commitment offense and Petitioner's insufficient parole plans, claiming they did not see them in the file; therefore, Petitioner will present only the facts relevant to the reasons the Board used to find him unsuitable for parole.

///////

///////

///////

- 5 -

Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION TO FIND HIM UNSUITABLE FOR
PAROLE WHEN HE HAS SATISIFED THE LEGISLATIVELY
PRESCRIBED PUNISHMENT FOR THE COMMITMENT OFFENSE AND
THERE IS NO EVIDENCE HE IS PRESENTLY A THREAT TO PUBLIC
SAFETY, THE DECISION BEING ARBITRARY AND AN ABUSE
OF DISCRETION

---

Answers to 6(a) - Supporting facts

At the outset the Board noted that Petitioner's life term started
on August 15, 1995 and his minimum eligible parole date (MEPD) was
August 16, 2002 (EXHIBIT 2, HT 1:8-14).[1]  Petitioner's controlling
offense was kidnap for ransom in violation of Penal Code § 209(a)[2]
with use of a firearm in violation of Penal Code § 12022.5(a).

After pro forma preliminary procedures, Petitioner's parole
suitability hearing begins in earnest (HT 10).  Petitioner presented
a declaration under penalty of perjury stating his exact involvement
in the commitment offense (HT 10:14-18; see EXHIBIT 3).  Petitioner
was then sworn to tell the truth (HT 10:19-24).

The facts of the commitment offense, which are quite lengthy,
were read into the record (HT 11:8-20:19), incorporated herein by
reference.

Petitioner was asked what was his involvement in the offense
(HT 20:22-23).  Petitioner explained because of the confusion in
the record, the previous Panel requested that he document exactly
what his involvement was, so he did so in a declaration under penalty

---

1.  Reference to parole hearing transcript (EXHIBIT 2) will be made by HT
    followed by page number, and line number where necessary, e.g., (HT 1:1).

2.  All statutes and regulations are California, unless otherwise noted.

of perjury which he relies on for the facts of his involvement in the offense (HT 20:25-21:3).

In response, Commissioner Garner stated: "we will review this during our deliberations and incorporate whatever we feel is appropriate. [] And at some point we may want to put it on the record or we may adopt it by way of exhibit and get it back in the record that way" (HT 21:12-19).

Pursuant to Penal Code § 3041(d), any statements or materials considered shall be incorporated into the transcript, see also California Code of Regulations, Title 15, § 2249 ("A prisoner shall have the right to present relevant documents to the hearing panel"). In that in a conspiracy parole consideration is to be based on the prisoner's individual acts in the offense, Petitioner presents the facts of his individual involvement in the offense from his declaration (EXHIBIT 3):

On April 11, 1993, I was residing in East Palo Alto, California when I received a phone call from my former girlfriend, Letty Gonzales, who at the time told me that something terrible had happened and she and her children were in danger and I could come to El Monte, California. I asked what happened but Ms. Gonzales would not discuss it over the phone, only insisting that I come to El Monte because she and her children were in great danger.

On April 12, 1993 I flew to El Monte. When I arrived in El Monte I called Ms. Gonzales and she instructed me to go to a local Motel 6 and rent a room. After securing a room at the Motel 6, I called Ms. Gonzales.

Ms. Gonzales came to my room at the Motel 6 accompanied by a man who was introduced to me as Manuel. Ms. Gonzales informed me that Manuel had her children and was holding them to force her to help him get $90,000 back that her cousin Marcos Isordia had ripped him off for.

Manuel then told me that Ms. Gonzales' cousin, Marcos, had ripped him off for $90,000 and he wanted his money back and if he did not get it back something would happen to somebody. When I asked Manuel what he meant, he told me that he had Ms. Gonzales' children and that I better not go to the police or he will hurt the children and rape Ms. Gonzales' daughter.

On April 13, 1993, around noon, I flew back to East Palo Alto, arriving at the San Jose airport between 3:00 and 4:00 p.m.. I went to East Palo Alto and

contacted several friends in an attempt to borrow money to pay Manuel. I raised only $1,000. I rented a room in Sunnyvale, California around 8:00 or 9:00 p.m. that night.

On April 14, 1993 I flew back to El Monte and called Ms. Gonzales upon my arrival. Ms. Gonzales instructed me to return to the Motel 6 and this time rent two rooms. I did as Ms. Gonzales instructed me and after securing the two rooms called Ms. Gonzales telling her where I was at.

Ms. Gonzales and Manuel came to the motel and I gave Manuel the $1,000 I had raised. Manuel was very upset that I had raised only $1,000. It was at that time I was told Ms. Isordia had been kidnapped.

To this point on April 14, 1993, I had only been aware that Ms. Gonzales' children were being held by Manuel and had absolutely no prior knowledge that Ms. Isordia was a victim in Manuel's attempt to get his money returned from Marcos Isordia.

On April 14, 1993, after I gave Manuel the $1,000, he told me he would release the children of Ms. Gonzales, but I would have to help him collect the money Marcos stole from him. It was then I was told of the kidnap of Mrs. Isordia and that all I would have to do is make some phone calls and collect the money from Marcos and give it to him, Manuel. I went with Manuel to where he was holding Mrs. Isordia. I made 4 or 5 phone calls and arranged to pick up some money. I was arrested on (April 19, 1993) on my way to pick up the money.

I had absolutely no prior knowledge of the kidnap of Mrs. Isordia, nor was I involved in the kidnap of Mrs. Isordia. My personal involvement was limited to being taken to where Mrs. Isordia was being held, making phone calls, and by Mrs. Isordia's own testimony, trying to comfort her and, when taking her to use a phone, telling her she can leave if she wants.

Petitioner's timeline was established by motel receipts in his possession and will be made available upon an evidentiary hearing if challenged by the respondent.

Petitioner was questioned in relation to the declaration he submitted, confirming his individual involvement in the offense (HT 34:15-37:12).

Deputy District Attorney Sachs did not dispute Petitioner's involvement in the offense, but opposed "parole based on the totality of the circumstances of the offense" (HT 38:8-11).

Relative to the commitment offense and Petitioner's <u>current</u> threat to public safety, the Board reviewed the psychiatric evaluation prepared by Dr. Macomber, one of the Board's own forensic experts,

- 8 -

dated May 13, 2006 (HT 32:11-33:11; see EXHIBIT 4).  After a two
hour interview with Petitioner and reviewing his central and medical
files (EXHIBIT 4, p. 1), Dr. Macomber gives Petitioner a GAF (Global
Assessment of Functioning) score of 90 (EXHIBIT 4, p. 3 [90 is the
highest score attainable]).  Dr. Macomber goes over the commitment
offense and Petitioner's involvement in the offense, and, in his
expert opinion states: Petitioner's "involvement in this offense
appears, in this writers opinion, to be related to his negative
associates and his use of poor judgment at the time.  He is not at
all criminally oriented.  There is no evidence of anti-social or
criminal thinking or values in this case.  There are many situational
aspects to this case in his involvement in this situation at the
time" (EXHIBIT 4, pp. 3-4).

   Most importantly, under "assessment of dangerousness" it is
Dr. Macomber's expert opinion, at EXHIBIT 4, p. 4:

> "In considering potential for dangerous behavior when released to the community,
> I agree completely with Dr. Reed's assessment in his evaluation, dated 5/10/01
> (EXHIBIT 5).  He concluded that Mr. Flores poses no more risk of violence in
> the community than the average citizen in the community.  This conclusion is
> supported by the administration at this time of the Level of Service
> Inventory-Revised.  This is an actuarial measure that assesses criminal history,
> substance abuse history, current achievements, and social relationships and other
> factors to determine current risk level on parole.  He obtained a score of 1.8
> cumulative frequency for prison inmates.  This score means that if 100 men were
> released on parole, he would do better on parole than 98 of them.  This is an
> extremely low risk level.  He is not a criminally oriented individual.  His level
> of threat to the community is probably lower than the average citizen.  ¶ "At
> this point in time, there are no significant risk factors in this case."

   The Board observed: "The psychiatrist's recommendations indicate
that you have a very good attitude.  You have grown, changed, matured
and advanced in his self-awareness and knowledge over his years of
incarceration and the prognosis for successful adjustment in the
community is excellent" (HT 33:2-8).  Commenting, "Congratulations,

- 9 -

you have done very well in your adjustment. Certainly we don't always see that, those kind of recommendations by the psychiatrists" (HT 33:8-11).

The Board acknowledged that Petitioner, "[b]ecause of the INS hold there is no likelihood of staying (in the U.S.)" (HT 23:17-18), so he "could go back to Michoacan where you have family still living" (HT 23:21-22) where, being a machinist "would look for work in welding or any kind of skilled machinist work...or some kind of supermarket" (HT 23:22-27).

Although letters of support were submitted to Petitioner's counselor prior to the hearing, they were misplaced (HT 46:7-48:6), or did not make it to Petitioner's file, like letters of support for housing in Mexico (HT 49:2-11). All Commissioner Garner could do was offer his "apologies" (HT 49:12-13).

In her letter of support, Petitioner's mother assured the Board that if he were paroled to Mexico "he can count on us for whatever he needs. We are able to provide moral, financial as well as work advice and whatever else he might need" (HT 25:10-15). Mr. Reyes writes in his letter of support that if Petitioner "were to be taken to Mexico he also has a home there and overall a job. He will always have support here or in Mexico" (HT 26:17-21).

Although Petitioner's institutional programming is not at issue, relative to parole plans, he has "a vocational certificate in plumbing"; "machine shop"; and "welding" (HT 30:23-31:11), being congratulated on his many vocations (HT 31:13-14).

In pleading for his freedom, Petitioner told the Board in his closing statement (HT 42:3-24):

- 10 -

"The reason why I think I should be found suitable is because I know I am a different person, I have changed a lot. I have matured a lot during this whole time and I am very aware of my actions and choices. And I think I would be, once I integrated into society it would be to give support to many people who have gone through drugs and alcohol as I tell them my story and the things I have gone through. I could then prevent many things, many bad things that would happen to others. And as you have seen I haven't wasted my time. I have tried to take all the tools that have been provided to me during the time that I have been incarcerated. And as you have seen my family is waiting for me. I have all the support from them. Another things also, I won't be a load, a load for the state being that I will be deported. And I also ask that you take into account all the time I have spent here. I have been doing positively."

### D E C I S I O N

The Board, in finding Petitioner "not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety" (HT 44:10-12) relied on the following:

"this offense was carried out in an especially cruel manner in that the victim was forced from her home, Maria Isoderia. She was kidnapped. She was held for ransom in a hotel in Tijuana and then transported in and around the Los Angeles County area, eventually winding up in Tijuana. The offense was carried out in a very dispassionate and calculated manner in that the victim was removed from her home, threatened, taken to Mexico and held there for ransom for a number of days. The motive for the crime, the best we could determine, the panel came up with it was some economic gain that they hoped to gain from the kidnapping" (HT 44:18-45:6).

Although, as it was in the past, it is not clear if the Board used Petitioner's single prior conviction for transporting a controlled substance as a reason to deny parole or was simply stating its existence for the record (HT 45:15-20), just as mentioning, almost in pro forma fashion, "you did hear the district attorney from San Diego indicate opposition to the granting of parole" (HT 47:47).

Petitioner was commended for his postconviction behavior as having done "very well" (HT 45:20-21); the psychological evaluation prepared by Dr. Macomber was "a good report" (HT 45:25-46:2).

The Board was concerned about Petitioner's parole plans, seemingly having little support from Mexico and a support system set up (HT 46:6-19). Petitioner pointed out that documents of that

- 11 -

very nature, AA and NA programs in the community he will parole to
in Mexico, were in his file (HT 46:20-22).  Said documents were found
and acknowledged: "For the record there is support groups specifically
in Michoacan, Nueva Italia. [] And also in the other, Apasigan in
Michoacan indicating support services in the community that you will
be, you will be paroling to" (HT 47:20-26).

Once it was accepted that Petitioner had a support network in
Mexico, the Board voiced a concern about having housing in Mexico,
stating, "support is one thing but what we need to do is have with
respect to housing and any other kind of support, financial support"
(HT 48:10-14).  To clarify, Petitioner asked if what the Board wants
is letters showing he has housing and family support in Mexico (HT
49:2-4).  Commissioner Garner answered, "Yes" (HT 49:5).  When
Petitioner stated that such letters were sent to his counselor and
should have been in his file, all Commissioner Garner could do was
offer his apologies" (HT 49:6-13 [please see HT 25:10-15, Petitioner's
mother assured the Board that if he were paroled to Mexico he would
be provided "moral, financial as well as work advice and whatever
else he might need"; HT 26:17-21, Mr. Reyes in his letter of support
writes if Petitioner "were to be taken to Mexico he also has a home
there and overall a job.  He will always have support here or in
Mexico"]).

Counsel for Petitioner asked the Board if they would have seen
the documents of support discovered during the decision during the
evidence portion of the hearing, would the decision have been
different (HT 50:5-7).  Commissioner Garner admitted "it would have
been persuasive" (HT 50:8-9).

The only recommendations the Board made was for Petitioner "to remain disciplinary-free, and we want you to continue in the self-help program" (HT 47:9-11).

The documents supporting Petitioner's parole plans to Mexico "would be incorporated into the next hearing" (HT 48:14-15).

## C O N C L U S I O N

Based on the foregoing facts, court records in this case, and the attached memorandum of law, it is respectfully requested that the Court grant an Order to Show Cause for the Board to provide evidence, other than a pro forma hearing with a predetermined outcome, why Petitioner is **presently** too dangerous to grant a fixed parole release date and why he should not therefore be granted relief and the Board fix Petitioner's term in accord with due process and his individual culpability, not based on the commitment offense as a whole and the conduct of coconspirators.

Date: 3/6/07

Respectfully submitted,

Jose L. Flores
Petitioner in pro per

- 13 -

V E R I F I C A T I O N

I, Jose L. Flores, hereby declare that I have read the foregoing facts and state that they are true and correct, and having reviewed the exhibits in support of the facts state that they are true copies of the originals. Doing so this ___6___ day of ___MARCH___, 200? at Soledad, California.

_Jose Luis Flores F_
Jose L. Flores
Petitioner in pro per


P R A Y E R   F O R   R E L I E F

I, Jose L. Flores, state that I am a prisoner of the state of California and have no other plain or speedy relief save habeas corpus. I respectfully pray that this Honorable Court therefore:

1.  Issue an Order to Show Cause why relief should not be granted;

2.  Appoint counsel to protect the rights of Petitioner;

3.  Grant discovery as necessary to further develop and proof Petitioner's claims;

4.  Grant an evidentiary hearing as necessary to resolve any conflict in the facts;

5.  Declare the rights of the Petitioner;

6.  Grant any other relief the Court deems necessary in the furtherance of justice and to preserve judicial integrity.

Date: _3/6/07_

Prayerfully requested,

_Jose Luis Flores F_
Jose L. Flores
Petitioner in pro per


— 14 —

A P P E N D I X   "B"

M E M O R A N D U M   O F   L A W

## Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION TO FIND HIM UNSUITABLE FOR
PAROLE WHEN HE HAS SATISFIED THE LEGISLATIVELY
PRESCRIBED PUNISHMENT FOR THE COMMITMENT OFFENSE AND
THERE IS NO EVIDENCE HE IS PRESENTLY A THREAT TO PUBLIC
SAFETY, THE DECISION BEING ARBITRARY AND AN ABUSE
OF DISCRETION

---

## I N T R O D U C T I O N

It would appear from the decision to find Petitioner unsuitable

for parole that the Board relied solely on the commitment offense,

and then pro forma noted Petitioner's single prior nonviolent

conviction for a drug offense and the district attorney's opposition

to parole, just as the Board noted in passing Petitioner's positive

psychological evaluation.  Indeed, the only statutory reason to deny

parole is the gravity and timing of the commitment offense.  The

Board then tried to use as a reason to support the decision

Petitioner's lack of parole plans for Mexico, but that quickly

evaporated as the evidence was presented.  Thus, Petitioner will

focus on the only clear reason which he can decipher the decision

relies upon--the commitment offense, and there being absolutely no

evidence he is "presently too dangerous to grant a fixed parole

release date."

The issue is consistent with the Due Process Clause of the United

States Constitution: Would the state's penological interest be served

by continued imprisonment who has satisfied the legislatively

prescribed punishment under the determinate sentencing law when there

the evidence clearly demonstrates he is rehabilitated and therefore no evidence he is presently a threat to public safety under the indeterminate sentencing law?

### Answers to 6(b) - Supporting cases and authorities

#### STANDARD OF EVIDENCE

It is axiomatic, Petitioner has a liberty interest in parole and therefore "an expectation that [he] will be granted parole unless the Board finds, in the exercise of its discretion, that [he] is unsuitable for parole in light if the circumstances specified by statute and by regulation" (In re Rosenkrantz (2002) 29 Cal.4th 616, 654). The Rosenkrantz Court held, in 2002, relying on Superintendent v. Hill (hereafter Hill) (1985) 472 U.S. 445, 456, "that the due process clause of the federal Constitution was satisfied as long as there was 'some basis in fact' and 'some evidence' to support the Board's findings" (Id., at 655). That is no longer the case, however.

It has been presumed that the Supreme Court in Hill meant that "some evidence" applied at the administrative level of executive review, thus the Board only needed "some evidence" to support a decision. Then, on judicial review the courts only needed to assure a decision to deny parole the Board had "some evidence." Thus the Hill decision was ambiguous in its application, leaving no way for the "some evidence" standard to apply itself. That ambiguity was cleared up in the recent Supreme Court decision of Hamdi v. Rumsfeld (2004) 542 U.S. 507, 124 S.Ct. 2633. The High Court held at 124 S.Ct., 2651: "As the Government itself has recognized, we have utilized the 'some evidence' standard in the past as a standard of

review, not as a standard of proof. .... This standard is ill suited
to the situation in which a habeas petitioner has received no prior
opportunity to rebut the Executive's factual assertions before a
neutral decisionmaker." The "some evidence" standard is to be used
as "a standard of review" not as "a standard of proof" (Id.). Indeed,
although it has been ignored, the Board's own regulations require
that parole decisions be supported by "a preponderance of the
evidence" (California Code of Regulations, Title 15 (hereafter Cal.
Code Regs., tit. 15, § 2000(b)(50)).

Moreover, a parole suitability hearing is <u>not</u> a prison
disciplinary hearing and "the conduct of the Board is not the
equivalent of conduct of individual correctional officials. In
procedural and substantive terms, this type of determination is more
analogous to the sentencing determination made by the court"
(In re Roberts (2005) 36 Cal.4th 575, 587-588). Justice requires,
therefore, if "attacking a parole denial is a challenge to the length
of sentence, i.e., the sentence itself" (Id., at 586); the Board's
own regulations require "a preponderance of the evidence" standard
of proof for the decision, and international terrorists who are enemy
combatants of this great nation are entitled to "a preponderance
of the evidence" standard at the administrative review level, are
prisoners who are eligible for parole entitled to anything less?

Whether by "a preponderance of the evidence standard" or the
"some evidence" standard, the Board's decision that Petitioner is
presently a threat to public safety is not supported by any evidence
(In re Lee (2006) <u>143</u> Cal.App.4th <u>1400</u>, 2006 DJDAR 1396 (10-19-06),
at 13963 ["The test is not whether some evidence supports the <u>reasons</u>

- 17 -

the [Board] cites for denying parole, but whether some evidence indicates a parolee's release <u>unreasonably endangers public safety</u>. (Citations.)  Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." Emphasis in original]).

A.  THE BOARD IMPROPERLY DENIED PAROLE BASED UPON CONDUCT OF PETITIONER'S COCONSPIRATORS RATHER THAN HIS INDIVIDUAL CULPABILITY.

The Board's discretion is broad, but it is not absolute (<u>In re Powell</u> (1988) 45 Cal.3d 894, 902), the Board's discretion being structured by statutes and regulations (<u>In re Rosenkrantz</u>, <u>supra</u>, 29 Cal.4th, at 654).  Factor's restricting the Board's determination in case at bench are set forth in Cal. Code Regs., tit. 15, § 2281, subd. (c) as follows (with emphasis added):

Circumstances tending to indicate unsuitability include:
(1) Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:
(A) Multiple victims were attacked, injured or killed in the same or separate incidents.
(B) The offense was carried out in a dispassionate and calculated manner, <u>such as an execution-style murder</u>.
(C) The victim was abused, defiled or mutilated during or after the offense.
(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
(E) The motive for the crime is inexplicable or very trivial in relation to the offense.
(2) Previous record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.
(4) Sadistic Sexual Offenses.  The prisoner has previously assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.
(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

At the 2006 hearing, the presiding commissioner gave the following reason finding Petitioner unsuitable for parole (HT 44:18-45:3):

"[T]his offense was carried out in an especially cruel manner in that the victim was forced from her home, Maria Isodoria. She was kidnapped. She was held for ransom in a hotel in Tijuana and then trasported in and around the Los Angeles County Area, eventually winding up in Tijuana. The offense was carried out in a very dispassionate and calculated manner in that the victim was removed from her home, threatened, taken to Mexico and held there for ransom for a number of days."

"Any participant in a conspiracy may be equally culpable as a matter of law. The parole inquiry into the offense severity is much more factual, however, and focuses on the 'actual offense behavior' of the individual prisoner" (Roberts v. Corrothers (9th Cir. 1987) 812 F.2d 1173, 1180).

Firstly, by the Board's own regulations, a crime is "carried out in a dispassionate and calculated manner" when it is of the level of "an execution-style murder," and case at bench is not a murder; and, although kidnapping, always a crime by force, demonstrates "a callous disregard for human suffering," what the Board describes is inherent to what would normally take place in a kidnap for ransom. One cannot be kidnapped without being forced from wherever the location is. The information did not charge Petitioner with any kind of bodily injury enhancement, thus there are no circumstances in and of the offense itself that constitute "a dispassionate and calculated manner, such as an execution-style murder."

Secondly, the Board denied Petitioner for the totality of the offense when evidence, before the Board, affirms that Petitioner did not participate nor have prior knowledge of the kidnapping of the victim, but got involved after the fact and can therefore be held accountable for only coming in contact with the victim after she was transported to Tijuana (see the Appellate Court opinion, EXHIBIT 6, p. 9; EXHIBIT 3). That was Petitioner's conduct. The

- 19 -

district attorney did not contest Petitioner's testimony of his
individual involvement at the hearing (HT 38:8-11).

The inquiry under 2281 is whether "the prisoner committed the
offense in an especially heinous, atrocious or cruel manner"--not
whether the crime was committed "in an especially heinous, atrocious
or cruel manner." (Emphasis added.) What the coconspirators,
Angelica Gonzalez, Rodolfo Dimas, Luis Arce and Cecilio de Castro
did was done "in an especially heinous, atrocious or cruel manner"
if it can be deemed such. The conduct of Petitioner, getting involved
after the fact, caring for Mrs. Isordia, by her own testimony trying
to comfort her and, when taking her to use the phone even telling
her she can leave (see EXHIBIT 3, ¶ 12), by no stretch of the
imagination meet that standard. There is no evidence that
Petitioner's conduct was "especially heinous, atrocious or cruel."

Contrary to the prior decision by the superior court (EXHIBIT
1, p. 2:21-3:12), interpreting half answered questions during
Petitioner's 2003 parole hearing, Petitioner absolutely did not have
prior knowledge of the kidnap nor participate in the kidnap.
Petitioner has never admitted such and will not admit to what would
be a lie. After the Board stated Petitioner's involvement was not
clear and asked that he write it out, Petitioner did exactly that,
clearly defining his individual involvement (EXHIBIT 3). Did
Petitioner make phone calls? Yes, as instructed in the beginning.
Petitioner never made a call threatening violence. Mr. Arce, however,
admitted, although denying he stated "he was going to cut off the
victim's ears," did admit stating "he was going to shoot her" (EXHIBIT
7, p. 6), which is consistent with "Manuel" calling and threatening

the same (EX. 7, p. 4), <u>after</u> Petitioner's arrest on April 19, 1993).

The fact of the matter is, no one but Petitioner and Ms. Gonzales, whose version changed many times and is therefore unreliable, know exactly what Petitioner's individual involvement was; all else is speculation based on groundless accusations from which Petitioner cannot escape, because professions of lesser involvement become admissions of greater involvement and only confessions are accepted. In this cynical atmosphere, laws of evidence and constitutional guarantees are suspended. The only defendant in this crime whose version of involvement has remained consistent without waiver from the beginning is that of Petitioner. Truth may not always be accepted, but truth always remains constant. Moreover, it was observed by Mr. Arce that it was "Ms. Gonzales who was calling the shots of the kidnapping," stating, she's "the boss here" and the "one responsible for everything" (EX. 7, p. 6).

This case, although not a murder, presents a situation not unlike <u>In re Smith</u> (2003) 109 Cal.App.4th 489. The governor had reversed the Board's finding of suitability, largely based on the commitment offense. The Court of Appeal affirmed a trial court order granting a petition for a writ of habeas corpus. The evidence showed that the petitioner had not been the coconspirator who shot the victim. The court said of the <u>petitioner's</u> conduct: "[T]here is no evidence to suggest it was committed in 'a especially heinous, atrocious, or cruel manner'" (<u>Id.</u>, at 506).

Here, too, there is no evidence that what <u>Petitioner</u> did was committed in "an especially heinous, atrocious or cruel manner." Petitioner participated after the actual kidnap, made nonthreatening

- 21 -

phone calls, attempted to comfort the victim, and told the victim she could leave when taking her to use the phone. Yet, Petitioner is the only coconspirator still in prison. The Board violated Petitioner's right to due process by considering his parole suitability on the totality of the offense based on his coconspirators behavior and not his individual behavior during the offense.

B.  **Having Satisfied The Legislatively Prescribed Punishment For The Seriousness Of The Offense And Its Threat To Public Safety, The Offense Is No Longer Reliable Evidence In Determining Current Threat To Public Safety.**

The only statutory reason to deny Petitioner parole is the "timing and gravity" of the offense (Penal Code § 3041(b)). Our Supreme Court has taken this to mean an indeterminately sentenced prisoner is to be granted parole unless the prisoner "is presently too dangerous to grant a fixed parole release date" (In re Dannenberg (2005) 34 Cal.4th 1061, 1080), the "abiding concern that the Board not schedule the release of any life-maximum prisoner who is still dangerous" (Id., at 1088).

In finding Petitioner unsuitable for parole based on the commitment offense, it appears the Board was relying on Cal. Code Regs., tit. 15, § 2402(c)(1)(D): "The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder." It is simply irrational to compare a kidnap for ransom in which there was no injury to the victim to that of an "execution-style murder." The Board uses such language without regard for the facts as though it is some kind of magic incantation. There was not even a bodily injury allegation in this case. Regardless, this is an immutable factor that will never change and is therefore not to be viewed and weighed as though the offense occurred yesterday,

but how Petitioner is today and his current threat to public safety.

While it is true when determining a prisoner's parole suitability the Board considers all relevant and reliable information, including the timing and gravity of the offense, it is just as true that the offense is not to be viewed in a vacuum as though it occurred yesterday, but is to be put into perspective relative to time, "entailing primarily what a man is and what he may become rather than simply what he has done" (Greenholtz v. Inmates of Nebraska Penal and Correctional Complex (hereafter Greenholtz) (1979) 442 U.S. 1, 10). Moreover, "the ultimate purpose of parole is...the long-range objective of rehabilitation" (Id., at 13); and, although the commitment offense is a consideration in any particular case, "[t]he behavior record of an inmate during confinement is critical in the sense that it reflects the degree to which the inmate is prepared to adjust to parole release" (Id., at 15; In re Minnis (1972) 7 Cal.3d 639, 645 [in prison conduct and potential for rehabilitation are of "paramount" importance"; see also Biggs v. Terhune (9th Cir 2003) 334 F.3d 910, 916-917; In re Scott (2005) 133 Cal.App.4th 573, 595). Thus, "[p]arole decisions are based in large measure on occurrences subsequent to the commission of the offense" (In re Rodriguez (1975) 14 Cal.4th 639, 652). As it was observed in In re Andrade (2006) 141 Cal.App.4th 807, at 823, Pollak J., dissenting, "This record, like that in numerous recent cases, strongly suggests that California parole authorities are losing sight of that fact[,]" so can it be said in case at bench.

Every crime will have unique facts. Merely reciting those facts, as a prelude to moral outrage, does not amount to "a preponderance

of the evidence" or even "some evidence." The focus of the courts
have been on murder, so there are no cases to guide the Board or
lower courts on kidnaps for robbery or ransom. But in analogy, if,
once a petitioner convicted of second degree murder "reaches that
point" in time such that he would be "eligible for parole if he had
been convicted of first degree murder" it is necessary to "consider
if his offense would still be considered especially egregious for
a first degree murder" (In re Rosenkrantz, supra, 29 Cal.4th, at
690, J. Moreno concurring, emphasis in original), then for one
convicted of kidnap for ransom once reaching the point in time he
would be eligible for parole if convicted of second degree murder
the consideration must be is the offense particularly egregious for
a second degree murder. See In re Lee, supra, 2006 DJDAR 13961,
13963-13964 for a "yardstick" as to what constitutes "particularly
heinous, atrocious or cruel." Since, however, a kidnap is far from
murder but there can be a correlation between second degree and first
degree murder, there really can be no comparison of a kidnap to
murder, unless, perhaps, torture was involved, and that certainly
is not the case here.

Petitioner is now eligible for parole if he had been convicted
of second degree murder. Thus, the Board must not merely recite
in rote fashion that the offense was exceptionally cruel, but must
rationally explain how Petitioner is presently a threat to public
safety after reaching the legislatively prescribed punishment for
second degree murder.

Penal Code § 3041(a) mandates that the Board" shall normally
set a release date...in a manner that will provide uniform terms

- 24 -

for offenses of similar gravity and magnitude in respect to their threat to the public[,]" and "[t]he board shall establish criteria for the setting of parole release dates." In implementing the legislative mandate for uniform term in accord to various offenses and their threat to the public, the Board promulgated Cal. Code Regs., tit. 15, § 2280 et seq., § 2280: "A parole release date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to threat to the public." The offense for which Petitioner was convicted, kidnap for ransom, "with respect to the threat to the public" has been fixed at 9-11-13 years (Cal. Code Regs., tit. a5, § 2282(c) (B-I) [extensive movement with victim unharmed or minor injury]). Petitioner has satisfied the punishment for the crime, and there is no evidence that he, as a person, is a <u>current</u> threat to the public.

C.  <u>Other Factors</u>

It is not clear if the Board used Petitioner's prior drug conviction, opposition of district attorney, and the motive in denying Petitioner parole. One should not have to guess as to the reasons parole was denied. Since the Board found the motive to be "economic gain" it cannot be said the motive was "inexplicable," and the district attorney did not contest Petitioner's statement of personal involvement nor introduce any new revelations that have been in the record for years. Therefore, Petitioner will not argue them here, but will preserve them in the event any of them become an issue by the Board in a response ordered by the Court.

///////

- 25 -

D.  **The Decision To Deny Parole Was Made Before The Hearing Started
    Based On False Information In Petitioner's File And Positive
    Information Overlooked.**

From all appearances, the Board's decision was made before the
hearing began, the real reason denying parole being a lack of parole
plans, which evaporated during the decision when finally found in
Petitioner's file and presented to the Board, the Commissioner
admitting that the outcome may have been different if they would
have had the information earlier (HT 50:5-9).  The Board was also
given a false impression of Petitioner prior to the hearing when
reviewing his file and there was information of Petitioner having,
among other offenses, a prior convicted of murder (HT 21:19-23:7).
Although that being the wrong rap sheet misplaced in Petitioner's
file, the damage was done.  Certainly, the Board having the impression
Petitioner not only did not have adequate parole plans, but a prior
conviction for murder, he was found unsuitable for parole before
the hearing even began.  First impressions are the most important
impressions, and it is only human nature that the commissioners were
influenced by the grossly false information in Petitioner's file
before the hearing began.

E.  **Evidence, With The Passage Of Time, Support Parole.**

Petitioner's offense was 14 years ago, and he has been
disciplinary free during that entire time, having an exemplary
postconviction record.  Petitioner participated in and completed
several self-help programs, has marketable skills and realistic parole
plans for Mexico to which he will be deported, and the forensic
experts who evaluated Petitioner found absolutely no evidence he
is <u>currently</u> a threat to public safety.  The Board presents no

- 26 -

contravening evidence other than their lay opinion, which contradicts
the evidence.

F.  The Trial Court's Decision is Unreasonable in Light of the Facts
    and Case Law.

The trial/writ court's decision (ATTACHMENT A) is in error for the
following reasons:

(1)  The court relied on the assumption that the Board's decision
was supported by "some evidence"; "some evidence" being the standard
of proof for the Board.  The united States Supreme Court made it
clear in  Hamdi v. Rumsfeld, supra, 542 U.S. 507, 124 S.Ct., at 2651,
that the "'[some evidence]' standard therefore is ill suited to the
situation in which a habeas petitioner has received no prior
proceedings before any tribunal and had no prior opportunity to rebut
the Executive's factual assertions before a neutral decisionmaker."
The Executive is not a "neutral decisionmaker" (In re Dannenberg,
supra, 34 Cal.4th, at 1105, dissenting opinion [the Executive has
"little to gain and potentially much to lose by granting parole,
and accordingly, the incentive to give only pro forma consideration
to the parole decision is strong."

Hamdi v. Rumsfeld, supra, 542 U.S. 507, 124 S.Ct. 2633, is United
States Supreme Court precedent clearing up the ambiguity in Hill
that the standard of proof at the Executive level is "a preponderance
of the evidence" and judicial review is then "some evidence," thus
it is the law of the land (Yarborough v. Alvarado (2004) 541 U.S.
652, 664 [AEDPA does not require that state and federal courts to
wait for nearly identical factual case before a legal rule must be
applied]), nullifying In re Rosenkrantz, supra, 29 Cal.4th 616, on
the holding of "some evidence" as a standard of proof.

28  (2) Yes, Petitioner was involved in the kidnap, but absolutely did not have foreknowledge of nor did he help plan the kidnap, but was an accessory after the fact, coming into the kidnap after it took place. The trail judge made a finding of fact that Leticia Gonzalez was the mastermind (EXHIBIT 8, p. 900:10-13). Ironically, one of the reasons Petitioner's 2004 writ was denied was because there was some confusion in Petitioner's actual involvement and he was instructed to clear that up, then when he does, the trial writ court says it is not good enough.

(3) The trial/writ court finds that Petitioner's prior convictions substantiated the Board's decision, yet the Board's regulations mandate that a prisoner must have a "previous record of violence" (Cal. Code Regs., tit. 15, § 2481(c)(2)), not two prior nonviolent drug related convictions.

(4) Contrary to the trial/writ court's statement that the victim was "88 years old at the time of the kidnap" the victim was in reality 50 years old (EXHIBIT 8, p. 887:18-20).

(5) The Board found the offense to be carried out in a dispassionate and calculated manner, such as an execution-style murder" (Cal. Code Regs., tit. 15, § 2402(c)(1)(D)). Was the crime callous? Yes. But is certainly was not an execution-style murder. This finding by the Board is dishonest and shows that the Board arbitrarily uses any excuse it can to deny parole rather than making an honest and fair assessment of the facts. Moreover, clearly demonstrates how unconstitutionally vague the regulations are.

(6) Although it is true the Board told Petitioner to tighten up his parole plans, it is just as true that, as the Board

acknowledged, Petitioner has acquired several vocational trades while imprisoned and all the law requires is "or has developed marketable skills that can be put to use upon parole" (Cal. Code Regs., tit. 15, § 2281(d)(8); In re Andrade (2006) 141 Cal.App.4th 807, 816 [having marketable skills are "realistic plans for release"]).

(7) The trial/writ court relies on the Board stating that Petitioner is "certainly at the cusp" and deferred him one year. One year deferrals are a joke and are used only for scheduling convenience, as an evidentiary hearing would clearly prove, some men and women have received over a dozen one year deferrals in a row. And, after being found suitable for parole and reversed by the governor, given a three year deferral at the next hearing. The only words that have meaning are: "Parole granted." Even then, parole is tenable and not certain.

(8) The trial/writ court failed to address the focus of Petitioner's writ, his "individual" offense behavior in the offense, and the immutable factors of the offense against the legislatively prescribed punishment for the facts and circumstances of the offense, relying on In re Dannenberg, supra, 34 Cal.4th 1084. Firstly, it would appear our Supreme Court is backing away from Dannenberg in that it denied review and depublication in the precedent setting case of In re Lee (2006) 143 Cal.App.4th 1400, 49 Cal.Rptr.3d 931, 936-941 (petitioner for review and depublication denied 2/7/07, Case no. S149411) [Board must demonstrate Petitioner is a current risk to public safety and that risk must be made between a rational connection to the commitment offense and time elapsed since the offense.] Which brings us to, secondly, the legislatively prescribed

- 29 -

punishment of different minimums for life sentences, Petitioner's being seven (7) years, and the legislatively prescribed matrix for kidnap for ransom for similar facts and circumstances (Cal. Code Regs., tit. 15, § 2282(c)), have to mean something. The facts and circumstances of the instant offense are not outside the usual range of circumstances contemplated in the legislatively prescribed punishment in the matrix. If a prisoner exhibits violent behavior postconviction, or in Petitioner's case having two prior drug related convictions have a history of disciplinary write ups for drugs, then exclusive from the offense there would be evidence that the prisoner is currently a threat to public safety. But in case at bench, where postconviction behavior is exemplary, then punishment for the offense is satisfied when time served is that prescribed in the matrix.

The trial/writ court did not have the advantage of the <u>Lee</u> case being precedence at the time of its decision. There are many reasons this Court should issue an Order to Show Cause and grant the writ.

C O N C L U S I O N

The Board's decision was not only fixated on immutable factors and presented no contravening evidence to the psychological forensic expert's finding that Petitioner is no more a threat to public safety than the average citizen in the community, the Board making no rational connections between its findings and Petitioner's <u>present</u> threat to public safety, but the trial/writ court did little more than rubber stamp the Board's decision, abusing its discretion.

WHEREFORE, it is respectfully requested that this Appellate Court issue an Order to Show Cause why the writ should not be granted and the Board ordered to fix Petitioner's term in accord with his

- 30 -

personal culpability in the offense.  It is further requested that counsel be appointed.

Date: ___3/6/07___

Respectfully submitted,

*Jose Luis Flores J*

Jose L. Flores
Petitioner in pro per